**[ORAL ARGUMENT REQUESTED]**

**No. 25-6189**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

---

MARK E. SCHELL,

*Plaintiff-Appellant,*

*v.*

THE CHIEF JUSTICE AND JUSTICES OF THE OKLAHOMA SUPREME COURT; THE MEMBERS OF THE OKLAHOMA BAR ASSOCIATION'S BOARD OF GOVERNORS; JANET JOHNSON, Executive Director, Oklahoma Bar Association, all in their official capacities,

*Defendants-Appellees.*

---

On Appeal From The United States District Court
For The Western District Of Oklahoma

No. 5:19-CV-00281-HE (MDL No. 2695)
(The Honorable Joe Heaton)

---

# OPENING BRIEF OF PLAINTIFF-APPELLANT


Timothy Sandefur
Scott Day Freeman
Adam C. Shelton
Scharf-Norton Center for
Constitutional Litigation at the
GOLDWATER INSTITUTE
500 E. Coronado Rd.
Phoenix, AZ 85004
(602) 462-5000
litigation@goldwaterinstitute.org

Anthony J. Dick
John C. Brinkerhoff Jr.
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001-2113
(202) 879-3939
jbrinkerhoff@jonesday.com

*Counsel for Plaintiff-Appellant Mark E. Schell*

## TABLE OF CONTENTS


**Page**

TABLE OF AUTHORIITES ........................................................................ iii

PRIOR OR RELATED APPEALS................................................................ viii

GLOSSARY ...........................................................................................ix

JURISDICTIONAL STATEMENT ...............................................................x

INTRODUCTION ........................................................................................1

ISSUES PRESENTED...................................................................................3

STATEMENT OF THE CASE........................................................................4

A. Legal Background. ..............................................................................4

B. Factual Background. ............................................................................7

C. Procedural Background.......................................................................10

SUMMARY OF ARGUMENT .....................................................................12

STANDARD OF REVIEW ..........................................................................16

ARGUMENT ..............................................................................................17

I. Compelling Schell To Be A Member Of The Association Burdens His Right To Freedom Of Association. ..............................18

II. The Association Cannot Justify Its Burden On Schell's Right To Free Association.........................................................................20

A. Germaneness Alone Determines Whether An Integrated Bar's Expressive Activity Violates Associational Rights. ......22

1. There is no *de minimis* exception to non-germaneness. ...........................................................22

2. There is no exception for non-ideological or apolitical speech.......................................................25

3. There is no misattribution requirement. ........................28

B. Germaneness Requires At Least An Inherent Connection To The Practice Of Law........................................................35

C. The Association Violated Schell's Right To Free Association By Forcing Him To Associate With Its Non-Germane Speech. ..............................................................43

CONCLUSION ..... 52
STATEMENT REGARDING ORAL ARGUMENT ..... 53
CERTIFICATE OF COMPLIANCE ..... 54
CERTIFICATE OF SERVICE ..... 55
ADDENDUM: District Court Opinion, ECF 191 (Oct. 21, 2025) ..... Add.1
ADDENDUM: District Court Judgment, ECF 192 (Oct. 21, 2025) ..... Add.21

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abood v. Detroit Bd. of Educ.*,
431 U.S. 209 (1977) ........................................................ 5, 6, 7, 17, 25, 38, 40

*Ark. Educ. Tele. Comm'n v. Forbes*,
523 U.S. 666 (1998) ........................................................................ 52

*Am. for Prosperity F. v. Bonta*,
594 U.S. 595 (2021) ........................................................... 20, 21, 36

*Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apts., LLC*,
843 F.3d 1225 (10th Cir. 2016) ........................................................ 40

*Banner Bank v. First Am. Title Ins. Co.*,
916 F.3d 1323 (10th Cir. 2019) ................................................. 16, 17

*Boudreaux v. La. State Bar Ass'n* (*Boudreaux I*),
3 F.4th 748 (5th Cir. 2021) ............................................................. 42

*Boudreaux v. La. State Bar Ass'n* (*Boudreaux II*),
86 F.4th 620 (5th Cir. 2023) ........................................ 23, 24, 26, 28, 36, 38, 39, 43, 44, 49, 51, 52

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ................................................. 18, 19, 29–32, 46

*Cal. Dem. Party v. Jones*,
530 U.S. 567 (2000) ........................................................... 17, 19, 32

*Chi. Tchrs. Union v. Hudson*,
475 U.S. 292 (1986) ........................................................................ 21

*Christian Legal Soc'y Ch. of the Univ. of Cal. v. Martinez*,
561 U.S. 661 (2010) .......... 17

*Circle Schs. v. Pappert*,
381 F.3d 172 (3d Cir. 2004) .......... 32

*City of Dall. v. Stanglin*,
490 U.S. 19 (1989) .......... 19, 29

*Cornelio v. Connecticut*,
32 F.4th 160 (2d Cir. 2022) .......... 22

*Crowe v. Ore. State Bar* (*Crowe I*),
989 F.3d 714 (9th Cir. 2021) .......... 42

*Crowe v. Ore. State Bar* (*Crowe II*),
112 F.4th 1218 (9th Cir. 2024) .......... 26, 28, 29, 31–35, 44

*Dem. Party of U.S. v. Wis. ex rel. La Follette*,
450 U.S. 107 (1981) .......... 31

*Dubin v. United States*,
599 U.S. 110 (2023) .......... 39

*Ellis v. Bhd. of Ry., Airline & S.S. Clerks*,
466 U.S. 435 (1984) .......... 18

*File v. Martin*,
33 F.4th 385 (7th Cir. 2022) .......... 42

*Harris v. Quinn*,
573 U.S. 616 (2014) .......... 26, 41, 43

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*,
585 U.S. 878 (2018) .......... 7, 11, 16–18, 26, 30, 38, 41,42

*Jarchow v. State Bar of Wis.*,
590 U.S. 974 (2020) .......... 42

*Jefferson Cnty. v. Acker*,
210 F.3d 1317 (11th Cir. 2000) .......................................................................42

*Keller v. State Bar of Cal.*,
496 U.S. 1 (1990)............................................................. 3, 6, 7, 10, 11, 13–15,
21, 23, 25, 26, 35, 36, 38, 39, 41–44, 49

*Knox v. Serv. Emps. Int'l Union*,
567 U.S. 298 (2012).......................................................................27, 40, 41, 43

*Lathrop v. Donohue*,
367 U.S. 820 (1961)................................................ 5, 6, 7, 13, 21, 24, 25, 42, 43

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001)..............................................................................13, 22, 23

*Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*,
584 U.S. 617 (2018)..........................................................................................27

*McDonald v. Longley*,
4 F.4th 229 (5th Cir. 2021) ........................................ 4, 15, 19, 30, 33, 38, 39, 42

*Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974)..........................................................................................20

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)................................................ 14, 15, 20, 24, 25, 32, 33, 52

*NAACP v. Button*,
371 U.S. 415 (1963)..........................................................................................38

*PruneYard Shopping Ctr. v. Robins*,
447 U.S. 74 (1980)............................................................................................32

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)....................................................................................17, 20

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
490 U.S. 477 (1989)....................................................................................41, 42

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)....23

*Romero v. Colegio de Abogados de P.R.*,
204 F.3d 291 (1st Cir. 2000)....19, 21, 27, 28, 30, 36, 40, 43

*Rumsfeld v. F. for Acad. & Inst. Rts., Inc. (FAIR)*,
547 U.S. 47 (2006)....19, 32

*Santucci v. Commandant*,
66 F.4th 844 (10th Cir. 2023)....40, 41

*Schell v. Chief Justice & Justices of Okla. Sup. Ct.*,
11 F.4th 1178 (10th Cir. 2021)....1, 11, 13, 15, 18, 21, 26, 36, 40, 42, 44, 45

*Schneider v. Colegio de Abogados de P.R.*,
917 F.2d 620 (1st Cir. 1990)....26, 36, 37, 38, 40, 49

*United States v. United Foods, Inc.*,
533 U.S. 405 (2001)....18, 27, 28, 41

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)....17

*Wyo. Gun Owners v. Gray*,
83 F.4th 1224 (10th Cir. 2023)....13, 22, 23, 36, 37

**OTHER AUTHORITIES**

Scott T. Allison & David M. Messick, *The Group Attribution Error*,
21 J. OF EXP. SOC. PSYCH. 563 (1985)....34

Ralph H. Brock, *An Aliquot Portion of Their Dues*,
1 TEX. TECH. J. ADMIN. L. 23 (2000)....4

Oliver Corneille et al., *Threat and the Group Attribution Error*,
27 PERS. & SOC. PSYCH. BULL. 437 (2001)....34

Fed. R. Civ. P. 56 .......... 17

Brian A. Garner et al., THE LAW OF JUDICIAL PRECEDENT (2016) .......... 41

Okla. Bar Ass'n Bylaws, art. VII, §§ 3, 5–9 .......... 8

Okla. Bar Ass'n Bylaws, art. VIII, § 4 .......... 8

Okla. St. Bar Rules, art. 2, § 7 .......... 7

Okla. St. Bar Rules, art. 8, § 1 .......... 7

Okla. St. Bar Rules, art. 8, § 2 .......... 7

*The Integrated Bar Association*,
30 FORDHAM L. REV. 477 (1962) .......... 4

## PRIOR OR RELATED APPEALS

This Court has considered a prior appeal in this matter: *Schell v. Chief Justice and Justices of the Oklahoma Supreme Court*, No. 20-6044. The decision of this Court in that appeal, as amended on rehearing, is reported at 11 F.4th 1178 (2021).

# GLOSSARY

OBA – Oklahoma Bar Association

## JURISDICTIONAL STATEMENT

On October 21, 2025, the district court issued an order granting Defendants' motion for summary judgment and denying Schell's cross-motion for summary judgment. App. 193. The court entered judgment in favor of Defendants on the same day. App. 194. Schell timely filed his notice of appeal on November 18, 2025. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

## INTRODUCTION

The First Amendment almost categorically prohibits States from requiring individuals to join expressive associations. The rationale is intuitive: The right to free association includes a corollary right to *not* associate, and forcing membership in expressive groups likewise forces association with the expressions of that group.

Mandatory state bar associations are a rare exception, and the First Amendment cabins their operations accordingly. While courts have held that States can force attorneys to join bar associations as a condition of practicing law, they can do so only within narrow confines. They cannot engage in speech that is not "germane" to the limited functions that justify compelled membership: regulating the legal profession and improving the quality of the legal service available to the people of the State. Recognizing the First Amendment implications of forced association, courts have narrowly construed this requirement to require bar association speech to be inherently linked to the practice of law.

The Oklahoma State Bar Association, however, flouts these restrictions. Previously, this Court reversed the dismissal of Plaintiff Mark Schell's complaint against the Association, holding that it stated a claim for First Amendment violations and directing the parties to conduct discovery into the Association's publication, the *Oklahoma Bar Journal*. *See Schell v. Chief Justice & Justices of Okla. Sup. Ct.*, 11 F.4th 1178, 1178 (10th Cir. 2021).

The full record confirms that the Association has repeatedly exercised its editorial discretion over its publication to platform political, partisan, and most importantly, non-germane advocacy. This appeal focuses that issue on a series of articles the Association published. One decries incarceration rates and calls to "unwind" Oklahoma's laws regarding prison litigation reform. Another accuses modern election-integrity laws of being disingenuous covers for racial discrimination akin to odious laws in place over a century ago. Another critiques "Oklahoma's embrace of the white racial identity" and calls to "reengineer" parts of society to eliminate "disparate impacts." Another assails Oklahoma's educational practices, which it accuses of "revel[ing] in its colorful past" while remaining "invested in keeping the bloody stains of its history hidden." And a final one dispenses quasi-spiritual wellness advice about developing a "resilient mindset."

Regardless whether these articles may raise important issues worthy of public debate, they are not germane to the practice of law, particularly as courts have defined it. All but one are rank advocacy to change substantive law, all in the same partisan direction. And the final one has nothing to do with law at all. Platforming this partisan advocacy creates precisely the kind of forced expressive association that the First Amendment does not allow. And the district court erred when it concluded otherwise by embracing limitless theories of "germaneness" and adding additional limits to the First Amendment. This Court should reverse its decision.

## ISSUES PRESENTED

1. Did the district court err when it recognized exceptions for *de minimis* harms, non-ideological/apolitical speech, and non-misattribution to associational harms under *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990)?

2. Did the district court err when it concluded that forcing Schell to associate with the political and irrelevant publications in the *Oklahoma Bar Journal* did not violate the First Amendment because those publications were germane?

## STATEMENT OF THE CASE

### A. Legal Background.

This appeal concerns an "integrated" bar association, "an official state organization requiring membership and financial support of all attorneys admitted to practice in that jurisdiction." *The Integrated Bar Association*, 30 FORDHAM L. REV. 477, 477 (1962). These associations are distinct from "voluntary" bar associations in that they enjoy both "official organization by authority of the state and compulsory membership." *Id.* They are "integrated" because they both regulate the legal profession and engage in other activities such as lobbying, promoting pro bono work, organizing continuing legal education programs, holding public forums, publishing reports, and promoting diversity initiatives. To date, 31 states have integrated bars, while the remainder have either a hybrid system or voluntary bars. *See McDonald v. Longley*, 4 F.4th 229, 237 (5th Cir. 2021); Ralph H. Brock, *An Aliquot Portion of Their Dues*, 1 TEX. TECH. J. ADMIN. L. 23, 24 (2000).

Due to their state-sanctioned imprimatur and compelled membership, integrated bar associations have long been the subject of First Amendment controversy. Because integrated bar associations express positions on a range of issues, members have objected that forced membership violates their freedom of association and that compelling them to pay dues to these bars constitutes improper compelled speech.

In *Lathrop v. Donohue*, the Supreme Court considered the compelled-speech argument, producing a fractured decision spread across five opinions. 367 U.S. 820 (1961). Between three opinions, seven justices agreed in principle that compelling payments to a bar association in itself did not violate the First Amendment. *See id.* at 843 (plurality op.); *id.* at 849 (Harlan, J., concurring in the judgment); *id.* at 865 (Whittaker, J., concurring in the judgment). But there was no unanimity about anything more. The plurality qualified that it was "confronted … only with a question of compelled financial support of group activities, not with involuntary membership in any other aspect." *Id.* at 828. And after resolving the general acceptability of the practice, the plurality declined to resolve whether the compelled dues to the Wisconsin Bar specifically violated the First Amendment in light of the positions that the bar took on political issues. *See id.* at 844–48.

The Supreme Court addressed a closely related claim in the context of state-compelled dues to labor unions several years later, in *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977). There, the Court recognized the overlap with *Lathrop* but relegated that decision to a footnote, reasoning that the "only proposition about which a majority of the Court in *Lathrop* agreed was that the constitutional issues should be reached" and that the "disparate views" of the Court deprived it of any "clear holding to guide" the Court. *Id.* at 233 n.29.

Drawing instead from other decisions, the *Abood* Court agreed that the employees who did not want to pay dues to a union "may constitutionally prevent the Union's spending a part of their required [dues] to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative." *Id.* at 234. It reasoned that the First Amendment "prohibit[s] [the State] from requiring [a person] to contribute to the support of an ideological cause he may oppose as a condition of holding a job as a public school teacher." *Id.* at 235. But *Abood* added a consequential qualifier: a union could spend dues on matters "germane to its duties as a collective-bargaining representative." *Id.*

*Abood* grounded the Supreme Court's subsequent articulation of when mandatory bar dues violate the First Amendment in *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990). Recognizing the "substantial analogy" between mandatory unions and integrated bars, the Court repurposed *Abood*'s holding for integrated bars. *Id.* at 12. It thus instructed courts to focus on the fact that an integrated bar is "created, not to participate in the general government of the State, but to provide specialized professional advice to those with the ultimate responsibility of governing the legal profession." *Id.* at 13. The "guiding standard," the Court held, "must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of the legal service available to the people of the State.'" *Id.* at 14 (quoting *Lathrop*, 367 U.S. at 843). As in

*Lathrop*, the Court again qualified that it did not address when compelled membership in a bar association, as opposed to paying bar dues, would violate the First Amendment's Freedom of Association. *Id.* at 17.

Finally, the Supreme Court overruled *Abood* in *Janus v. American Federation of State, County, and Municipal Employees*, reasoning that it was "inconsistent with other First Amendment cases and has been undermined by more recent decisions." 585 U.S. 878, 886 (2018). The Court thus held that "States and public-sector unions may no longer extract agency fees from nonconsenting employees." *Id.* at 929.

**B. Factual Background.**

The Oklahoma Bar Association is integrated. Its rules, which are part of Oklahoma law, mandate that "[n]o person … shall practice law in the State of Oklahoma who is not an active member of the Association." Okla. St. Bar Rules, art. 2, § 7.[1] The Association likewise mandates that all licensed attorneys in the State pay annual dues, on penalty of suspension and additional fines for nonpayment. *See id.* art. 8, §§ 1–2. Pursuant to these requirements, Schell has maintained membership in and paid annual dues to the Association for years. He would not have done so had it not been required as a condition of his ability to practice law in Oklahoma.

[1] The Oklahoma Bar Association's Rules are included as Appendix 1 to Title 5, Chapter 1 of Oklahoma Statutes. For clarity, they are referenced only as "Oklahoma Bar Rules."

The Association's bylaws empower it to endorse "[a]ny" legislation "for the improvement of the law, procedural or substantive." Okla. Bar Ass'n Bylaws, art. VIII, § 4. The bylaws likewise establish an involved "Legislative Program" to propose legislation and make recommendations on pending legislation "relating to" the administration of justice; to court organization, selection, tenure, salary and other incidents of the judicial office; to rules and laws affecting practice and procedure in the courts and in administrative bodies exercising adjudicatory functions; and to the practice of law. *Id.* art. VII, §§ 3, 5–9. Pursuant to this authority, the Association has long been an aggressive opponent of judicial elections or gubernatorial appointment, advocating instead for an appointed Judicial Nominating Commission. Its president has criticized politically accountable alternatives in stark terms, arguing that they will lead to "big money and special interest groups elect[ing] judges" and "buy[ing] court opinions." App. 146–47. And it has employed a lobbyist for years to directly advocate against reform. One pamphlet the lobbyist provided to legislators, for example, opined that reform would lead to "activist judges who will be swayed by money and politics instead of facts and the law." App. 148.

The Oklahoma Bar Association likewise regularly expresses itself through its magazine, the *Oklahoma Bar Journal*. Through that publication, the Association platforms political views in the same partisan direction that have little to do with the practice of law. A few articles are particularly relevant here:

- A polemic on prison litigation that assails incarceration due to "drug possession offences," the State legislature's purported "underfunding of its constitutional promise" to prisoners, and prison litigation reform statutes, which the article describes as a "statutory blockade on the courthouse." App. 151–53. The article makes its purpose explicit in closing, urging readers that "family members, friends, and neighbors under incarceration need more protection for their constitutional rights" and that the Supreme Court or legislature need to "unwind" existing law in a more pro-prisoner direction. App. 155.
- A broadside attack against election-integrity laws, a critique the article says should "come from an understanding of" the State's history of odious discrimination in the years following the Civil War. App. 163. After discussing this history at length, the author suggests that modern supporters of election-integrity laws are disingenuous and that these laws are designed to disenfranchise minorities. App. 162–65. It ends with a call to action for States to "remember" this implication "when drafting new voting laws." App. 165.
- An article titled, "Oklahoma's embrace of the white racial identity" that offers a politically charged critique of Manifest Destiny as "guid[ing] …. White supremacy" and then expressly connects this conclusion to the present, noting that the "past is never dead." App. 167–70. After stressing its view that "racial inequality and disparate impacts" exist "in almost every facet of life," the article

proclaims that "we must … reengineer methods and systems of reward and punishment." App. 170–71.

- A critical history of Oklahoma's relationship with Indian tribes, paired with a critique of the State's modern approach of "revel[ing] in its colorful past" while remaining "invested in keeping the bloody stains of history hidden." App. 173.
- A quasi-spiritual wellness article peddling unlicensed psychological strategies for developing a "resilient mindset." App. 156.

### C. Procedural Background.

Schell filed suit against the OBA in April 2020, raising three First Amendment claims. He alleged that his forced membership in the organization violated his right to association due to its expressive activities; that the Association's collection of dues to subsidize its speech was unconstitutional compelled speech; and that, even assuming mandatory bar dues themselves are constitutional, the Association failed to establish necessary safeguards to ensure that his dues are not used for non-germane speech. App. 61–66. Schell sought declaratory and injunctive relief. App. 66–67.

The district court dismissed Schell's first two claims (challenging mandatory bar membership and dues, respectively), reasoning that *Keller* foreclosed both. App. 37–40. But it declined to dismiss the third claim regarding the Association's safeguards for the use of its dues. *See* App. 40. In response, the Association adopted

the safeguards that Schell requested, and the court granted the Association's unopposed motion to dismiss Schell's remaining claim. *See* App. 41.

Schell appealed the dismissal of his first two claims, and this Court reversed in part. *See Schell*, 11 F.4th at 1178. The Court agreed that *Keller* foreclosed any categorical challenge to compulsory bar dues and that it remained binding even after the Supreme Court's decision in *Janus*. *Id.* at 1191. But it disagreed that Schell's associational claim was invalid, observing that the Supreme Court's prior decisions had reserved the potential viability of a "freedom of association challenge to mandatory bar membership where at least some of a state bar's actions might not be germane to regulating the legal profession and improving the quality of legal services in the State." *Id.* at 1194. Reasoning that Schell had pleaded a viable claim that articles the Association chose to platform in its publication, the *Oklahoma Bar Journal*, were not sufficiently germane, the Court remanded for the district court to evaluate the viability of Schell's association claim. *Id.* at 1192–95.

On remand, the parties completed discovery and filed cross-motions for summary judgment. As instructed by this Court in *Schell*, the dispute largely focused on a series of articles the Association platformed in the *Oklahoma Bar Journal*. *See supra* at 9–10.

The district court granted the Association's motion. App. 193. For all but one of the articles, the court ruled that the content was germane, looking generally

to the perceived "thrust" of articles or isolated references to legal practice. *See* App. 177–87. For the one article that was simply too tenuous under any theory to be germane, the court concluded that there was no violation because the forced association was *de minimis*, suggesting that it was isolated, not sufficiently ideologically slanted, and that the context surrounding its publication as an individual article made it unlikely that the views would be attributed to Schell. App. 191–92.

Schell appealed.

## SUMMARY OF ARGUMENT

The First Amendment protects the right to free expressive association, which includes the right to not associate. The district court erred when it concluded that forcing Schell to be a member of the Association was compatible with his associational rights.

**I.** There can be no dispute that Schell's associational rights are burdened. Oklahoma law directly requires him to be a member of the Association. The Association engages in expressive activities, including lobbying and publishing a magazine with content that it curates. Schell is thus forced to associate with those expressive activities.

**II.** The Association cannot justify the burden it places on Schell's associational rights. This Court has held that associational challenges are subject to

exacting scrutiny and that *Keller*'s germaneness standards apply to these challenges. In the context of exacting scrutiny, germaneness functions as the tailoring requirement, which requires the compelled association to be narrowly tailored to the interests *Keller* promotes.

**A.** The district court erred by diluting exacting scrutiny with additional requirements beyond germaneness. None are valid.

**1.** There is no *de minimis* exception to associational challenges. In the interim since *Schell*, this Court has made that much very clear, holding when finding an associational violation that "[t]here is no *de minimis* exception for a speech restriction that lacks sufficient tailoring or justification." *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1248 (10th Cir. 2023) (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001)). Here, however, the district court disregarded that instruction. Nor is there any reason to think that the Supreme Court concluded otherwise in *Lathrop*. Even the plurality explicitly disclaimed reaching any further than the facial propriety of compelled financial support for unions, while later Supreme Court decisions have repeatedly and authoritatively construed *Lathrop* as not reaching beyond that limited facial ruling.

Precedent aside, a *de minimis* exception would be unworkable and prone to abuse. Because the First Amendment would prohibit courts from scrutinizing viewpoints, a bar could take any position it wanted, however extreme, on any non-

germane political issue so long as it produced enough germane speech elsewhere. Particularly given *Keller*'s shaky foundations following *Janus*, there is no reason to create such a glaring loophole to the First Amendment.

**2.** There is likewise no exception for non-ideological or non-political speech. While political and ideological speech is highly suspect under *Keller*, the converse is not true. The Supreme Court has made clear in the closely analogous context of compelled speech that courts cannot avoid scrutinizing speech because it is mundane or apolitical. Unsurprisingly, this conclusion accords with every Circuit to address the issue when considering integrated bar associations.

**3.** There is no requirement that a reasonable observer impute meaning from the Association's expressive activity to Schell to find that his rights have been violated. Such a rule would improperly conflate the distinct circumstances of compelling an individual to join an organization and compelling an organization to accept individuals. Besides, even under organizational rules, a "reasonable person" standard disregards clear Supreme Court precedent requiring deference to the person claiming an associational violation.

Even if such a rule applied, the district court was wrong to focus on whether an observer would misattribute the Association's views to Schell. The Supreme Court recently and emphatically made clear that it has "never" conditioned "First Amendment protection on the risk of misattribution." *Moody v. NetChoice, LLC*,

603 U.S. 707, 739 (2024). Such a rule would allow the government to violate the First Amendment with impunity, so long as the victim had some opportunity to clarify his beliefs.

Finally, there is not even a basis to conclude that the Association is not creating misattribution with its expressive activity. Bar associations have authority when they speak only because their "membership is part of the message"; they purport to represent all lawyers in a State. *McDonald*, 4 F.4th at 245–46. Similarly, the average observer is unlikely to know which State bar associations are voluntary and which are mandatory. And even if observers knew that membership was mandatory, decades of research reaffirms that they would still attribute organizational views to individual members.

**B.** The district court also erred by adopting a far too loose standard of germaneness. As multiple Circuits have found, germaneness requires a direct and inherent connection to the practice of law. This Court too implied as much in *Schell* when describing various advocacy positions that would not pass muster. The direct-and-inherent requirement tracks germaneness's roles in ensuring tailoring to the interests *Keller* identified and more broadly in justifying ongoing First Amendment burdens. It is the only practically available limit on germaneness that would not render the standard meaningless. And it better harmonizes the Supreme Court's

recent precedent, including decisions prior to *Janus* clarifying that germaneness is narrowly circumscribed.

**C.** Under the proper standard, the Association has plainly forced Schell to associate with a wave of non-germane speech in violation of the First Amendment. The parties have distilled the dispute to five articles the Association published in the *Oklahoma Bar Journal*. One sharply criticizes substantive law designed to limit frivolous prisoner litigation and advocates for policy change. Another attacks election laws as tools of racism and warns States to "remember" that when considering new laws. Another discusses Oklahoma's "embrace of white racial identity" and advocates for "reengineer[ing]" society to eliminate "disparate impacts." Another takes issue with Oklahoma's educational practices, which it views as "keeping the bloody stains of history hidden." And a final one dispenses quasi-psychological advice about wellness. Nearly all of these are politically charged (in the same partisan direction). And none have anything to do with the *practice* of law. In concluding otherwise, the district court was forced to adopt extremely attenuated theories of germaneness based on isolated aspects of these polemics. The First Amendment requires more.

## STANDARD OF REVIEW

This Court reviews a ruling on summary judgment *de novo*. *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019). Summary judgment

is warranted if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard, with each motion viewed in the light most favorable to its nonmoving party." *Banner Bank*, 916 F.3d at 1326.

## ARGUMENT

The underlying principles in this appeal are well established. It is a "fixed star in our constitutional constellation" that Americans cannot be "force[d] to confess by word or act" belief in a particular orthodoxy." *Abood*, 431 U.S. at 235 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). That freedom includes the "right to eschew association for expressive purposes." *Janus*, 585 U.S. at 892; *accord, e.g.*, *Cal. Dem. Party v. Jones*, 530 U.S. 567, 574–75 (2000); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). The Supreme Court has thus "rigorously reviewed laws and regulations that constrain associational freedom." *Christian Legal Soc'y Ch. of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 680 (2010). Courts determine first whether the plaintiff's associational rights are burdened, and then whether that burden is justified. *Roberts*, 468 U.S. at 622–23.

Here, Schell's right to expressive association was violated. The very act of forcing him to associate with a mandatory bar association that engages in expressive activity burdens that right. And the Association cannot justify that burden.[2]

## I. Compelling Schell To Be A Member Of The Association Burdens His Right To Freedom Of Association.

The government burdens First Amendment associational rights when it forces an association that interferes with expression. *See United States v. United Foods, Inc.*, 533 U.S. 405, 413–14 (2001) (considering first "whether there is some state imposed obligation which makes group membership less than voluntary" and then "whether a conflict with freedom of belief exists"). For example, requiring employees to accept a particular union as their exclusive bargaining agent represents a "significant impingement on associational freedoms." *Janus*, 585 U.S. at 916; *accord Ellis v. Bhd. of Ry., Airline & S.S. Clerks*, 466 U.S. 435, 455 (1984) ("[B]y allowing the union shop at all, we have already countenanced a significant impingement on First Amendment rights."). This burden is most commonly triggered by State interference in associational *membership*. In *Boy Scouts of*

---

[2] Schell acknowledges that this Court resolved a number of issues in its prior appeal, including that *Keller*'s framework survives *Janus*; that the germaneness inquiry applies to claims of free association; that some germane political or ideological advocacy, including the Association's lobbying regarding judicial nominations, is permissible under the First Amendment; that an opt-out system is proper under *Janus*; and that exacting scrutiny is the applicable standard of review. *See Schell*, 11 F.4th at 1186–95. Schell respectfully preserves these issues.

*America v. Dale*, for example, the Supreme Court found that forcing the Boy Scouts to accept a homosexual man as a scoutmaster would interfere with its expressive association due to its positions on sexual morality. *See* 530 U.S. 640, 648 (2000).

Conversely, the right to expressive association is not implicated where a law does not compel membership. *See, e.g.*, *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc. (FAIR)*, 547 U.S. 47, 69 (2006) (compelling law schools to host military recruiters did not violate free association because recruiters remained "outsiders who come onto campus for the limited purpose of trying to hire students—not to become members of the school's expressive association"). Nor is the right implicated where association is not expressive. *City of Dall. v. Stanglin*, 490 U.S. 19, 25 (1989) (rejecting claim based on "a generalized right of 'social association'" that protects "chance encounters in dance halls").

Schell's rights are plainly burdened here. Merely saying that Oklahoma law *forces* him to be a *member* of the Oklahoma Bar *Association* makes clear that a forced association is at issue. "The very act of the state compelling an … attorney to belong to or pay fees to a … bar association implicates that person's First Amendment right not to associate." *Romero v. Colegio de Abogados de P.R.*, 204 F.3d 291, 301 (1st Cir. 2000); *accord McDonald*, 4 F.4th at 245 ("[C]ompelling a lawyer to join a bar association engaged in non-germane activities burdens his or her First Amendment right to freedom of association.").

The Association likewise plainly engages in expressive activity. Relevant here, it directly lobbies elected officials and publishes a magazine, perhaps two of the clearest forms of expression. After all, the First Amendment's protections extend to "compiling and curating others' speech." *Moody*, 603 U.S. at 731; *see, e.g.*, *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (holding that state law requiring the publication of responsive views in a newspaper violated the First Amendment because "the choice of material to go into a newspaper … constitute[s] the exercise of editorial control and judgment"). By dint of his forced membership in the Association, then, Schell is forced to associate with the editorial choices that the Association uses in its publication. That burdens his associational rights.

## II. The Association Cannot Justify Its Burden On Schell's Right To Free Association.

Because Oklahoma has already burdened Schell's free-association rights, the case turns on whether that burden can be justified. Generally, "[i]nfringements on [the associational] right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. Likewise, "exacting scrutiny requires that" any "requirement be narrowly tailored to the interest it promotes." *Am. for Prosperity F. v. Bonta*, 594 U.S. 595, 611 (2021).

In the context of challenges to integrated state bars, "the guiding standard must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of the legal service[s] available to the people of the State.'" *Keller*, 496 U.S. at 14 (quoting *Lathrop*, 367 U.S. at 843 (plurality op.)) (mandatory bar dues); *see Schell*, 11 F.4th at 1194 (compelled membership). *Keller* has thus identified the "strong public interests [that] justify the intrusion, and the germaneness test guarantees that these public interests are being served by any challenged activity." *Romero*, 204 F.3d at 301. In other words, germaneness functions as a tailoring requirement, ensuring that the compelled association remains "narrowly tailored to the interest it promotes." *Bonta*, 594 U.S. at 611; *see also Chi. Tchrs. Union v. Hudson*, 475 U.S. 292, 303 (1986) (requiring procedures to refund dues for nongermane activities to be "carefully tailored to minimize the infringement").

When construing these standards, the district court committed two dispositive errors: It concluded that considerations other than germaneness could defeat Schell's claim, and it adopted a far too loose standard for germaneness. These errors contaminated the district court's analysis of the Association's expressive activities, which cannot be justified in relation to Schell's right to free association. Each of these issues is taken in turn.

### A. Germaneness Alone Determines Whether An Integrated Bar's Expressive Activity Violates Associational Rights.

To avoid finding a violation for expressive activity that it conceded was not germane, the district court offered a trio of reasons justifying the Association's conduct. It first recognized a *de minimis* exception to Schell's First Amendment rights. It also appeared to assert both that non-germane expression is permissible if it is not "ideological" or "political" and that no associational violation occurs if a "reasonable person" would not attribute viewpoints expressed by the Bar to Schell. App. 191–92. None of these purported limitations on Schell's First Amendment rights are valid.

#### 1. There is no *de minimis* exception to non-germaneness.

The district court concluded that a *de minimis* exception exists for non-germane speech. It did not explain its rationale. Regardless, the district court was wrong.

**1.** Treating an associational harm as *de minimis* regardless of germaneness flouts precedent. Indeed, this Court and the Supreme Court have both rejected this possibility: "There is no *de minimis* exception for a speech restriction that lacks sufficient tailoring or justification." *Wyo. Gun Owners*, 83 F.4th at 1248 (quoting *Lorillard Tobacco Co.*, 533 U.S. at 567) (finding associational violation). In other words, "the government must still justify the burden that exists" regardless of magnitude. *Id.* (quoting *Cornelio v. Connecticut*, 32 F.4th 160, 176 (2d Cir. 2022)).

While *Wyoming Gun Owners* is itself most instructive as an associational-rights case, it is of a kind with the broader First Amendment principles, which likewise instruct that all First Amendment violations are serious. *See, e.g.*, *Lorillard*, 533 U.S. at 567 (rejecting argument that restriction was permissible because "the burden on speech … is very limited"); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Caselaw regarding compelled association with integrated bar associations points in the same direction. Nowhere in *Keller* is a *de minimis* exception mentioned, much less embraced. Instead, the court made clear that "the guiding standard must be" germaneness. 496 U.S. at 15. For this reason, the Fifth Circuit has squarely held that there is no *de minimis* exception to integrated bar association activity. *See Boudreaux v. La. State Bar Ass'n* (*Boudreaux II*), 86 F.4th 620, 637 (5th Cir. 2023).

For a *de minimis* exception to have any meaning, it would require more than germaneness and exacting scrutiny. That is precisely what *Wyoming Gun Owners* forecloses. There is thus no reason to split with the Fifth Circuit by adding additional requirements to *Keller*'s analysis, which likewise made no hint of a *de minimis* exception.

**2.** More fundamentally, a *de minimis* exception makes little sense in this context. As *Boudreaux II* notes, to the extent the *de minimis* exception concerns the relative proportion of a bar's expressive activity that is not germane, then it would require courts to review the sum total of a bar's activity and draw an arbitrary, "subjective point at which there is enough non-germane speech for the Constitution to kick in." 86 F.4th at 637. It would likewise allow bar associations to run up the score on "germane" expressive activity to inoculate any non-germane advocacy they wish. Indeed, because the First Amendment does not—and cannot—turn on the viewpoints or content at issue, bar associations could justify making their members associate with highly incendiary opinions on high-profile issues. *Cf. Moody*, 603 U.S. at 737 (holding that imposing viewpoint neutrality on social media companies would require them to platform posts that, *inter alia*, "support Nazi ideology," "glorify rape or other gender-based violence," "discourage the use of vaccines," and "encourage teenage suicide and self-injury"). That is not the law.

**3.** When flagging the question, this Court suggested potential support for a *de minimis* exception in *Lathrop*, which noted that "the bulk" of the Wisconsin Bar's activities were proper when rejecting a facial challenge. 367 U.S. at 843 (plurality op.). But *Lathrop* does not reach nearly so far. As an initial matter, not even the plurality can be read to endorse a *de minimis* exception to as-applied challenges. It made clear that it resolved only the facial "question of compelled financial support

of group activities, *not with involuntary membership in any other aspect*." *Id.* at 827–28 (emphasis added); *see Abood*, 431 U.S. at 232 n.29 (noting that the plurality held only that "the requirement was not *on its face* unconstitutional" (emphasis added)). This tracks with its limited resolution of a facial challenge, which turned on whether *some* of the Wisconsin Bar's activities were proper.

Equally important, the Supreme Court has cabined *Lathrop* to this narrow holding, recognizing that "the only proposition about which a majority of the Court in Lathrop agreed was that the constitutional issues should be reached." *Abood*, 431 U.S. at 232 n.29. Indeed, the Court stressed *Lathrop*'s "limited scope" in *Keller*, where it reiterated the plurality's qualifications that it was not resolving "any other aspect" of "involuntary membership" beyond the facial challenge. 496 U.S. at 9.

At bottom, a *de minimis* exception cannot be reconciled with precedent and would disregard the Supreme Court's authoritative construction of *Lathrop*, split with another Circuit, and create an unworkable and manipulable exception that further complicates the law. There is nothing to recommend this approach.

**2. There is no exception for non-ideological or apolitical speech.**

The district court fares no better with its opinion that some of the Association's expressive activity "did not obviously relate to any current political or similar dispute." App. 192. To the extent it thought that Schell's First Amendment

rights extend only to "political" or "ideological" issues—whether under the label of *de minimis* or something else—the district court got things backwards.

Numerous courts have recognized that ideological and political speech by mandatory bars is particularly suspect. Because of their narrow focus, it is far harder to justify how ideological and political advocacy is germane. And yet, there are clear incentives to do so. Thus, "speech engaging with, promoting, or encouraging participation in wider public policy and social controversies is rarely, if ever, germane." *Boudreaux II*, 86 F.4th at 635; *see, e.g.*, *Crowe v. Ore. State Bar* (*Crowe II*), 112 F.4th 1218, 1239–40 (9th Cir. 2024) (holding that criticism of President Trump's comments about other countries was not germane); *Schneider v. Colegio de Abogados de P.R.*, 917 F.2d 620, 633 (1st Cir. 1990) (requiring any political activity to be "narrowly limited" and "directly linked to the legal profession or the judicial system"). This Court reflected the same concern in *Schell*, where it found a viably pleaded claim because it was plausible the Association published articles that "discussed matters in an ideological manner." 11 F.4th at 1194. And this understanding likewise tracks the Supreme Court's later construction of *Keller*. *See Harris v. Quinn*, 573 U.S. 616, 655 (2014) (construing *Keller* as holding "that members of [the] bar could not be required to pay the portion of bar dues used for political or ideological purposes"); *see also Janus*, 585 U.S. at 909 (contrasting

"speech that is germane" with speech that "instead concerns political or ideological issues").

The fact that political and ideological advocacy is suspect, however, does not mean that speech *must* be political or ideological to be non-germane. To start, precedent again squarely forecloses that view. Where forced association is at issue, the "general rule is that the speaker and the audience, not the government, assess[es] the value of the information presented." *United States v. United Foods*, 533 U.S. 405, 411 (2001) (internal quotation marks omitted). After all, "it is not … the role of the State or its officials to prescribe what shall be offensive." *Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 638 (2018). Thus, compelling speech that is "of interest to but a small segment of the population" still "must pass First Amendment scrutiny" all the same. *United Foods*, 533 U.S. at 410–11 (finding First Amendment violation for compelled funding of advertisements for mushrooms). Indeed, the First Amendment's application to "mundane" subjects "only highlights the importance" of its protections. *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 309–10 (2012).

Unsurprisingly, then, at least two Circuits have refused to cabin First Amendment challenges to only the ideological or political speech of integrated bar associations. Start with the First Circuit's decision in *Romero*, 204 F.3d 291. That court reasoned that because the "very act of the state compelling an employee or an

attorney to belong to or pay fees to a union or bar association implicates that person's First Amendment right not to associate," the *only* permissible expressive activities are those underpinning the "strong public interests [that] justify the intrusion." *Id.* at 301. Bars thus cannot compel someone "to join and support a bar association for legitimate reasons" and then compel her to pay for and support "any bar activity for any reason or no reason, as long as it did not involve political or ideological expression." *Id.* Echoing *United Foods*, the Fifth Circuit has likewise found violations with a bar association's non-ideological communications. *See, e.g.*, *Boudreaux II*, 86 F.4th at 632–33 (tweets with advice on health and technology).

At bottom, there is no reason to find an exception to the First Amendment for non-ideological or apolitical speech.

**3. There is no misattribution requirement.**

Finally, the district court seemed to rely on whether the bar's expressive activities would lead "a reasonable person" to believe something "about the views of [the Association's] members generally." App. 192. It appeared to invoke the test proposed by the Ninth Circuit for associational challenges which includes proof "that a reasonable observer would impute to him a message to which he objects." *Crowe II*, 112 F.4th at 1235. While the district court did not provide reasoning, the court in *Crowe II* explained it this way: A plaintiff "must show that the required association impairs his expression," which occurs when "a reasonable observer

would impute some meaning to membership in the organization and the plaintiff objects to that meaning." *Id.* at 1234. That is purportedly not a problem for integrated bar associations, because "when the bar engages in expression, a reasonable observer ordinarily would not interpret the fact that the attorney is a member of the bar to mean that the bar's activities reflect the attorney's personal views." *Id.* at 1236. Thus, plaintiffs must prove that the association's expression specifically implied that its members agreed with it on the subject. *Id.* at 1236–37.

This analysis is flawed several times over. It defies numerous decisions from the Supreme Court. And it puts the Ninth Circuit in direct conflict with multiple circuits. It should not be a model for this Court.

**1.** The Ninth Circuit improperly conflated compelled membership with cases requiring organizations to comply with nondiscrimination requirements. These contexts are distinct in how they implicate the Supreme Court's recognition that freedom of association is limited to intimate or "expressive association." *Stanglin*, 490 U.S. at 25. When considering whether an association must admit new members, the burden on expressive activity is not self-evident because new members are not necessarily expressive. Instead, that inquiry turns on whether the inclusion of new members interferes with the group's expressive activity, which requires an additional inquiry. *See, e.g.*, *Boy Scouts of Am.*, 530 U.S. at 648–53 (examining the

Boy Scouts' "expression" and holding that forcing it to accept a homosexual scoutmaster would burden that expression).

There is no such ambiguity where individuals are forced to become members of an expressive association. Once it is established that a group engages in expressive activity, then "the very act of the state compelling" membership "implicates that person's First Amendment right not to associate." *Romero*, 204 F.3d at 301. Even without mandatory dues, for example, "requir[ing] that a union serve as exclusive bargaining agent for its employees" is "itself a significant impingement on associational freedoms." *Janus*, 585 U.S. at 916. Both *Janus* and *Romero* recognize the self-evident fact that forcing someone to affiliate with an organization that engages in expressive activity forces that person to affiliate with the expression. And "[t]hat act of compulsion in forcing attorneys to belong to an integrated bar distinguishes … cases where people voluntarily associate and the government then permissibly prohibits discrimination by the private actors in the association." *Romero*, 204 F.3d at 301 & n.9. Thus, germaneness, and germaneness alone, determines whether that burden is constitutionally justified. *Id.*; *McDonald*, 4 F.4th at 245–46. Schell's freedom of association is burdened by the very fact he is forced to be a member of a bar association that engages in expressive activity.

**2.** Even if the rules governing expressive associations did apply to individuals, the Ninth Circuit separately misapplied this rule by looking to whether a "reasonable

observer would impute some meaning to membership in the organization." 112 F.4th at 1234. The fulcrum is not the meaning that an abstract third party would ascribe to an association. The Supreme Court could not have been clearer that courts must "give deference to an association's assertions regarding the nature of its expression" and "what would impair its expression." *Boy Scouts of Am.*, 530 U.S. at 653; *see, e.g.*, *Dem. Party of U.S. v. Wis. ex rel. La Follette*, 450 U.S. 107, 123–24 (1981) (holding that "a court … may not constitutionally substitute its own judgment for that of the Party" when considering competing narratives of the burden compelled association would have on the group's expression). Looking to what a "reasonable observer" might think usurps that directive, disregarding the affected party's understanding of its own expression and substituting the court's understanding. That is not permissible.

**3.** More fundamentally, the Ninth Circuit compounded its error applying its "reasonable observer" standard by narrowing the focus to misattribution—narrowing whether "some meaning" is "imputed" to specifically whether an observer would "interpret the fact that the attorney is a member of the bar to mean that the bar's activities reflect the attorney's personal views." *Crowe II*, 112 F.4th at 1236; *see also id.* at 1240 n.12 (describing the "only infringement" as the bar "suggest[ing] that [the plaintiff] shares [its] views"). Misattribution is the wrong focus. The Supreme Court has recently and emphatically disavowed conditioning

"First Amendment protection on the risk of misattribution." *Moody*, 603 U.S. at 739–40.[3] The harm from forced association is not simply misattribution, but direct injury to an individual's expression, *see id.*, which includes the "corollary … right not to associate," *Cal. Dem. Party*, 530 U.S. at 574.

The Ninth Circuit's understanding of remedies, which the district court tepidly adopted, further illustrates the poor fit between misattribution and the First Amendment. The court posited that an associational violation might be remedied if an integrated bar included a disclaimer in its publications. *Crowe II*, 112 F.4th at 1240. But a "general disclaimer … does not erase the First Amendment infringement" of freedom of expressive association. *Circle Schs. v. Pappert*, 381 F.3d 172, 182 (3d Cir. 2004). If it did, state actors could "infringe on anyone's First Amendment interest at will, so long as the mechanism of such infringement allows the speaker to issue a general disclaimer." *Id.* That cannot be true. Such a conclusion would have produced the opposite result in decisions like *Boy Scouts of America*, where the defendant could have simply announced that it was forced to associate with the plaintiff's message. At bottom, even assuming that a disclaimer would clear the "prospect of misattribution," it does not change that Schell is forced to "engage[] in expression," *Moody*, 603 U.S. at 740, by becoming a full-fledged

[3] In doing so, it rejected *Crowe II*'s reading of *Rumsfeld*, 547 U.S. 47, and *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 87 (1980), as supporting a misattribution theory. *See Moody*, 603 U.S. at 739–40.

member of a bar association that engages in flagrantly political speech about non-legal topics even when he would prefer to remain silent. It is the latter point that is dispositive. *Id.*

**4.** Even if nondiscrimination rules applied, even if a "reasonable observer" standard applied, and even if the risk of misattribution were the proper focus of that standard, the Ninth Circuit would *still* have erred because it misapplied even that standard. Further underscoring the perils of substituting court judgment for that of the affected party, the Ninth Circuit's *ipse dixit* that a reasonable observer would not see an individual's full-fledged membership in a bar association as meaningful is wrong. As the Fifth Circuit recognized, a bar association's "membership is part of the message." *McDonald*, 4 F.4th at 245–46. When a bar association speaks, "part of its expressive message is that its members stand behind its expression." *Id.* Stated differently, the authority with which the Association engages in expression is directly correlated to the fact that it purports to represent all Oklahoma attorneys in general. Thus, if attorneys were free to dissociate from the bar for expounding views that they reject, it would be far clearer that the Association speaks for only a narrow partisan viewpoint, not all attorneys in the State.

*Crowe II*'s assumption to the contrary is built on two faulty premises. First, it assumed that "a reasonable observer understands state bar membership to mean only that the attorney is licensed by the bar." 112 F.4th at 1236. Unlikely. Recall

that just over half of States require lawyers to join bar associations, while the balance have hybrid or voluntary bar associations. *See supra* at 4. Consider three lawyers: Jerome is a member of the Alaska Bar Association, Sally is a member of the New Jersey Bar Association, and Bill is a member of the Arkansas Bar Association. Would the average attorney, judge, or law clerk know whether each willingly joined a voluntary association or was forced to join an association? Probably not. And even that question loads the dice. Would an average *person*, who is presumably not a lawyer, know that? Obviously not.[4]

But even accepting *Crowe II*'s faulty premise, it *still* does not follow that the observer "ordinarily would not interpret [membership] to mean that the bar's activities reflect the attorney's personal views." 112 F.4th at 1236. Decades of research supports that people heuristically "tend to assume a correspondence between a group decision and group members' attitudes," even when they are aware that members played no role in the group's decision. Scott T. Allison & David M. Messick, *The Group Attribution Error*, 21 J. OF EXP. SOC. PSYCH. 563, 576 (1985); *see, e.g.*, Oliver Corneille et al., *Threat and the Group Attribution Error*, 27 PERS. & SOC. PSYCH. BULL. 437, 438–44 (2001) (collecting authority and replicating

---

[4] Answer Key: Jerome is forced to be a member of his bar association, while Sally and Bill are voluntary members of their bar associations. *See Bars by Type*, AM. BAR ASS'N, https://www.americanbar.org/groups/bar-leadership/resources/resourcepages/barworldbasics/barsbytype/ (last visited Feb. 11, 2026).

findings). So even knowing that an individual played no role in editorial choices for a group's official publication does not stop people from inferring that this individual shares the same beliefs and attitudes of the ideas published.

* * *

Putting everything together, *Crowe II*'s misattribution standard is flawed on nearly every level. It conflates standards from distinct contexts and serially misapplies the governing law of the standard it invokes, both by failing to defer to Schell's understanding of associational conflict and by focusing on misattribution in the first place. And even applying it to compelled bar association membership, a reasonable observer would conflate the views of a bar association with its members, because associations trade on the authority of their members, because the average observer does not know that membership is mandatory (or which associations are mandatory), and because decades of research supports that they would still attribute an association's views to members even if they knew all of this.

### B. Germaneness Requires At Least An Inherent Connection To The Practice Of Law.

Although the district court never provided an explanation of germaneness, its application of that standard to the Association's activities here illustrates that its understanding was far too capacious. Integrated bars do not "participate in the general government of the State" but instead "provide *specialized professional advice* to those with the ultimate responsibility of governing the legal profession."

*Keller*, 496 U.S. at 13 (emphasis added). Given that role, *Keller* requires "a germaneness test with teeth." *Romero*, 204 F.3d at 300. Germaneness requires, at the very least, speech to have "inherent connection to the practice of law." *Boudreaux II*, 86 F.4th at 633; *see, e.g.*, *Schneider*, 917 F.2d at 633 ("directly linked to the legal profession or the judicial system"). For example, this Court offered an article that "advocated for policies eliminating bars on a prisoner's ability to advance suits against prisons and jails" as an example of nongermane expression. *Schell*, 11 F.4th at 1194. Beyond *Schell*, several interlocking reasons compel such a test.

**1.** A tight understanding of germaneness follows from germaneness's role in ensuring that the integrated bar mandate is "narrowly tailored to the [cognizable government] interest[s] it promotes." *Bonta*, 594 U.S. at 611; *see supra* at 20–21. That requires close examination of "the extent to which the burdens are unnecessary." *Bonta* at 611. Or as this Court has put it in another case involving associational freedoms, "the lodestar of the narrow-tailoring inquiry is the necessity of the burdens." *Wyo. Gun Owners*, 83 F.4th at 1248. So where alternatives are available to reduce the burden on associational freedom, the government must justify its choice in relation to those alternatives and the interests that justified the burden in the first place. *See, e.g.*, *Bonta*, 594 U.S. at 615 (holding that a broad disclosure requirement selected for "administrative convenience does not remotely reflect the

seriousness of the actual burden that the demand … imposes on … association rights”).

Consider this Court’s decision in *Wyoming Gun Owners*, which considered an associational-rights challenge to a law that required organizations to disclose contributions and expenditures “related to” most electioneering communications. 83 F.4th at 1229. Applying exacting scrutiny, this Court recognized that disclosure requirements “pose a significant threat to associational freedom” but that the disclosure law nonetheless implicated important government interests in informing voters and preventing corruption. *Id.* at 1243–47. The case thus came down to narrow tailoring, which was absent. Recognizing that few advocacy groups actually linked particular donations to particular communications, this Court concluded that the “related to” standard functionally required these groups to disclose all contributions during election cycles. *Id.* at 1247. That flunked narrow tailoring because the state could simply require disclosure of donations earmarked for electioneering purposes. *Id.* at 1248. This narrower (and clearer) requirement would mitigate the burden and, if anything, be more effective in fulfilling the interests in disclosure related to electioneering communications. *Id.* at 1248–49.

So also here, harmonizing germaneness with narrow tailoring requires recognizing available alternatives. And there is an obvious one: Even while maintaining an integrated bar, attorneys can still “band together in a voluntary

association, without coercing those with different views to join their ranks." *Schneider*, 917 F.2d at 631; *see also, e.g.*, *McDonald*, 4 F.4th at 252 (recognizing that States could create "a hybrid system" that avoids the compulsion of pure, integrated bars). Given this alternative, germaneness must be understood in terms of what private actors could not accomplish through their own voluntary bar association. And matters without an "inherent connection to the practice of law" can easily be pressed by a voluntary association. *Boudreaux II*, 86 F.4th at 633.

**2.** A narrow understanding of germaneness would follow even if it were not part of narrow tailoring. Again, there is no dispute that First Amendment rights are *already* burdened by mandatory bar associations, regardless of germaneness. *See Janus*, 585 U.S. at 916. Germaneness simply justifies that burden. *See Keller*, 496 U.S. at 14. Thus, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438 (1963) (finding associational violation). Understandably, then, "Supreme Court cases upholding compelled membership rest on an implicit assumption that 'the cause which justified bringing the group together' would be sufficiently narrow that dissenting employees would be forced to associate against their will in only a limited way." *Schneider*, 917 F.2d at 631 (quoting *Abood*, 431 U.S. at 223). To accept a capacious understanding of germaneness would cheapen the First Amendment.

**3.** As other Circuits have concluded, a narrow understanding of germaneness likewise tracks practical reality. *Keller* itself acknowledged that germaneness is a "difficult question" that "will not always be easy to discern." 496 U.S. at 14–15. In the abstract, "germane" is similar to phrases like "related to" or "involving" that would have "no limits" to their meaning when they are "taken to extend to the furthest stretch of [their] indeterminacy." *Dubin v. United States*, 599 U.S. 110, 119 (2023) (construing "relate to") (internal quotation marks omitted). Courts thus recognize that they are heavily context dependent. *See, e.g.*, *id.*

The same is true here. Other Circuits have recognized the need for administrable lines and limiting principles. The Fifth Circuit, in particular, has stressed that "once [courts] allow advice that is not inherently tied to the practice of law or the legal profession," then it becomes impossible to "discern any principled line." *Boudreaux II*, 86 F.4th at 633. It has thus rejected attempts to extend germaneness to speech that "is 'law related,'" or promoting content "of concern to lawyers," or engaging in activities to promote "goodwill" towards the legal profession, or activity connected to things "that might impact a person who is practicing law." *Id.* at 633–35; *see, e.g.*, *McDonald*, 4 F.4th at 251 (holding that supporting an organization that lobbies for "changes to … substantive law designed to benefit low income Texans" was not germane).

This aligns with the understanding of this Court that advocacy for changes in substantive law would not be germane. *Schell*, 11 F.4th at 1194. Indeed, a full seven members of the Supreme Court in the context of union dues rejected arguments that "the First Amendment permits a union to compel nonmembers" to "support[] political causes and candidates." *Knox*, 567 U.S. at 320; *id.* at 323–24 (Sotomayor, J., concurring in the judgment) (concluding that political spending "to defeat perceived antiunion initiatives and to elect a sympathetic Governor and legislature … are not germane to the union's function as a bargaining representative").

The First Circuit has engaged in similar analysis, emphasizing the need to avoid interpretations of germaneness that would render "the limitation on compulsory support carved out in *Abood* … meaningless." *Schneider*, 917 F.2d at 631. It has instead reiterated that germaneness "generally must revolve around the role of the lawyer as lawyer, rather than relying on the lawyer's more generic role as an informed and perhaps influential member of a complex society." *Id.* at 640 (internal quotation marks omitted); *see, e.g.*, *Romero*, 204 F.3d at 302–03 (holding that maintaining life insurance program was not germane even though it was for the benefit of bar members); *Schneider*, 917 F.2d at 633 ("[T]he bar could not use dissenting members' funds to promote a system of no-fault automobile insurance."). As noted, germaneness must have "teeth." *Romero*, 204 F.3d at 300.

**4.** Finally, a narrow view is supported by this Court's duty to "harmonize" the germaneness requirement, to the extent possible, "with prior and subsequent Supreme Court precedents." *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apts., LLC*, 843 F.3d 1225, 1237 (10th Cir. 2016); *see, e.g.*, *Santucci v. Commandant*, 66 F.4th 844, 862 (10th Cir. 2023) ("'[D]ecisions of equal authority' *i.e.*, from the same court that appear to be 'discordant' 'should be harmonized' 'if at all possible.'" (quoting Brian A. Garner et al., THE LAW OF JUDICIAL PRECEDENT 300 (2016) (alterations omitted))). This duty manifests in two ways here.

*First*, prior to *Janus*, the Supreme Court narrowly defined the germaneness requirement. When categorically discussing "compelled association" in *Knox*, the Supreme Court clarified that "compulsory fees can be levied only insofar as they are a 'necessary incident' of the 'larger regulatory purpose which justified the required association.'" 567 U.S. at 310 (quoting *United Foods*, 533 U.S. at 414). "Necessary incident" is a conspicuously restrained understanding of germaneness. Shortly after, the Supreme Court in *Harris* reiterated this narrowness when authoritatively construing *Keller* as holding only that bar members "could be required to pay … dues used for activities connected with proposing ethical codes and disciplining bar members." 573 U.S. at 655 (2014). A capacious understanding of germaneness is not compatible with the Supreme Court's most recent understanding of the concept.

*Second*, there is *Janus*. Schell recognizes that the Supreme Court has the prerogative of overruling its own precedents. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989); *Schell*, 11 F.4th at 1182. Still, this Court has joined many others in recognizing that "*Keller* is vulnerable to reversal by the Supreme Court" because *Janus* overruled much of its rationale. *Schell*, 11 F.4th at 1190;[5] *see also Jarchow v. State Bar of Wis.*, 590 U.S. 974, 976 (2020) (Thomas, J., dissenting from denial of certiorari) ("[T]here is effectively nothing left supporting our decision in *Keller*."). And there remains "a difference between following a precedent and extending a precedent." *Jefferson Cnty. v. Acker*, 210 F.3d 1317, 1320–21 (11th Cir. 2000). Thus, the "weakened foundations" of *Lathrop* and *Keller* "counsel[] against expanding their application as [this Court] consider[s] various questions the two cases left open." *Boudreaux v. La. State Bar Ass'n* (*Boudreaux I*), 3 F.4th 748, 755 (5th Cir. 2021). Importantly, *Keller* clarified only "the extreme ends of the spectrum" before leaving the rest to lower courts for resolution. 496 U.S. at 15–16. Where *Keller* does not have "direct application" to this case, *Rodriguez de Quijas*, 490 U.S. at 484, this Court should look to *Janus*,

---

[5] *See, e.g.*, *McDonald*, 4 F.4th at 243 n.14 (recognizing *Lathrop*'s and *Keller*'s "increasingly wobbly, moth-eaten foundations" (internal quotation marks omitted)); *File v. Martin*, 33 F.4th 385, 391–92 (7th Cir. 2022) ("The tension between *Janus* and *Keller* is hard to miss. … [T]he foundations of *Keller* have been shaken."); *Crowe v. Ore. State Bar* (*Crowe I*), 989 F.3d 714, 725 (9th Cir. 2021) (acknowledging tension).

*Harris*, and *Knox* for guidance. In such a circumstance, the authoritative construction of the First Amendment in these decisions likewise binds this Court. And they counsel narrowness.

For any number of reasons, then, germaneness requires more than a conceptual connection. It requires a direct and inherent connection to the *practice* of law. That standard provides at least some protection against further burdens on First Amendment rights.

### C. The Association Violated Schell's Right To Free Association By Forcing Him To Associate With Its Non-Germane Speech.

Putting things together, this case rises and falls on germaneness to "regulating the legal profession or 'improving the quality of legal service[s] available to people of the State.'" *Keller*, 496 U.S. at 14 (quoting *Lathrop*, 367 U.S. at 843). That at least requires an "inherent connection to the practice of law." *Boudreaux II*, 86 F.4th at 633. That does not encompass activities that are merely "law related" or "of concern to lawyers" or that promote "goodwill," or that "might impact a person who is practicing law." *Id.* at 633–35. Nor does it include activities that "enhance the reputation" of the legal industry or that "benefit[] all members" of the Association. *Romero*, 204 F.3d at 303. And political or ideological advocacy is particularly suspect. *See supra* at 26.

Because Oklahoma has elected to compel its attorneys to join an association that engages in expressive activity, the Constitution demands that the Association

stay within defined bounds. Relevant here, managing and curating a publication is fraught with problems on that score, as it forces members to associate with those editorial decisions, which have only an attenuated connection (at best) to regulating the practice of law. That is why bar journals and similar curatorial activities are a common basis for courts to find viable claims under *Keller*. *See Schell*, 11 F.4th at 1194 (two journal articles); *Crowe II*, 112 F.4th at 1239–40 (journal article); *Boudreaux II*, 86 F.4th at 625 (sharing external articles). To the extent Oklahoma attorneys wish to operate a journal that goes beyond topics germane to regulating the legal profession, then they must do so on their own, without co-opting every single Oklahoma attorney, including Schell.

The problems with the *Oklahoma Bar Journal* are pervasive, and the district court erred by concluding otherwise. The parties have distilled the dispute into five articles, most of which reflect a clear partisan slant, and all of which are simply not germane to "regulating the legal profession or improving the quality of legal service[s] available to the people of the State." *Keller*, 496 U.S. at 14. Schell cannot be forced to associate with the editorial decision to platform these views.

<u>Advocating for More Prisoner Suits:</u> The Association published a polemic on prison litigation by inmates, which assails the reportedly "alarming" trend that "[i]ncarceration rates … continue to climb" largely because Oklahoma's elected representatives have authorized imprisonment for "drug possession offenses." App.

151. The article goes on to criticize Oklahoma's fiscal decisions related to prisons ("underfunding of its constitutional promise" to inmates) and malign the State's efforts to stop the widespread problem of frivolous litigation by prisoners (a "statutory blockade of the courthouse"). App. 151–53. It concludes with a call to action and concrete policy demands: "[N]ow more than any other time in our state's history those family members, friends, and neighbors under incarceration need more protection for their constitutional rights. As time goes on, we can only hope for more clarity and certainty in the form of those protections or (more simply) for the hope that the Legislature will sensibly rewind its exemption from liability for prisons and jails." App. 155.

Criticizing drug enforcement policy and advocating for "unwinding" substantive law are not germane to the *actual practice* of law. Indeed, *Schell* itself held at the pleading stage that the complaint's allegations "make it plausible [that this] article[] strayed from the germane purposes of the OBA" because "it is … plausible the article advocated for policies eliminating bars on a prisoner's ability to advance suits against prisons and jails." 11 F.4th at 1194. Because the article was not appended to the complaint, this Court concluded it was "not possible" to resolve whether the article in fact reflected that content. *Id.* The article is part of the summary judgment record. And it is pure ideological advocacy for "eliminating bars

on a prisoner's ability to advance suits against prisons and jails." *Id.* That is precisely what this Court said would be non-germane.

The district court concluded otherwise, reasoning that the article's "thrust" was describing the "statutory and legal limits on claims challenging prisoners' conditions of confinement." App. 181. That made it "reasonably related to improving the quality of legal services" because it "educat[ed] lawyers as to the legal hurdles in pursuing claims for prisoners." *Id.*

There are two problems with the district court's analysis. First, the court clearly misstates the article. Its "thrust" was advocacy in the hopes of changing the law, not education for the purpose of litigating under the status quo. Indeed, it presented legal hurdles as a largely hopeless cause for prisoners, which backstopped the thesis of the article: It should be easier for prisoners to sue prisons, ideally by "the Legislature … sensibly rewind[ing]" its laws. To reiterate, that is precisely what this Court said would render it nongermane.

More fundamentally, germaneness cannot turn on only the "thrust" of an article. Association is more nuanced. *See, e.g.*, *Boy Scouts of Am.*, 530 U.S. at 655–56 (rejecting claim that groups must "associate for the purpose of disseminating a certain message in order to be entitled to the protections of the First Amendment"). The right to expressive association is not limited to only one issue per article.

Consider an article celebrating the First Amendment that discusses precedents protecting the speech of racist groups like the Ku Klux Klan and the Nazi Party. So long as the article was primarily framed as educating lawyers on bringing First Amendment suits, then the "thrust" of this article is legal education. That would remain true even if the article's penultimate paragraph opined that the views of these groups are correct and deserve to flourish. Under the district court's standard, every Oklahoma lawyer would be forced to associate with the choice to publish praise for the Klan and Nazi Party simply because that abhorrent view was not the "thrust" of the article. That cannot be what the First Amendment allows.

Attacking Election Law: Next is an article attacking election-integrity laws. The author opens by asserting that "[a]ny debate" in the present about election security should "come from an understanding of" the State's history of odious discrimination in the years following the Civil War. App. 163. He then discusses at length a grandfather clause in a postbellum statute that otherwise required voters to pass a literacy test. App. 163–65. That clause, the article explained, revealed the statute "had no other purpose but to keep black people from voting." *Id.* Turning to the present, the author singled out laws that impose "additional voter identification requirements, limit voting by mail and even punish people who provide voters waiting in lines with water or food." App. 165. It then connected the two: Implying that supporters are disingenuous and that these laws are designed to disenfranchise

minorities, the article argued that these "laws *are presented as* attempts to stop fraud and expand voting rights, but are met with the *same type of criticism* as" the grandfather clause. *Id.* (emphasis added). The article thus urged readers to remember this "heavy" cost that "States should remember … when drafting new voting laws." *Id.*

This article has nothing to do with the practice of law. On its own terms, its goal is to cast one side of a modern political debate in negative terms. The closest it comes is a discussion of a century-old Supreme Court decision that the author admits was "short lived" because the Oklahoma Legislature quickly took action to nullify it. *Id.* As the article's introduction and conclusion both stress in unambiguous terms, the thesis of the article is to link modern *political* debates in *legislatures* about election laws to past racism. Whether or not that link is in fact justified is ultimately beside the point. What matters is that the Association felt it proper to platform this partisan critique.

Straining for a theory of germaneness, the district court reasoned that the "thrust" of this article "is to educate lawyers about the history of voting rights for black people," which would be "beneficial as to lawyers' understanding of the possible impact of voting laws." App. 185. But that explanation would apply to *anyone*. Non-lawyers, after all, are voters too.

The explanation would also apply to *any* law. If "education" about the "potential impact" of voting laws is fair game, then so would advocacy pieces that educate about the potential impact of laws about abortion, immigration, or the death penalty. That breathtakingly limitless rationale would nullify germaneness. For that reason, courts have roundly rejected it. "Just because lawyers are interested in a general social issue does not give a mandatory bar association blanket permission to promote content or speak about it." *Boudreaux II*, 86 F.4th at 636; *see also, e.g.*, *Schneider*, 917 F.2d at 631 (recognizing that if germaneness extended to "any activity that promoted the creation of a strongly pluralistic society, the limitation" of germaneness "would be meaningless"). It would also contradict *Keller*, which expressly found that such things as "gun control or nuclear weapons freeze initiative" would be non-germane. 496 U.S. at 16.[6]

<u>"Oklahoma's Embrace of the White Racial Identity":</u> Oklahoma platformed what the district court acknowledged was an "ideologically charged" article about white people in Oklahoma, which cast "manifest destiny" as "guid[ing] efforts to colonize the people on the land and establish white supremacy." App. 167. Like the

[6] The district court likewise misconstrued the article, which it framed as arguing that the century-old Supreme Court decision was "still a critical case regarding voting laws." App. 185. The article did not make this point. The closest it came was stating that the National Association for the Advancement of Colored People, which filed a brief in that case, is "still instrumental in challenging new voting laws passed by States."

attack on election integrity, the article paired a historical discussion of racism in Oklahoma's history with the present, stressing, "[t]he past is never dead, it's not even past." App. 167–70. After contending that "racial inequality and disparate impacts" exist "in almost every facet of life," the article proclaimed that "we must … reengineer methods and systems of reward and punishment." App. 170–71.

The district court's sole basis for germaneness was a single paragraph in the article that "advocate[s] for diversity in the state's law firms, judiciary, and law faculty given the percentage of nonwhites in Oklahoma." App. 186. This disregards everything else about the article. The charged and extended historical critique about the evils of Manifest Destiny and "whiteness" has nothing to do with the practice of law. *See* App. 167–70. Neither does the article's advocacy about "disparate impacts in *almost every facet of life*" and the need for action from "Oklahomans associated with the bar *and beyond*." *Id.* (emphases added). Even if "thrust" were the guiding standard, the "thrust" of the article is plainly not directed at the legal profession. The district court's position would allow mandatory associations to engage in the most transparent partisan advocacy so long as each publication had some threadbare paragraph linking some concept in the piece to lawyers. That is truly a limitless position.

<u>Criticizing the failure to teach history:</u> The Association platformed what is nominally a book review but in substance a critical history of Oklahoma's

relationship with Indian tribes and a broadside against the State's purported modern practice of "revel[ing] in its colorful past" while remaining "invested in keeping the bloody stains of history hidden." App. 173. Indeed, the title of the article, "A Silent History," emphasizes that critique.

The district court could not identify a theory of germaneness for this article. That is because it is plainly not germane. At no point is law discussed beyond noting that "courts had little control over the lawless desperadoes of Indian Territory and even less over the white squatters and permitted residents." *Id.* Again, there is no doubt that Oklahoma has a historically fraught relationship with Indian tribes. Likewise, the extent to which that history should be taught and whether it is accurately taught are certainly worthy matters for public debate. But none of that is directly connected to the practice of law. Attorneys should not be forced to associate with one side of these issues with no way to formally disavow that relationship.

<u>"A Resilient Mindset":</u> Finally, the Association selected an article dispensing quasi-spiritual, quasi-psychological advice on mental wellbeing during COVID. App. 156–61. It was not focused on stresses or problems related to legal practice. Instead, it provided general thoughts from someone with no apparent expertise about how to "acknowledge your feelings." App. 160. That cannot be germane. Indeed, the district court's conclusion otherwise is entirely devoid of an explanation linking

it to law beyond the fact that it was written by an attorney. *See* App. 183–84. But authorship obviously cannot create the requisite relationship.

The article is indistinguishable from the "wellness" advocacy that *Boudreaux II* ruled was not germane. 86 F.4th at 632. Its reasoning is instructive here too: "[I]f bar associations may opine, advise, and inform on anything that they deem is generally conducive to attorney health and wellness, there is no limiting principle." *Id.* The Association is neither "an all-encompassing wellness service" nor the purveyor of a general interest magazine. *Id.* Because attorneys are forced to be members of it, the Association must remain focused on the specific interests that justify its ongoing burdening of the First Amendment.

In sum, the Association has a pattern of platforming politically charged and skewed articles, conspicuously in the same partisan direction, on matters divorced from the actual practice of law. Glaringly, there is no evidence in the record of articles cutting the other way on these issues—there are no essays defending tort reform as a way to eliminate frivolous inmate suits that overburden state courts or articles explaining that laws prohibiting people from providing food to people in line to vote are designed to prevent improper electioneering on down-ballot races.

All of this just underscores the common point: "An entity 'exercising editorial discretion in the selection and presentation of content is engaged in speech activity.'" *Moody*, 603 U.S. at 731 (quoting *Ark. Educ. Tele. Comm'n v. Forbes*, 523 U.S. 666,

674 (1998)). How the Association wields that discretion determines the positions with which attorneys across Oklahoma are forced to associate. And its current practices for doing so violate the First Amendment.

## CONCLUSION

This Court should reverse the judgment of the district court.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(1), Schell respectfully requests oral argument. This case raises numerous issues of first impression regarding the interaction between compelled bar association membership and the First Amendment. These issues have split other Circuits in multiple ways that are squarely raised by this appeal.

Dated: February 11, 2026

Respectfully submitted,

/s/ John C. Brinkerhoff Jr.
Anthony J. Dick
John C. Brinkerhoff Jr.
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001-2113
(202) 879-3939
jbrinkerhoff@jonesday.com

Timothy Sandefur
Scott Day Freeman
Adam C. Shelton
Scharf-Norton Center for
Constitutional Litigation at the
GOLDWATER INSTITUTE
500 E. Coronado Rd.
Phoenix, AZ 85004
(602) 462-5000
litigation@goldwaterinstitute.org

*Counsel for Plaintiff-Appellant Mark E. Schell.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,153 words. It complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: February 11, 2026

*/s/ John C. Brinkerhoff Jr.*

John C. Brinkerhoff Jr.
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Tenth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

Dated: February 11, 2026

*/s/ John C. Brinkerhoff Jr.*

John C. Brinkerhoff Jr.
*Counsel for Plaintiff-Appellant*

# ADDENDUM

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| MARK E. SCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | NO. CIV-19-0281-HE |
| | ) | |
| JANET JOHNSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

In this 42 U.S.C. § 1983 action, both plaintiff and defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56 and LCvR56.1.[1] The briefing is complete, and both motions are at issue.

*Background*

Plaintiff Mark E. Schell (Schell) is an attorney licensed to practice law in Oklahoma. He brought this lawsuit challenging the requirements that he join in, and pay dues to, the Oklahoma Bar Association (OBA) as a condition of practicing law. According to Schell, the mandatory membership and the mandatory payment of dues violated his rights to freedom of speech and association under the First and Fourteenth Amendments to the United States Constitution. He also asserted that to the extent mandatory membership and dues were constitutional, the OBA had not provided sufficient safeguards to ensure that dues were not used for activities not germane to the OBA's purpose of regulating the legal

[1] *In light of defendants filing of a supplemental summary judgment motion [Doc. #181], their initial motion [Doc. #179] will be stricken as moot.*

profession or improving the quality of legal services in Oklahoma as required under Keller v. State Bar of California, 496 U.S. 1 (1990).

Defendants are the justices of the Oklahoma Supreme Court, the members of the OBA Board of Governors, and the executive director of the OBA (OBA defendants). They have been sued solely in their official capacities for declaratory and injunctive relief.

In response to Schell's amended complaint, the OBA defendants moved for dismissal on various grounds. The court dismissed the claims regarding the mandatory membership and dues under Fed. R. Civ. P. 12(b)(6), based upon the United States Supreme Court's decisions in Lathrop v. Donohue, 367 U.S. 820 (1961) and Keller, *supra*., but it permitted Schell's claim regarding alleged inadequate safeguards to proceed. Subsequently, the OBA Board of Governors adopted a new policy concerning the expenditure of mandatory dues which mooted the safeguards claim, resulting in its dismissal.

Schell appealed the court's Rule 12(b)(6) ruling to the Tenth Circuit Court of Appeals. That court affirmed the dismissal of the mandatory dues claim but reversed the dismissal of the mandatory membership claim. It concluded that Schell stated a plausible freedom of association claim and remanded the case to this court to assess whether two articles, which were published in the April 2017 and November 2018 issues of The Oklahoma Bar Journal (OBJ),[2] constitute speech germane to the OBA's recognized purposes. *See* Schell v. Chief Justice and Justices of Oklahoma Supreme Court, 11 F.4th

[2] *The two articles were not part of the record on appeal.*

1178, 1194-95 (10th Cir. 2021). Schell then filed a petition for a writ of certiorari with the Supreme Court, which was subsequently denied.

Following remand, this court granted Schell leave to file a second amended complaint. The amended pleading included reliance on additional OBJ articles and other OBA activities which Schell claims are political or ideological in nature and are non-germane to the OBA's recognized purposes. The OBA defendants moved to dismiss under Rule 12(b)(6). The court denied the motion and allowed the freedom of association claim to proceed. After conducting discovery regarding the claim, the parties filed the present motions for summary judgment.

*Legal Standard*

"A party may move for summary judgment, identifying each claim . . . on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, the court is "presented with cross-motions for summary judgment, [it] must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." United States v. Supreme Court of New Mexico, 839 F.3d 888, 906-07 (10th Cir. 2016) (quotation marks and citations omitted).

*Discussion*

As instructed by the Tenth Circuit, the court applies "the test from *Keller* to determine whether the [challenged OBJ articles and other OBA activities] are germane to the accepted purposes of the state bar." Schell, 11 F.4th at 1195. To be germane, the articles

and activities must be "'necessarily or reasonably incurred for the purpose of regulating the legal profession or improving the quality of the legal service available to the people of the State.'" *Id*. at 1192 (quoting Keller, 496 U.S. at 14) (other quotation marks and citation omitted).

Schell's freedom of association claim now rests on 13 OBJ articles, 1 email, 7 articles distributed by Lexology under an OBA logo, and certain OBA legislative activities.[3]

OBJ Articles – April 2017, May 2017, and May 2018; Email – March 2025; and Legislative Activities

As part of his claim, Schell challenges views expressed by the OBA's then-executive director, in articles published in the April 2017 and May 2018 OBJ issues, regarding "attacks" on the Judicial Nominating Commission (JNC) and "merit selection" of appellate judges and justices. In the April 2017 article, the executive director, after describing legislative bills relating to the JNC, stated in part:

> Most of the JNC bills contain provisions similar to bills that have been filed before. The consistent theme is that the JNC must be changed so that political parties or political bodies can appoint and/or confirm judges and justices . . . Under the JNC, Oklahomans have enjoyed a scandal-free court system that was once the worst in the nation when bribes, disguised as campaign contributions, bought opinions of the Oklahoma Supreme Court. It is déjà vu all over again when it comes to bills attacking and attempting to alter, amend, or dispose of the JNC. If the attempts to cripple or kill the JNC are successful,

---

[3] *In the second amended complaint, Schell also challenges certain OBA continuing legal education (CLE) programs. See [Doc. #116, ¶¶ 92-94]. However, he has not addressed any CLE programs in his summary judgment motion, and he has responded to the OBA defendants' undisputed facts regarding CLE programs as being irrelevant. See [Doc. #182, ECF pp. 10-11, ¶¶ 50-62]. The court concludes Schell has abandoned any CLE challenge as support for his claim.*

> it will be déjà vu all over again when big money and special interest groups elect judges and justices and campaign contributions buy court opinions.

[Doc. #178-3].

In the May 2018 article, he described certain changes to the OBA during his 15 years as executive director. He stated in part:

> What scares me is the increasing changes in the practice of law and the attacks on the profession and the courts.
>
> * * *
>
> [T]he attacks on our judiciary are the most frightening. For most of the time I have been your executive director, I have dealt consistently with attacks on our courts and the Judicial Nominating Commission . . . At times I wonder if the public possesses the knowledge of the separation of powers and a clear understanding of the role of the courts.
>
> I have been consistently amazed at how the public and the press have grasped these concepts and joined with us to preserve the Judicial Nominating Commission. A few selfless lawyer legislators have been incredibly helpful as well. I still fear the constant (and at times well-funded) attacks on merit selection of judges and justices may someday prevail. Yes, it is scary to ponder the political and corrupt system returning to our state.

[Doc. #178-4].

Schell also challenges views expressed by the OBA's then-president in an article published in the May 2017 OBJ issue, entitled "14th Amendment Guarantees Are Vital," in which she stated:

> With 2017 bringing the 50th anniversary of the creation of merit selection of Oklahoma judges utilizing the Judicial Nominating Commission (JNC), it is the perfect time for the OBA to focus

> on the fair and impartial administration of justice for the benefit of all Oklahoma citizens.
>
> We need to educate the public on the benefits of the JNC, to warn them of the potential ill effects of reintroducing politics into our judicial selection process and promote the public's understanding of the importance of separation of powers, both central and essential in a representative democracy.

[Doc. #178-15].

In addition, Schell challenges a March 2025 email sent by the OBA president to the OBA members concerning proposed changes being considered by the Oklahoma Legislature. In the email, he stated: "The OBA Board of Governors stands firm in its continued endorsement of the JNC-based model of judicial selection." [Doc. #178-14].

Along with the articles and email, Schell challenges OBA legislative activities concerning the JNC. In particular, he challenges the retention of what he describes as a legislative "lobbyist" and what the OBA refers to as a legislative "liaison." Schell asserts that the lobbyist pursued members of the Oklahoma Legislature, with pamphlets in hand that he had prepared, to persuade them to vote against any changes to the appellate judicial selection procedures. He asserts that these lobbyist activities were specifically done on behalf of the OBA. Additionally, Schell asserts the lobbyist prepared a report in February 2018 for the OBA Board of Governors, which advised them in part about the State Chamber 2030 Plan calling for a "federal system of judicial selection." [Doc. #178-5]. The plan entailed changing Oklahoma's appellate judicial nominating and selection process to a system that mirrors the federal system.

The court concludes that the challenged articles, email, and legislative activities are germane to a recognized purpose of the OBA. Specifically, the court concludes that they were reasonably related to the purpose of improving the quality of legal services available to the people of Oklahoma. The Tenth Circuit determined that the May 2017 and May 2018 articles were germane for that reason. Schell, 11 F.4th at 1193.[4] Similarly, the court concludes that the April 2017 article, the May 2025 email, and all lobbyist/liaison's activities are germane because, as stated by the Tenth Circuit, "the judicial system is designed to be an apolitical branch of government, and promotion of the public's view of the judicial system as independent enhances the public trust in the judicial system and associated attorney services." *Id*. The challenged articles, email, and activities "fall[] within those activities accepted in *Lathrop* and *Keller*." *Id*;[5] *see also* McDonald v. Longley, 4 F.4th 229, 248 (5th Cir. 2021), *cert. denied*, 142 S.Ct. 1442 (2022) ("Lobbying for legislation regarding the functioning of the state's courts or legal system writ large [] is germane.").

OBJ Article – November 2018

Next, Schell challenges an article, entitled "Tort Litigation for the Rising Prison Population," published in the November 2018 OBJ tort-themed issue. [Doc #178-16]. The article was authored by an OBA member. Schell asserts that the article is not germane because it argues that Oklahoma's prison system is underfunded and advocates for the

---

[4] *Although not expressly stated, plaintiff is presumably seeking to preserve the issue for possible further review.*
[5] *The court previously rejected Schell's efforts to base his claim on the OBA's legislative efforts. See [Doc. #132].*

elimination of tort liability exemptions for prisons and jails. While the article does criticize Oklahoma's incarceration levels and funding in light of those levels and additionally expresses, among other things, "hope that the Legislature will sensibly rewind its exemption from liability for prisons and jails," *id.*, ECF p. 5, the thrust of the article is to set forth the statutory and legal limits on claims challenging prisoners' conditions of confinement and to explain the type of claims available to prisoners. The court concludes that the article is germane because it was reasonably related to improving the quality of legal services, i.e. educating lawyers as to the legal hurdles in pursuing claims for prisoners, including tort liability exemptions, and the claims available to prisoners who may suffer injury in Oklahoma prisons and jails.

OBJ Articles – February 2019 and March 2019

Schell also challenges an article in the February 2019 OBJ issue by the OBA's then-president explaining why "having lawyers in the Legislature is a plus" [Doc. #178-17] and an article in the March 2019 OBJ issue by the OBA's then-chairman of the OBA's Legislative Monitoring Committee stating that a legislative panel at "the annual Reading Day" (for legislative bills) had "issued an urgent plea to any member of the bar considering a run for the Legislature to contact them. MORE LAWYERS ARE NEEDED!" [Doc. #178-18, ECF p. 1]. On appeal, the Tenth Circuit determined that "these articles are not inherently political or ideological in nature[,]" and "are germane to the OBA's core function to advance the interest of the profession." Schell, 11 F.4th at 1193. Schell, in his papers, acknowledges the Tenth Circuit's ruling, but "preserves his claims with respect to" the articles. [Doc. #178, ECF p. 23]. Given the Tenth Circuit's ruling and the lack of

identification of a change of law or other proper justification for a different ruling, the court rejects Schell's challenges with respect to the articles and concludes that they are germane to the stated OBA's purpose.

OBJ Article – May 2020

Schell challenges views expressed in an article in the May 2020 OBJ issue entitled "Representing Transgender and Gender-Diverse Clients." [Doc. #181, ECF p. 52]. The article was not mentioned in the second amended complaint but apparently came to light during discovery. Schell contends that the article is non-germane, asserting it "reads as a 1960s teach-in, praising the like-minded as brilliant, energetic, and thought provoking and presenting the current laundry-list of fashionable gender terminology." [Doc. #182, ECF pp. 29-30 (quotation marks omitted)]. He also asserts that the article promotes watching "films, interviews[,] and performances by trans people, attending community forum and conferences, imagining that you identify as a gender different from the sex you were assigned at birth, [and] exploring implicit bias." *Id.* at ECF p. 30 (quotation marks omitted). Although he acknowledges the article provides a list of cases that "have shaped transgender rights," he asserts that the article does not explain the cases relevance or applicability. *Id.*

The court concludes that the article is germane to the OBA's purpose of improving the quality of legal services. It provides information to assist lawyers in effectively representing LBGT[6] clients. This includes terminology, representation issues, practice

[6] *Lesbian, Gay, Bisexual, Transgender.*

tips, additional resources, and lists of cases. While the article does not specifically discuss any of the cases listed, the court concludes that such discussion is not necessary for germaneness purposes. The cases provided would be beneficial for lawyers who may be retained to represent a client regarding transgender matters and are unfamiliar with such matters.

OBJ Article – December 2020

Schell next challenges views expressed in an article in the December 2020 OBJ issue entitled "A Resilient Mindset: Take Stock of What You Lost and What You Gained to Move Forward." [Doc. #178-19]. The article was authored by a North Carolina and Oregon lawyer and founder of a company providing mindfulness-based coaching, training and consulting to attorneys and law firms. According to Schell, the article is non-germane because it "dispenses psychological advice related to COVID" and "concerns about racism and the upcoming election." *Id*. at ECF p. 3.

The court concludes, however, that the article is germane to the OBA's purpose of improving the quality of legal services. It is an article about developing a resilient approach to overcome professional and personal challenges caused by the COVID-19 pandemic. Although the article mentions in passing that the author's lawyer friend reported to her that since the pandemic's beginning, she had "frustrations with remote learning and worrying about [her] children's education, retirement accounts fluctuating, worrying about clients who have COVID, fearing for the future of the firm, concerns with racism and the upcoming election," [Doc. #178-19, ECF p. 3], the article cannot be reasonably read to advance any political or ideological position on COVID-19, racism, or the 2020 election.

The article provides specific steps for lawyers to help cultivate a resilient mindset to overcome professional as well as personal challenges that they may have been experiencing. In the court's view, the article was reasonably related to improving the quality of legal services in the particular circumstances of the pandemic. The article's resilient mindset discussion is factually distinguishable from the tweets regarding the benefits of walnuts, exercise, and sunlight found to be non-germane speech in Boudreaux v. Louisiana State Bar Association, 86 F.4th 620, 632-33 (5th Cir. 2023).

OBJ Articles – May 2021

Schell additionally challenges two articles authored by OBA members and published in the May 2021 OBJ "Black Legal History in Oklahoma" issue.

The first article is entitled "*Guinn v. U.S.*: States' Rights and the 15th Amendment." [Doc. #178-20]. Schell contends that the article attributes President Joe Biden's victory in the 2020 election to the "high turnout of Black voters" and "highlight[s] criticisms directed at states that amended voting laws in reaction" to that election. [Doc. #178, ECF p. 23]. According to Schell, the article explains that the amended voting laws are presented as "'attempts to stop fraud and expand voting rights but are met with the same type of criticism as the voting laws in *Guinn*,' i.e., that the laws attempt to 'disenfranchis[e] Black voters and creat[e] generations of distrust and pain.'" [Doc. #178, ECF pp. 23-24, quoting Doc. #178-20, ECF p. 4]. Schell argues that "the article weighs in on a highly ideological and debatable matter, painting citizens seeking reforms to restore confidence in voting systems as reactionaries[,]" and thus, is not germane to the OBA's recognized purposes. *Id.* at ECF p. 24.

While political or ideological in nature, the court concludes that the article is germane because it was reasonably directed to improving the quality of legal services available to Oklahomans. The thrust of the article is to educate lawyers about the history of voting rights for black people and, specifically, those in Oklahoma. It discusses the original Oklahoma Constitution allowing men of all races to vote as required by the Fifteenth Amendment to the United States Constitution, an early amendment to the Oklahoma Constitution requiring voters to satisfy a literacy test but having a "grandfather clause" exemption which allowed illiterate white men to vote, the impact of that amendment on voting rights for black people, and the Supreme Court's decision in Guinn v. U.S., 238 U.S. 347 (1915), striking down the amendment because the "grandfather clause" prevented black people from voting. It further points out that the Guinn decision is still a critical case regarding voting laws. While the author suggests the newly-enacted "voter restriction laws" may disenfranchise black voters and create generational distrust and pain like those at issue in Guinn, the court concludes that the article is nonetheless reasonably connected to improving the quality of legal services. The information provided would be beneficial as to lawyers' understanding of the possible impact of voting laws.

The second article challenged by Schell is "Oklahoma's Embrace of the White Racial Identity." [Doc. #178-21]. Schell contends that the article "evokes emotional readings of Oklahoma history to ultimately argue that Oklahoma's legal profession is responsible for 'very few nonwhites at the partnership or director level' in the state's major firms, using no evidence to support such a claim.'" [Doc. # 178-24, quoting Doc. #178-21, ECF p. 4].

While the article is ideologically charged in nature, the authors specifically advocate for diversity in the state's law firms, judiciary, and law faculty given the percentage of nonwhites in Oklahoma. The court concludes that the article is germane to the OBA's purposes of regulating the legal profession and improving the quality of legal services. *See* McDonald, 4 F.4th at 249-50 (bar diversity initiatives, despite being controversial and ideological in nature, are germane to the purposes identified by Keller); *see also* Boudreaux, 86 F.4th at 633 ("Promoting diversity efforts at law firms is germane[.]").[7]

OBJ Article – February 2022

Schell also challenges views expressed in an article published in the February 2022 OBJ issue entitled "Vaccine Mandates and Their Role in the Workplace." [Doc. #178-22]. It was authored by an OBA member for the labor and employment-themed issue. According to Schell, the article "praises the Biden administration's vaccine mandates as a 'last resort' after the public failed to 'consistently wear face masks in public and failed to socially distance in those first weeks of the pandemic's United States spread two years ago." [Doc. #178, ECF p. 24, quoting Doc. #178-22, ECF p. 5].

The court concludes that the article is germane to the OBA's purpose of improving the quality of legal services. The court is not persuaded the article may be reasonably read to "praise[]" the Biden administration for the COVID-19 vaccine mandates. While it does proffer reasons why the author believes the vaccine mandates were implemented, it does not specifically endorse their implementation. The court concludes that the thrust of the

[7] *The court has previously so determined. See [Doc. #132, ECF p. 4].*

article is to educate lawyers regarding the federally-mandated and voluntarily-implemented COVID-19 vaccine mandates, the recognized exemptions to the mandates, and the litigation relating to those mandates. The information provided would be beneficial to lawyers who were rendering legal services to their employer or employee clients on the subject of vaccine mandates. Thus, the article falls within Keller's germaneness standard.

OBJ Article – May 2022

Plaintiff next challenges an article in the May 2022 OBJ issue announcing the Oklahoma Bar Foundation's "Diamonds & Disco Event." [Doc. # 178-24]. He contends that the article is not germane to the OBA's recognized purposes because its purpose is to promote "goodwill," i.e. a charitable event to support the Oklahoma Bar Foundation (OBF) and its grantee partners, including, notably, the Catholic Charities of the Archdiocese of Oklahoma City. [Doc. # 178, ECF p. 25].

The court concludes, however, that the article is germane to the OBA's purpose of improving the quality of legal services. Although one of the stated purposes for the event was to celebrate the OBF's 75th anniversary, the other stated purpose was to raise "funds for access to justice programs." [Doc. #178-24]. While the Catholic Charities of the Archdiocese of Oklahoma City is one of OBF's grantee partners, it, like other OBF grantee partners, would have received grants to benefit the legal profession. The article was not simply promoting a community-engagement opportunity for lawyers, like the tweets at issue in Boudreaux, 86 F.4th at 634, but was promoting an event to raise money that would improve the quality of legal services. The court concludes that it falls within Keller's germaneness standard.

OBJ Article – May 2022

Schell further challenges an article entitled "A Silent History." It was authored by an OBA member and published in the May 2022 OBJ issue. Schell asserts that the article "amplifies a provocative view of history, but it does not concern OBA's regulatory purposes." [Doc. #178, ECF p. 25].

The article is a book review. Its purpose is to encourage the reading of the late historian Angie Debo's book, *And Still Waters Run*. Schell indicates the book criticizes the federal government for failing to keep white settlers out of Indian lands in Oklahoma. While the review no doubt has an ideological/viewpoint slant to it and the book addresses historical events occurring many years ago, that does not necessarily make it non-germane for Keller purposes. The OBJ is distributed mostly to lawyers in Oklahoma, where Indian reservations were recently re-discovered a hundred or so years after most Oklahomans understood them to be gone. *See* McGirt v. Oklahoma, 591 U.S. 894 (2020). The court's conclusions in McGirt appear to have been substantially shaped by its view of the historical record of treatment of the Indian tribes and dealings with them. Against that backdrop, it is not implausible to view the review and book as providing information useful to an Oklahoma lawyer in understanding events shaping the law in Oklahoma. However, as the article does not explicitly assert any such rationale or connection, or suggest its use as a practice aid of some sort, the court concludes that the review qualifies as non-germane, if only marginally so.

Lexology Articles

Finally, Schell challenges certain articles distributed by email to OBA members by Lexology under an OBA logo. The specific articles proffered by Schell are "The Skilled Person Uses "They/Them" Pronouns, and Why You Should Care," "An interview with Woodsford discussing ESG[8] engagement & litigation in England and Wales," "Gender recognition certificates and divorce in Scotland," "The Importance of LGBTQIA+ Visibility in The Legal Profession," "Law Firms Must Improve DEI Efforts Through Objective Work Allocation or Risk Losing Clients," "Are Law Firms Ignoring Their Most Critical Assets? Bridging the DEI Divide," and "How did we get here (and where is here)." [Doc. #178-25, Doc. #178-26, Doc. #178-27, Doc. #178-28, Doc. #178-29, Doc. #178-30, and Doc. #116-11].

In their motion, the OBA defendants challenge Schell's standing to base his claim on the Lexology articles, relying on Schell's deposition testimony that he did not know what the Lexology service was and had not used it. They contend that, because he had no injury as a result of the articles, he has no standing. [Doc. #181, ECF pp. 12, 32-33].

It is difficult to see how "standing" considerations apply here in any strict sense. It appears undisputed that Schell has standing to assert a freedom of association claim of some sort. Whether the Lexology articles are of such a nature that they tend to prove his claim or not is certainly open to debate. But, in the court's view, resolution of the question does not turn upon applying a separate standing analysis to each instance or element of proof upon which Schell relies. Rather, the question is whether the specific instances or

---

[8] *According to Schell, ESG stands for "Environmental, Social, and Governance." [Doc. #178, ECF p. 12, n. 7].*

aspects of proof tend to show activities by the OBA which would qualify as a non-germane activity under Keller. The court concludes that the Lexology articles do not.

The parties' submissions establish that Lexology is a "news aggregator" service, based in London, which distributes news articles and which the OBA provides access to as a free service to its members. The OBA does not pay Lexology for the service, and the members do not pay the OBA for it. The connection or link to the Lexology service is apparently forwarded to OBA members via email, which email includes a logo for both Lexology and the OBA on it. But the OBA does not select the content displayed and, ultimately, the content provided by Lexology to particular OBA members is controlled by the member, who has the ability to customize the nature of the material being provided to him/her. As the OBA's former executive director characterized it, it's a "big bunch of stuff that you can go in and set it for whatever you want." [Doc. #178-6 at ECF p. 125, ll. 8-10].

Ultimately, the Lexology service is not speech or activity of any kind such as might offend associational proscriptions. An OBA member does not have to use it. He/she does not pay for it, directly or indirectly. Particular articles are not displayed to the member unless the member clicks on them to select them. The member controls the sort of news articles to be sent to him/her. In these circumstances, the court can discern no coerced association with a particular viewpoint or position such as might be the basis for either a free speech or freedom of association claim. The presence of the OBA logo on the transmission email cannot plausibly be viewed as endorsing the content of articles it did not select or, for that matter, even know about. As a result, it is unnecessary to belabor

whether the particular articles Schell's counsel located via Lexology would otherwise meet a "germaneness" test if they had been distributed or somehow endorsed by the OBA defendants.

No Violation of Associational Rights

Per the above discussion, the court concludes that only one of the challenged OBJ articles ("Silent History"), and none of the other challenged activities, are non-germane to the OBA's recognized purposes. Therefore, the court must determine whether such a showing is sufficient to make out a freedom of association claim. The court concludes that it is not. In its remand order, the Tenth Circuit noted that there is "[a] potential open issue [as to] what degree, in quantity, substance, or prominence, a bar association must engage in non-germane activities in order to support a freedom-of-association claim based on compelled bar membership." Schell, 11 F.4th at 1195, n. 11. "In other words, the Tenth Circuit . . . left open the possibility that a de minimis amount of non-germane speech would not run afoul of an objecting member's associational rights." Pomeroy v. Utah State Bar, Case No. 21-cv-00219-TC-JCB, 2024 WL 1810229, at *5 (D. Utah April 25, 2024), *appeal pending*, Tenth Circuit Case No. 24-4054. Like the Pomeroy court, this court concludes that the Tenth Circuit will and should recognize some sort of de minimis exception and that it applies as to the limited instance of non-germaneness shown here.

Here, the quantity of non-germane activities was very limited and, to use of the language of the Lathrop court, the "bulk" of the bar association's activities were permissible as against the Keller factors. Lathrop, 367 U.S. at 843. Only the single OBJ article appears to meet the standard of being non-germane and, as noted above, that was a

close question. Further, the particular non-germane article, though ideological to some degree, was focused on historical events and did not obviously relate to any current political or similar dispute such that association with it might imply a particular position or approach to current issues. Finally, the circumstances surrounding the non-germane article/review would not suggest to a reasonable person anything about the beliefs of an individual OBA member. It was a book review, and it seems unlikely that anyone would assume a reviewer's take on some book necessarily implied anything about the views of OBA members generally. It was written by an individual OBA member, rather than by an OBA officer. It was published as the "Back Page" of the OBJ issue, rather than as a feature article. Further, and more significantly, the masthead of each OBJ edition included a disclaimer that "Statements or opinions expressed in the *Oklahoma Bar Journal* are those of the authors and do not necessarily reflect those of the Oklahoma Bar Association ...." [Doc. # 181, ECF p. 10, ¶ 29].[9] These circumstances would have prevented a reasonable person from attributing the viewpoint expressed in the article to the beliefs of any objecting OBA member, like Schell.

In light of the quantity, substance, and prominence, of the non-germane material involved here, the court concludes that a violation of Mr. Schell's associational rights did not occur. Summary judgment in favor of the OBA defendants on Schell's freedom of association claim is therefore appropriate.

---

[9] *Defendants' submissions indicate that the OBJ now includes such a disclaimer on each page of every "practice-themed" article. However, it appears the particular article/review at issue here preceded that practice.*

*Conclusion*

For the reasons stated, the OBA defendants' joint motion for summary judgment [Doc. #179] is **STRICKEN** as **MOOT** and their supplemental motion for summary judgment [Doc. #181] is **GRANTED.** Plaintiff's motion for summary judgment [Doc. #178] is **DENIED**.

**IT IS SO ORDERED**.

Dated this 21st day of October, 2025.

JOE HEATON
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| MARK E. SCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | NO. CIV-19-0281-HE |
| | ) | |
| JANET JOHNSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## JUDGMENT

For the reasons stated in the separate order entered this date, judgment is entered in favor of defendants as to plaintiff's freedom of association claim. Plaintiff's other claims are dismissed per prior orders of the court.

**IT IS SO ORDERED**.

Dated this 21st day of October, 2025.

JOE HEATON
UNITED STATES DISTRICT JUDGE