**ORAL ARGUMENT NOT REQUESTED**
**No. 25-6189**

# UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

MARK E. SCHELL,
*Plaintiff-Appellant*,

*v.*

JANET JOHNSON ET AL.,
*Defendants-Appellees*.

Appeal from the United States District Court for the Western District of Oklahoma,
No. 5:19-cv-00281 (Heaton, J.)

## BRIEF FOR DEFENDANTS-APPELLEES

MICHAEL BURRAGE
WHITTEN BURRAGE
512 N Broadway Avenue, Suite 300
Oklahoma City, OK 73102

THOMAS G. WOLFE
HEATHER L. HINTZ
PHILLIPS MURRAH P.C.
424 N.W. 10th Street, Suite 300
Oklahoma City, Oklahoma 73103

*Counsel for the Members of the Oklahoma Bar Association Board of Governors and Janet Johnson*

DANIEL S. VOLCHOK
*Counsel of Record*
JOSEPH M. MEYER
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
daniel.volchok@wilmerhale.com

*Counsel for all defendants-appellees*

KIERAN D. MAYE, JR.
LESLIE M. MAYE
MAYE LAW FIRM
3501 French Park Drive, Suite A
Edmond, Oklahoma 73034

*Counsel for the Chief Justice and Justices of the Oklahoma Supreme Court*

April 13, 2026

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ........ iii

PRIOR OR RELATED APPEALS ........ vii

GLOSSARY ........ vii

INTRODUCTION ........ 1

ISSUES PRESENTED ........ 4

STATEMENT ........ 4

A. The Oklahoma Bar Association And Its Journal ........ 4

B. *Lathrop* And *Keller* ........ 6

C. This Litigation ........ 8

SUMMARY OF ARGUMENT ........ 12

ARGUMENT ........ 14

I. THIS COURT HAS ALREADY REJECTED SCHELL'S ARGUMENT THAT EXACTING SCRUTINY APPLIES HERE ........ 14

II. SCHELL'S ATTACKS ON THE DISTRICT COURT'S GERMANENESS RULING LACK MERIT ........ 18

A. The District Court Applied The Correct Germaneness Standard ........ 18

B. Each Challenged Article Is Germane To A Legitimate OBA Purpose ........ 24

III. EVEN IF NOT GERMANE, THE CHALLENGED ARTICLES ARE INSUFFICIENT IN QUANTITY AND NATURE TO SUPPORT SCHELL'S FREE-ASSOCIATION CLAIM ........ 34

A. Quantity ........ 35

1. A *de minimis* amount of non-germane activity does not violate freedom of association ........ 35

2. Any non-germane activity here was *de minimis* ........ 43

B. Nature ....................................................................................45

1. A state bar's non-germane activity supports a bar member's expressive-association claim only if the activity affects that member's expression................................45

2. The challenged articles do not affect Schell's expression........................................................................51

CONCLUSION ....................................................................................57

STATEMENT REGARDING ORAL ARGUMENT ............................................57

CERTIFICATES

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Abood v. Detroit Board of Education*, 431 U.S. 209 (1977) ............................37, 38

*Allen v. Minnstar, Inc.*, 8 F.3d 1470 (10th Cir. 1993) ......................................55, 56

*Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021)....................19

*Barnes v. United States*, 776 F.3d 1134 (10th Cir. 2015).......................................16

*Board of Directors of Rotary International, Inc. v. Rotary Club of Duarte*, 481 U.S. 537 (1987) ...........................................................................46

*Bost v. Illinois State Board of Elections*, 146 S.Ct. 513 (2026) ..............................29

*Boudreaux v. Louisiana State Bar Association*, 86 F.4th 620 (5th Cir. 2023) ................................................................ 19, 21, 23, 25, 31, 40

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000)...................... 34, 35, 45-48, 56

*Burdick v. Takushi*, 504 U.S. 428 (1992)..........................................................42, 43

*Circle Schools v. Pappert*, 381 F.3d 172 (3d Cir. 2004) ........................................53

*City of Dallas v. Stanglin*, 490 U.S. 19 (1989) .......................................................45

*Crowe v. Oregon State Bar*, 112 F.4th 1218 (9th Cir. 2024) .....39, 46-48, 51-53, 55

*Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239 (10th Cir. 2016) ..........................................................................................................16

*Guinn v. United States*, 238 U.S. 347 (1915) ....................................................28, 29

*Harjo v. Kleppe*, 420 F.Supp. 1110 (D.D.C. 1976) ..............................................33

*Harris v. Quinn*, 573 U.S. 616 (2014) ....................................................................22

*In re Integration of State Bar of Oklahoma*, 95 P.2d 113 (Okla. 1939) ................4, 5

*Indian Country, U.S.A., Inc. v. Oklahoma*, 829 F.2d 967 (10th Cir. 1987) ....................32

*Janus v. American Federation of State, County, & Municipal Employees*, 585 U.S. 878 (2018) ....................9, 20, 47

*Jarchow v. State Bar of Wisconsin*, 590 U.S. 974 (2020) ....................15

*Keller v. State Bar of California*, 496 U.S. 1 (1990) .......... 1, 7, 8, 18, 22, 24, 38, 40

*Knox v. Service Employees International Union*, 567 U.S. 298 (2012) ....................22

*Lathrop v. Donohue*, 367 U.S. 820 (1960) .................... 6, 7, 11, 35-37, 43, 44, 55

*Lorillard Tobacco Company v. Reilly*, 533 U.S. 525 (2001) ....................39

*Matter of Stroble*, 2025 OK 48, 2025 WL 1805918 (Okla. July 1, 2025) ....................32

*McDonald v. Langley*, 4 F.4th 229 (5th Cir. 2021) ........... 23, 31, 39, 40, 52, 53, 55

*McGirt v. Oklahoma*, 591 U.S. 894 (2020) ....................32

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ....................49, 50

*NAACP v. State of Alabama*, 357 U.S. 449 (1958) ....................47, 48

*New York State Club Association v. City of New York*, 487 U.S. 1 (1988) ....................46

*Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022) ....................32

*Pomeroy v. Utah State Bar*, 2024 WL 1810229 (D. Utah Apr. 25, 2024) ....................41

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) ....................49

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) ....................39

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ....................35, 48

*Schell v. Chief Justice & Justices of the Oklahoma Supreme Court*, 11 F.4th 1178 (10th Cir. 2021) ......... 1, 8-12, 15-17, 19-23, 27, 31, 34-37, 41, 42

*Schell v. Darby*, 142 S.Ct. 1440 (2022) ............................................................1, 15

*Schneider v. Colegio de Abogados de Puerto Rico*, 917 F.2d 620 (1st Cir. 1990) ..................................................................................44

*St. Mary Catholic Parish in Littleton v. Roy*, 154 F.4th 752 (10th Cir. 2025) ........................................................................34, 35, 46, 49, 53

*United States v. Adair*, 913 F.Supp. 1503 (E.D. Okla. 1995)..................................33

*United States v. Monsisvais*, 946 F.2d 114 (10th Cir. 1991)..................................16

*United States v. Pickel*, 863 F.3d 1240 (10th Cir. 2017)........................................17

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008).......................................................................49, 55

*Woods Petroleum Corporation v. Department of Interior*, 47 F.3d 1032 (10th Cir. 1995) (en banc) .....................................................32

*Wyoming Gun Owners v. Gray*, 83 F.4th 1224 (10th Cir. 2023)................19, 20, 39

**DOCKETED CASES**

*Louisiana v. Callais*, No. 24-109 (U.S.) ..............................................................29

*National Republican Senatorial Committee v. Federal Election Commission*, No. 24-621 (U.S.) ...................................................29

*Schell v. Chief Justice and Justices of the Oklahoma Supreme Court*, No. 20-6044 (10th Cir.) ............................................................23

*Schell v. Darby*, No. 21-779 (U.S.).......................................................................15

*Watson v. Republican National Committee*, No. 24-1260 (U.S.)......................29, 30

**STATUTES**

42 U.S.C. §1983 .......................................................................................................26

5 Oklahoma Statutes
ch.1, app.1, art.II, §1 .......... 5
ch.1, app.1, art.VIII, §1 .......... 5
ch.1, app.1 preamble .......... 4
ch.1, app.3-a, rule 1.1 .......... 4

## OTHER AUTHORITIES

American Bar Association, *Bar Types*, https://www.americanbar.org/groups/bar-leadership/resources/resourcepages/barworldbasics/bartypes (visited April 13, 2026) .......... 5

## PRIOR OR RELATED APPEALS

This Court decided a prior appeal in this matter. The decision in that appeal, as amended on rehearing, is reported at 11 F.4th 1178 (2021).

## GLOSSARY

| | |
|---|---|
| OBA | Oklahoma Bar Association |
| *OBJ* | *Oklahoma Bar Journal* |

## INTRODUCTION

In his previous appeal in this litigation, appellant Mark Schell argued that the exacting-scrutiny standard applicable to First Amendment challenges to mandatory public-sector union dues also applies to his First Amendment challenges to Oklahoma's mandatory bar, the Oklahoma Bar Association ("OBA"). This Court rejected that argument: It held that *Keller v. State Bar of California*, 496 U.S. 1 (1990), "established a germaneness test" for First Amendment challenges to mandatory-bar activity and that the Supreme Court has "not replace[d] that longstanding test with exacting scrutiny." *Schell v. Chief Justice & Justices of the Oklahoma Supreme Court*, 11 F.4th 1178, 1191 (10th Cir. 2021) ("*Schell I*"), *cert. denied sub nom. Schell v. Darby*, 142 S.Ct. 1440 (2022) (mem.).

Based on that rejection, this Court affirmed the dismissal of Schell's free-speech claim and remanded with instructions for adjudicating his free-association claim, which is based on OBA's membership requirement and its publication of certain *Oklahoma Bar Journal* ("*OBJ*") articles with which Schell claims to disagree. *Schell I*, 11 F.4th at 1191. Those instructions had two parts: First, the district court was to determine whether the challenged articles satisfy *Keller*'s germaneness test—i.e., whether each article is germane to improving the practice of law or OBA's other legitimate purposes—and thus necessarily does not violate Schell's free-association right. *Id.* Second, if any articles were not germane, the

court was to consider whether those articles established a free-association violation. *Id.*

The district court followed this Court's instructions and correctly granted summary judgment for defendants. First, applying *Keller*, the court held that the OBA articles Schell challenges on appeal were germane except for one that the court deemed "non-germane, if only marginally so," App.188. Second, the court concluded that the "marginally" non-germane article—a by-lined book review accompanied (like all the challenged articles) by a disclaimer that any views expressed were the author's alone—was insufficient to support Schell's expressive-association claim.

Although Schell challenges the court's rulings, he refuses to abide by the terms this Court set in *Schell I*. Perhaps most importantly, he insists (Br.18 n.2) that "exacting scrutiny is the applicable standard"—indeed, his entire argument rests on that premise—even though *Schell I* held the opposite. He also ignores the record developed below. For example, he significantly mischaracterizes (e.g., Br.2, 9-10) the articles on which his claims rest. *See infra* pp.25-34. He also argues (Br.48) that, under *Keller*'s germaneness test, legal history has "nothing to do with the practice of law," despite conceding below that "information explaining the history and development of laws can help a lawyer maintain the requ[isite] skill and knowledge in their [practice] area," D.Ct. Dkt.181 at 7 (¶41). And he now

contends (Br.33-34) that *OBJ* articles that others authored could reasonably be attributed to him, contrary to his admission below that "no one would conclude that" the *OBJ* article *he* authored was "the speech of anyone" else, D.Ct. Dkt.181 at 8 (¶49). These concessions and mischaracterizations are not side issues; they go to the heart of the two questions this Court identified in *Schell I*: what is "germane" under *Keller*, and whether any non-germane activity imposes a meaningful burden on expressive association.

Schell's disregard of *Schell I* and the record make clear that the judgment should be affirmed. Indeed, the Court can and should affirm simply on the ground that Schell rests his challenge on the mistaken premise that exacting scrutiny is the applicable standard, and therefore has not raised on appeal any claim of error under the standard that applies under *Schell I*.

If this Court nonetheless reaches *Keller*'s germaneness test, it should affirm on the ground that each of the challenged articles is germane, including the book review that the district court deemed "marginally" non-germane. And if this Court deems any of the articles non-germane, then it should affirm on the ground that the articles are insufficient in quantity (Schell has chosen to rest his appeal on just five articles) and nature (the articles do not implicate Schell's own expression, including because they could not reasonably be attributed to him) to support Schell's claim.

## ISSUES PRESENTED

If this Court overlooks Schell's failure to argue for reversal under any standard other than the exacting scrutiny that *Schell I* held does not apply—a failure that, as noted, suffices to affirm—the questions on appeal are:

1. Whether each challenged *OBJ* article is germane to any of OBA's legitimate purposes.

2. To the extent any articles are non-germane, whether those articles are sufficient in quantity and nature to support Schell's free-association claim.

## STATEMENT

### A. The Oklahoma Bar Association And Its Journal

1. The Oklahoma Supreme Court established OBA in 1939, *see In re Integration of the State Bar*, 95 P.2d 113, 113 (Okla. 1939), for purposes including "foster[ing] and maintain[ing] on the part of those engaged in the practice of law high ideals of integrity, learning, competence and public service" and "provid[ing] a forum for the discussion of subjects pertaining to the practice of law, the science of jurisprudence, and law reform," 5 Okla. Stat. ch.1, app.1 preamble. Consistent with these goals, the state's Rules of Professional Conduct instruct lawyers to "keep abreast of changes in the law and its practice." *Id*. at ch.1, app.3-a, rule 1.1, comment 6. It is the bar's policy to engage only in "activity that is reasonably intended to effectuate the purposes of the OBA." D.Ct. Dkt.81-1 at 1.

Like the bars of 31 other states, the District of Columbia, and six U.S. territories, OBA is an "integrated" bar. *In re Integration*, 95 P.2d at 113; American Bar Association, *Bar Types*, https://www.americanbar.org/groups/bar-leadership/resources/resourcepages/barworldbasics/bartypes. This means that all individuals licensed to practice law in Oklahoma must be OBA members. 5 Okla. Stat. ch.1, app.1, art.II, §1. Members must provide OBA with a current address and pay dues, *id.*; *id.* at ch.1, app.1, art.VIII, §1, but nothing in OBA's rules requires members to attend meetings, serve on committees, vote in elections, or otherwise associate with the bar.

2. To serve the ends for which it was created, OBA publishes *OBJ*. The journal's purposes are "to provide a forum for information on the practice of law, to educate lawyers in their practice areas and [on] updates in the law, and to provide practitioners OBA-related notices and information on rules, budgets, and developments." D.Ct. Dkt.181 at 4 (¶18). From March 2017 (the beginning of the statute-of-limitations period in this case) through June 2022 (when Schell filed the operative complaint), OBA published 53 editions of *OBJ*, containing approximately 650 articles by numerous authors. *Id.* at 5 (¶27). Schell himself had an article published in 2010. *Id.* at 8 (¶48).

Every *OBJ* issue has a disclaimer on the masthead page explaining that "[s]tatements or opinions expressed in the *Oklahoma Bar Journal* are those of the

authors and do not necessarily reflect those of the Oklahoma Bar Association." D.Ct. Dkt.181 at 5 (¶29). The disclaimer also explains that "articles carried in [*OBJ*] are selected by the Board of Editors." *Id*. Since mid-2022, a similar disclaimer has appeared on every page of every practice-themed *OBJ* article. *Id*. at 5 (¶30).

### B. *Lathrop* And *Keller*

The Supreme Court has twice addressed First Amendment challenges to integrated bar associations.

1. In *Lathrop v. Donohue*, 367 U.S. 820 (1960), the Court considered a lawyer's claim that Wisconsin violated his rights to free speech and association "by compelling him … to be a member of and financially support … the State Bar of Wisconsin," *id*. at 827 n.4 (plurality). The plaintiff (Lathrop) complained that he was "coerced to support an organization which … engage[s] in political and propaganda activities"—such as "mak[ing] and oppos[ing] proposals for changes in … laws and constitutional provisions"—"contrary to plaintiff's convictions and beliefs." *Id*. at 822.

Across three opinions, seven justices concluded that the mandatory bar dues and membership did not violate Lathrop's right to free association. A four-justice plurality emphasized the limited nature of the mandatory association, noting that the bar did "not compel the plaintiff to associate with anyone," including because

he was "free to attend or not attend its meetings or vote in its elections as he chooses." 367 U.S. at 828. The plurality then focused on the limited quantity of objectionable bar activity, noting that the activity was "not the [bar's] major activity." *Id*. at 839. Although the bar engaged in "some" objectionable activity, the plurality was "unable to find any impingement upon protected rights of association" because "[t]he bulk of State Bar activities serve the function … of … improving the quality of the legal service available to the people of the State." *Id*. at 843. Finally, noting the lack of a full record, the plurality declined to resolve Lathrop's claim "insofar as it rests on the assertion that his rights of free speech"—as opposed to free association—"are violated by the use of his money for causes which he opposes." *Id*. at 845.

Three justices concurred in the judgment but would have gone further, by also rejecting the free-speech claim. Two of those three reasoned that the bar's decision to "devote some part of [its] funds to" objectionable activity did not "so identif[y] the individual payor of dues with the belief expressed" by that activity as to offend the First Amendment. 367 U.S. at 860 (Harlan, J., concurring). The third opined simply that mandatory bar dues and membership "do[] not violate any provision of the … Constitution." *Id*. at 865 (Whittaker, J., concurring).

2. In *Keller*, the Supreme Court confronted the free-speech question left unresolved in *Lathrop*. The *Keller* plaintiffs "contend[ed] that the use of their

compulsory [bar] dues to finance political and ideological activities … with which they disagree[d] violate[d] their rights of free speech." 496 U.S. at 9. The Court unanimously held "that lawyers admitted to practice in the State may be required to join and pay dues to the State bar," *id*. at 4, and that compulsory dues do not support a free-speech claim so long as the dues fund activities "germane" to the state's "interest in regulating the legal profession and improving the quality of legal services." *Id*. at 13-14. The Court further held that—as Schell acknowledges (Br.6)—the germaneness standard is "whether the challenged expenditures are necessarily or reasonably incurred for the purpose of regulating the legal profession or improving the quality of the legal service available to the people of the State." 496 U.S. at 14 (quotation marks omitted). *Keller* declined to reach what it called the plaintiffs' "broader freedom of association claim" because the lower courts had not addressed it. *Id*. at 17.

### C. This Litigation

Schell brought this case in March 2019. App.14. (His brief mistakenly says (p.10) that he "filed suit against the OBA in April 2020.") Schell alleged that (1) Oklahoma's requirement that practicing attorneys join OBA violates his right to free association, (2) OBA's use of mandatory bar dues to subsidize OBA speech violates his right to free speech, and (3) OBA lacked an adequate policy to prevent any impermissible use of mandatory bar dues. *See Schell I*, 11 F.4th at 1184-1185.

The district court dismissed Schell's first two claims, deeming each foreclosed by *Lathrop* and *Keller*, but declined to dismiss his third claim. App.37-40. OBA then adopted the safeguards that Schell's third claim alleged were required. *Schell I*, 11 F.4th at 1186. The parties agreed that those safeguards mooted that claim, so the district court dismissed it. *Id.*; App.41.

Appealing the dismissal of his first two claims, Schell argued that *Janus v. American Federation of State, County, & Municipal Employees*, 585 U.S. 878 (2018)—which applied exacting scrutiny to mandatory public-union dues—"transformed prior Supreme Court decisions upholding mandatory bar dues and membership such that what was once permitted by *Lathrop* … and *Keller* … is now precluded." *Schell I*, 11 F.4th at 1182. This Court disagreed, reasoning that "bar associations are meaningfully distinct from unions" and that "*Keller* remains binding precedent." *Id*. at 1190. Summarizing its central holding, the Court explained that "*Keller* established a germaneness test" and "*Janus* did not replace that longstanding test with exacting scrutiny." *Id*. at 1191. The Court accordingly "affirm[ed] the district court's holding that mandatory bar dues do not violate Mr. Schell's First Amendment rights." *Id*. at 1182.

This Court concluded, however, that *Lathrop* and *Keller* did not "necessarily foreclose[]" Schell's membership-based free-association claim. *Schell I*, 11 F.4th at 1194. It held that the "primary inquiry for assessing" that claim is whether the

bar activity to which Schell objects satisfies *Keller*'s germaneness test. *Id*. at 1192. Applying that "primary inquiry," the Court determined that "Schell's allegations" made it "plausible" that two of the six *OBJ* articles to which Schell objected "strayed from [OBA's] germane purposes." *Id*. at 1194. (The articles themselves were not in the record. *Id.*) The Court accordingly "reverse[d] the district court's dismissal of Mr. Schell's freedom of association claim based on mandatory bar membership" and "remand[ed] so that Mr. Schell may conduct discovery on that claim." *Id*. at 1183.

This Court issued specific instructions for the remand: It directed that once "discovery is complete, if defendants seek summary judgment, the district court will need to apply the test from *Keller* to determine whether the [challenged *OBJ*] articles are germane to the accepted purposes of the state bar." *Schell I*, 11 F.4th at 1194-1195. "[I]f the articles are not germane," this Court continued, "the district court will need to assess whether Mr. Schell may advance a freedom of association claim based on [those] articles." *Id*. at 1195.

With respect to the second step, this Court noted a "potential open issue" as to "what degree, in quantity, substance, or prominence, a bar association must engage in non-germane activities in order to support a freedom-of-association claim based on compelled bar membership." *Schell I*, 11 F.4th at 1195 n.11. The Court observed that the "*Lathrop* plurality … thought it important that 'the bulk of

State Bar activities serve[d]' the legitimate functions of the bar association," and recited the plurality's conclusion that compelled membership was constitutional "'even though'" the bar engaged in "'some'" objectionable activity, because that activity was "'not the major activity' of the bar." *Id.* (quoting *Lathrop*, 367 U.S. at 839, 843). But the Court declined to resolve this "potential open issue" because it had not been briefed. *Id*.

On remand, Schell amended his complaint to add allegations of non-germane activity. His amended complaint challenged thirteen *OBJ* articles, seven articles distributed by a news-aggregation service under an OBA logo, and certain OBA legislative activities. App.49-58, 177.

After discovery, the district court granted summary judgment for defendants. App.193-194. Following this Court's instructions, the district court applied *Keller*'s test to determine whether the challenged activity was germane. App.176. Based on its analysis, the court found all the activity germane except for a "single OBJ article" that it deemed "non-germane, if only marginally so." App.188, 191. The court then considered whether that one "marginally" non-germane article was "sufficient to make out a freedom of association claim," and "conclude[d] that it is not." App.191. Citing *Lathrop*, the court reasoned that "the quantity of non-germane activit[y] was very limited," that "the 'bulk' of the bar association's activities were permissible [under] *Keller*," and that the germaneness of even the

one article deemed non-germane was "a close question." App.191-192. The court further reasoned that the content and context of that one article "would not suggest to a reasonable person anything about the beliefs of an individual OBA member," noting *OBJ*'s disclaimer and the fact that the article was a "Back Page" book review—not a "feature article"—"by an individual OBA member, rather than by an OBA officer." App.192. Using the language of *Schell I*, the court concluded that "[i]n light of the quantity, substance, and prominence[] of the non-germane material[,] … a violation of Mr. Schell's associational rights did not occur." *Id.*

In this appeal, Schell argues (Br.35-53) that five *OBJ* articles (the one deemed non-germane and four deemed germane below) are non-germane. He further contends (Br.22-35) that *any* non-germane activity—regardless of quantity, substance, and prominence—violates his right to free association.

**SUMMARY OF ARGUMENT**

I. Schell's argument proceeds from the premise that exacting scrutiny governs his claim. But *Schell I* (the case he cites for that proposition) held the opposite, instructing that "the primary inquiry for assessing this matter is" *Keller*'s germaneness test—which the Court explained is "not … exacting scrutiny." 11 F.4th at 1191, 1192. Schell's attempt to impose exacting scrutiny (including a version in which germaneness plays some role) thus violates both binding precedent and law of the case. And because Schell declines to argue that he

prevails under the *Keller*-germaneness standard that this Court held to govern, this Court can affirm simply by reiterating that the exacting-scrutiny standard he espouses does not apply.

II. Under *Keller*, all five challenged *OBJ* articles are germane. That includes the one article the district court deemed "marginally" non-germane: a book review of a historical treatise cited in numerous court decisions, including a recent Supreme Court decision of sweeping significance to Oklahoma lawyers. The district court reached the opposite conclusion by requiring the article to explain why it is germane. That is not necessary. The court correctly deemed the remaining articles germane; Schell's contrary arguments rest on mischaracterizing and/or ignoring significant portions of the articles.

Schell also urges this Court to narrow *Keller*'s test. But his arguments for doing so mostly flow from his faulty assumption that germaneness is a form of (or part of) exacting scrutiny. Again, that is foreclosed by precedent and law of the case. Schell's additional arguments for narrowing *Keller* rely on misinterpretations of binding precedent and administrability concerns that are debunked by *Schell I* and other decisions applying *Keller*.

III. Even if the challenged articles were not germane under *Keller*, they would not support Schell's free-association claim. As the district court concluded, whether non-germane conduct supports such a claim depends on the quantity and

nature of that activity. Supreme Court precedent and (if more were needed) common sense counsel that, to support an expressive-association claim like Schell's, any non-germane activity must (1) be significant in quantity and (2) affect the plaintiff's expression by creating a non-trivial risk that expression will be attributed to the plaintiff.

The allegedly non-germane activity here fails on both counts, providing two independent bases for affirmance (beyond those already noted). Schell challenges an infinitesimal fraction of OBA activity: under 1% of the *OBJ* articles published during the relevant period. And the five challenged articles—each of which was by-lined and run with a disclaimer stating that any views expressed therein were those of the author alone—do not affect Schell's expression because neither the articles nor their selection can fairly be attributed to him. Schell's contrary arguments rest on *ipse dixit*, misinterpretations of precedent, faulty logic, and evidence that is both irrelevant and improperly introduced for the first time on this appeal.

## ARGUMENT

### I. THIS COURT HAS ALREADY REJECTED SCHELL'S ARGUMENT THAT EXACTING SCRUTINY APPLIES HERE

Schell's entire argument proceeds from the false premise that exacting scrutiny governs his free-association claim. For example, he begins the relevant section of his argument by saying (Br.20) that "exacting scrutiny requires that any

requirement be narrowly tailored to the interest it promotes" (quotation marks omitted). He also asserts (Br.18 n.2) that in *Schell I*, "this Court resolved … that exacting scrutiny is the applicable standard of review." But exacting scrutiny is *not* the applicable standard here—because *Schell I* held the opposite of what Schell claims.

In that appeal, Schell argued that *Janus*, which applied exacting scrutiny to mandatory public-union dues, "transformed prior Supreme Court decisions upholding mandatory bar dues and membership such that what was once permitted by *Lathrop* … and *Keller* … is now precluded." *Schell I*, 11 F.4th at 1182. But this Court rejected that argument, holding that "*Keller* established a germaneness test" for mandatory-bar dues and membership, and that "*Janus* did not replace that longstanding test with exacting scrutiny." *Id*. at 1191. Schell's subsequent petition for certiorari—which likewise asked the Supreme Court to hold that the "exacting First Amendment scrutiny that applies to compulsory union fees under *Janus*" also applies to mandatory-bar dues and membership, Petition i, *Schell* (No. 21-779)—was denied without noted dissent, *Schell*, 142 S.Ct. at 1440, even though two justices had previously said the Court *should* take up the question Schell presented, *see Jarchow v. State Bar of Wisconsin*, 590 U.S. 974, 975 (2020) (Thomas, J., dissenting from denial of cert.).

Having rejected Schell's plea to apply exacting scrutiny, and having remanded only "Schell's freedom of association claim based on mandatory bar membership," *Schell I*, 11 F.4th at 1183, *Schell I* instructed that on remand, "the district court will need to apply the test from *Keller* to determine whether the [challenged *OBJ*] articles are germane to the accepted purposes of the state bar," *id*. at 1195. "[I]f the articles are not germane," this Court continued, "the district court will need to assess whether Mr. Schell may advance a freedom of association claim based on [those] articles. *Id*. This two-step framework—"not … exacting scrutiny," *id*. at 1191—governs Schell's claim in this appeal as much as on remand, because where "there is an appeal from the judgment entered after remand, the decision on the first appeal establishes the law … to be followed on the second." *United States v. Monsisvais*, 946 F.2d 114, 116 (10th Cir. 1991).

Schell's attempt to relitigate the last appeal—or simply rewrite *Schell I*—fails. It is foreclosed as a matter of circuit precedent, by which this panel is "bound … absent en banc reconsideration or a superseding contrary decision by the Supreme Court," *Barnes v. United States*, 776 F.3d 1134, 1147 (10th Cir. 2015) (emphasis omitted). It is also barred by the law-of-the-case doctrine, which "preclud[es] the relitigation of issues either expressly or implicitly resolved in prior proceedings in the same court," *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1241 (10th Cir. 2016).

Perhaps recognizing all this, Schell attempts to *meld* exacting scrutiny and germaneness. For example, he asserts (Br.12-13) that "[t]his Court has held that associational challenges are subject to exacting scrutiny and that *Keller*'s germaneness standards apply to these challenges." And later he claims (Br.23) that "[f]or a *de minimis* exception to have any meaning, it would require more than germaneness and exacting scrutiny." This confusing effort to conflate two separate standards—and thereby turn this Court's rejection of Schell's argument in the prior appeal on its head—is unavailing. As explained, *Schell I* made clear that germaneness and exacting scrutiny are different, stating: "In conclusion, *Keller* established a germaneness test for the constitutionality of mandatory bar dues" and "*Janus* did not replace that longstanding test with exacting scrutiny." 11 F.4th at 1191. Schell therefore cannot pretend that his exacting-scrutiny argument here is, despite having a germaneness component, anything other than a rejection of *Schell I*.

Because Schell's argument rests entirely "[i]n the context of exacting scrutiny," Br.13, he does not argue that he prevails under the applicable standard (*Keller*'s germaneness standard, as distinct from Schell's re-imagining of it). Any such argument "is therefore waived," even if Schell "makes [such an] argument for the first time in his reply." *United States v. Pickel*, 863 F.3d 1240, 1259 (10th Cir. 2017). Accordingly, to affirm, this Court need not (and should not) proceed

further than re-affirming that germaneness is not exacting scrutiny, and that the former governs Schell's claim.

## II. SCHELL'S ATTACKS ON THE DISTRICT COURT'S GERMANENESS RULING LACK MERIT

### A. The District Court Applied The Correct Germaneness Standard

As explained, *Keller* holds that a state bar's activity is germane to the bar's legitimate purposes if it is "necessarily or reasonably incurred for the purpose of regulating the legal profession or improving the quality of the legal services available to the people of the State." 496 U.S. at 14 (quotation marks omitted). Contrary to Schell's assertion that "the district court never provided an explanation of germaneness" (Br.35), that is the exact standard the court articulated and applied in rejecting Schell's free-association claim, *see* App.176-177.

Schell levels a hodgepodge of attacks on *Keller*'s germaneness standard. None has merit—and most fail for the reason already discussed: They depart from the binding holdings of *Keller* itself and *Schell I*.

1.a. Schell declares *Keller*'s standard "far too capacious," urging this Court to replace it with a more demanding test. Specifically, he proposes that germaneness "require[] a direct and inherent connection to the practice of law." Br.43 (emphasis omitted). But even if one could put aside that a panel cannot depart from *Keller* (which adopted the germaneness standard recounted above) or *Schell I* (which held that *Keller* governs in this case), Schell offers no valid

justification for his narrowed reformulation. Indeed, even the—non-binding—case from which he draws the word "inherent" recognized *Keller*'s actual test, explaining that "[t]o be 'germane,' bar association speech must be reasonably related to … (1) regulating the legal profession or (2) improving the quality of legal services." *Boudreaux v. Louisiana State Bar Association*, 86 F.4th 620, 631 (5th Cir. 2023).

Schell contends, however (Br.36), that his direct-and-inherent-connection gloss on germaneness "follows from germaneness's role in ensuring that the integrated bar mandate is 'narrowly tailored to the … interest[] it promotes'" (quoting *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 611 (2021)). In other words, as suggested by this quotation of *Bonta*—which applied exacting scrutiny—Schell's proposed germaneness standard is based on his assumption (Br.13) that, "[i]n the context of exacting scrutiny," "germaneness functions as the tailoring requirement." Indeed, Schell's primary support for this point is *Wyoming Gun Owners v. Gray*, 83 F.4th 1224 (10th Cir. 2023), another case "[a]pplying exacting scrutiny" (Br.37). This argument is thus just a different phrasing of his plea that this Court apply exacting scrutiny. But again, it is both binding precedent and law of the case that "the [germaneness] test from *Keller*" applies and that that test is "not … exacting scrutiny." *Schell I*, 11 F.4th at 1191, 1195. And if Schell is suggesting that *Wyoming* abrogated *Schell I*'s holding

despite never even citing *Schell I* (an argument so strained that Schell does not make it expressly), that is unavailing: *Wyoming* itself recognized that "different standards … govern different types of infringements," 83 F.4th at 1243, such that its application of exacting scrutiny to a campaign-finance law does not control in the very different context of mandatory bar membership—a context in which "*Keller* remains binding precedent on this court," *Schell I*, 11 F.4th at 1190.

Perhaps recognizing this, Schell shifts to the argument (Br.38) that his direct-and-inherent-connection gloss on germaneness "would follow even if it were not part of narrow tailoring," because "First Amendment rights are *already* burdened by mandatory bar associations, regardless of germaneness." Put differently, Schell says that because "[g]ermaneness simply justifies that burden," it must be "sufficiently narrow." *Id*. But despite Schell's alternative verbiage, this argument is no different from the narrow-tailoring argument just discussed. It too therefore fails because it flows from Schell's foreclosed premise that exacting scrutiny applies. Indeed, Schell's only citation for the proposition that "First Amendment rights are *already* burdened by mandatory bar associations" (*id.*) is to the portion of *Janus* articulating "[t]he exacting scrutiny standard … appl[ied]" there, 585 U.S. at 916.

Undeterred, Schell next asserts (Br.39) that his direct-and-inherent-connection gloss on germaneness is needed because germaneness calls for more

"administrable lines" than *Keller*'s articulation provides. But *Keller* has not proven difficult to administer. This Court, for example, applied it in *Schell I*, determining that some *OBJ* articles were germane but that others might not be (depending on what the record showed about them). *See* 11 F.4th 1192-1194. Nor is *Keller*'s articulation of germaneness "meaningless" or without "teeth" (Br.40). Schell suggests otherwise only by citing other glosses on germaneness that litigants have advanced, such as that germaneness is anything "'of concern to lawyers'" or anything potentially "'impact[ing] a person who is practicing law,'" Br.39 (quoting *Boudreaux*, 86 F.4th at 633). But as Schell says (*id.*), those glosses were *rejected*, so they do not support his argument. And certainly his direct-and-inherent-connection gloss does nothing to make the standard more precise; courts applying the test would then be interpreting two adjectives ("direct" and "inherent") rather than one ("germane"). As *Schell I* concluded, courts should continue to apply *Keller*'s germaneness test as the Supreme Court articulated it. No further gloss is needed, just as courts apply "reasonableness" in other areas of the law without complicating matters by layering additional adjectives on top.

b. Schell contends (Br.41) that his position "is supported by this Court's duty to harmonize" *Keller* with other Supreme Court precedents (quotation marks omitted). Specifically, he urges this Court to replace *Keller*'s standard with that of a case requiring that compulsory public-union fees be a "'necessary incident'" of

the union's regulatory purposes, Br.41 (quoting *Knox v. Service Employees International Union*, 567 U.S. 298, 310 (2012)). But that would read the word "reasonably" out of *Keller*, which, again, defines germane as "necessarily *or reasonably*" connected to a state bar's legitimate purposes, 496 U.S. at 14 (emphasis added). This Court should not read *Knox* as having silently rewritten *Keller*—a case *Knox* never even cited—especially in light of *Schell I*'s (correct) conclusion that "bar associations are meaningfully distinct from unions," 11 F.4th at 1190. That meaningful difference means there is no "discordan[ce]" between *Keller* and *Knox* that requires "harmoniz[ing]" (Br.41).

Schell is equally off base in asserting (Br.41) that *Harris v. Quinn*, 573 U.S. 616 (2014), "authoritatively constru[es] *Keller* as holding *only* that bar members 'could be required to pay … dues used for activities connected with proposing ethical codes and disciplining bar members'" (quoting *Harris*, 573 U.S. at 655) (emphasis added). *Harris* does not say "only," which is why that word appears in Schell's brief outside of quotation marks. Indeed, if germaneness meant "only" what Schell quotes from *Harris*, it would not cover efforts to improve court procedures, continuing legal education, or initiatives to improve access to legal services, all of which courts treat as legitimate integrated-bar activities. For instance, this Court deemed an *OBJ* article germane because it "involve[d] the structure of the court system," *Schell I*, 11 F.4th at 1193, and the Fifth Circuit has

deemed germane "CLE programs," *McDonald v. Langley*, 4 F.4th 229, 251 (5th Cir. 2021), and "'access to justice' initiatives," *Boudreaux*, 86 F.4th at 632.

Confirming that his "duty-to-harmonize" argument is just one more example of his disregard of *Schell I*, Schell asserts (Br.42) that "*Keller* does not have direct application to this case" and thus that "this Court should look to *Janus*" rather than "extending" *Keller* (quotation marks omitted). Again, it is both binding precedent and law of the case that "the test from *Keller*"—*not* the test from *Janus*—governs Schell's claim. *Schell I*, 11 F.4th 1195.

2. Finally, Schell levels two attacks on how the district court applied *Keller*'s germaneness standard. Each lacks merit.

First, Schell complains (Br.46) that the court erroneously looked to the overall "thrust" of *OBJ* articles rather than limiting its analysis to the specific portions of each to which Schell objects. But as with much of Schell's brief, *Schell I* refutes this critique: If germaneness could be determined based on isolated portions of an article, this Court would not have held that "without viewing [an] article, it is impossible to conclude" the article is "non-germane." 11 F.4th at 1194. Under Schell's view, this Court could have assessed germaneness based on the isolated snippets in Schell's brief, *see* Opening Br. (Dkt.41) at 7-10, *Schell*, No. 20-6044 (May 19, 2020). Schell cites no case engaging in the paragraph-by-paragraph or sentence-by-sentence approach he claims is required.

Second, Schell faults the district court (Br.25) "[t]o the extent it thought" that only political or ideological speech can be non-germane. But the court did not apply any categorical carveout for apolitical and non-ideological content. (Schell seems to recognize this, hence his repeated use of caveats in making the argument—not only "[t]o the extent it thought," *id.*, but also saying that the district court "appeared" to rule that speech must be political or ideological to be non-germane, Br.22.) The court considered whether articles were political or ideological as one factor in assessing germaneness. *See* App.183, 185, 192. Schell himself implicitly endorses that approach, contending (Br.26) that "it is *far harder* to justify how ideological and political advocacy is germane" (emphasis added).

In sum, Schell's myriad efforts to rewrite *Keller* and ignore *Schell I* should be rejected. The district court correctly applied the Supreme Court's germaneness test as articulated in *Keller* itself and as deemed by this Court in *Schell I* to remain binding.

### B. Each Challenged Article Is Germane To A Legitimate OBA Purpose

As explained, Schell's appeal rests on five *OBJ* articles published between 2018 and 2022. Br.44-53. Each is germane under *Keller* because each is "necessarily or reasonably" related to "regulating the legal profession or improving the quality of the legal services available to the people of the State," *Keller*, 496 U.S. at 14 (quotation marks omitted).

1. "A Resilient Mindset" (App.156-161). This article, published in December 2020—at the height of the COVID-19 pandemic—offers mental-health advice tailored specifically for lawyers. Contrary to Schell's assertion (Br.51) that it "was not focused on stresses or problems related to legal practice," the article addresses lawyer-specific challenges such as "fearing for the future of [one's law] firm," losing touch with either "clients [who] stopped calling" or "the people you saw in court," and not having "enough time to write [a] brief to [one's] satisfaction because" of "fatigue" or "mental disorganization" brought on by the pandemic. App.158-160. Similarly, contrary to Schell's assertion (Br.51) that the article offers "general thoughts" or "quasi-spiritual" wellness advice, the district court correctly recognized that the article "provides specific steps for lawyers," App.184. For example, the article suggests that lawyers use pandemic-imposed downtime "to do a complete file review for every case in the office" and "reach out to everyone with a pending case to say hello and check in." App.158. It also refers readers to "the Lawyers Helping Lawyers Assistance Program for professional support." App.160. As the district court recognized, these concrete and lawyer-specific suggestions make the article nothing like "the tweets regarding the benefits of walnuts, exercise, and sunlight found to be non-germane" by the Fifth Circuit. App.184 (citing *Boudreaux*, 86 F.4th at 633). Finally, contrary to Schell's suggestion that the article was authored by "someone with no apparent expertise,"

Br.51, the author was the founder of a company providing "training and consulting for attorneys and law offices nationwide," App.161. In short, the district court correctly held that "the article was reasonably related to improving the quality of legal services in the particular circumstances of the pandemic" and therefore "germane."

2. "Tort Litigation for the Rising Prison Population" (App.151-155). This article provides a detailed summary of the statutory limits on, and avenues available for, claims challenging prison conditions in Oklahoma. For example, it instructs on the statute of limitations supplied by Oklahoma Statutes Title 12, section 95, App.151; the immunities and notice requirements supplied by the Oklahoma Governmental Tort Claims Act, App.152; the administrative-exhaustion requirement imposed by Oklahoma Statutes Title 57, App.152; the "realistic options for plaintiffs" to sue under 42 U.S.C. §1983 and the Oklahoma Constitution, App.153; and several Oklahoma judicial "opinions regarding inmates and the Oklahoma Constitution," App.153—including a landmark Oklahoma Supreme Court decision the reach of which is the subject of a "split" among federal courts, App.154. Unsurprisingly, the article is dense with citations to Oklahoma statutes and state and federal case law. *See* App.155. The district court thus correctly held the article "germane because it was reasonably related to improving the quality of legal services, i.e. educating lawyers as to the legal

hurdles in pursuing claims for prisoners, including tort liability exemptions, and the claims available to prisoners who may suffer injury in Oklahoma prisons and jails." App.181.

Ignoring *all* of this—which is reason enough to affirm the district court's conclusion about this article—Schell zeroes in on the article's last two sentences, which call for "more protection for [inmates'] constitutional rights," App.155, *quoted in* Br.45. These sentences do not offer "concrete policy demands," Br.45, which *Schell I* suggested might be non-germane, *see* 11 F.4th at 1194. Nor do they render the article "pure ideological advocacy," Br.45; in fact, given everything in the article discussed above (and, as noted, simply ignored by Schell), that argument is frivolous. As the district court recognized, the "thrust of the article is to set forth the statutory and legal limits on claims challenging prisoners' conditions of confinement and to explain the type of claims available to prisoners." App.181. That is assuredly germane to improving the quality of legal services; indeed, Schell conceded below that "articles that explain how existing laws may be applied to different groups of Oklahomans can help a lawyer maintain the requ[isite] skill and knowledge in their [practice] area," D.Ct. Dkt.181 at 7 (¶41). All this may explain why Schell resorts to mischaracterizing the article, including by replacing its actual title ("Tort Litigation for the Rising Prison Population," App.151) with his own

misleading one: "Advocating for More Prisoner Suits." Br.44. Such rewrites do not render the article non-germane.

3. "*Guinn v. U.S.*: States' Rights and the 15th Amendment" (App.162-166). This article, published in *OBJ*'s "Black Legal History in Oklahoma" issue, discusses the history of state voting laws (including the state's literacy test and grandfather clause) and details the reasoning of voting-rights cases in Oklahoma and federal courts, focusing in particular on "the importance of the U.S. Supreme Court's 1915 decision in *Guinn v. United States*," 238 U.S. 347 (1915), a "little talked about appeal out of … Oklahoma." App.163. In its conclusion, the article ties this legal history to modern legal practice, noting that "[s]everal states have recently passed or are in the process of passing" new voting laws that are subject to "the same type of criticism as [the] voting laws in *Guinn*." App.165.

The district court correctly held that "the article is germane because" it "educate[s] lawyers about the history of voting rights for black people … in Oklahoma" and thus is "reasonably directed to improving the quality of legal services available to Oklahomans." App.185. Lawyers who understand how current controversies about an area of the law reprise controversies from the past can surely provide better representation than lawyers ignorant of such connections. Again, Schell agreed below, conceding that "having access to articles that contain information explaining the history and development of laws can help a lawyer

maintain the requ[isite] skill and knowledge in their [practice] area." D.Ct. Dkt.181 at 7 (¶41).

Here too, Schell resorts to mischaracterization. He again replaces the article's actual title ("*Guinn v. U.S.*: States' Rights and the 15th Amendment," App.162) with his own creation that evokes his preferred (but misleading) gloss: "Attacking Election Law," Br.47. That gloss flows from the article's statement that Oklahoma's literacy test "had no other purpose but to keep Black people from voting," App.165. But Schell ignores that that sentence was a description of *the Supreme Court's* reasoning in the case that is the article's subject. *See Guinn*, 238 U.S. at 365. Schell also claims (Br.48-49) that the article "has nothing to do with the practice of law" because voting is merely a "general social issue" and "[n]on-lawyers … are voters too." Br.48-49. That claim is hard to take seriously. Voting "has [*everything*] to do with the practice of law" (Br.48). Day in and day out, judges and lawyers throughout the country are litigating and deciding a variety of voting-rights lawsuits (often about state laws, as in *Guinn*). Indeed, the Supreme Court has four voting-related cases on its merits docket in the current term alone—a term that does not even include a general federal election. *See Bost v. Illinois State Board of Elections*, 146 S.Ct. 513 (2026); *Louisiana v. Callais*, No. 24-109 (U.S.); *National Republican Senatorial Committee v. Federal Election Commission*, No. 24-621 (U.S.); *Watson v. Republican National Committee*, No.

24-1260 (U.S.). The relevance of voting to lawyers and legal practice is why the article contains dozens of citations to court decisions and law-review articles, App.166—ignored, as noted, by Schell. Those citations further confirm the article's already-clear germaneness.

4. "Oklahoma's Embrace of the White Racial Identity" (App.167-172). This article, also published in *OBJ*'s "Black Legal History in Oklahoma" issue, discusses legal history bearing on racial justice in Oklahoma and advocates for racial diversity in the state's legal profession. Contrary to Schell's histrionic assertion (Br.50), the article is not a "historical critique about the evils of … 'whiteness'" that "has nothing to do with the practice of law." Rather, drawing on research support from the Oklahoma City University School of Law, *see* App.172, the article teaches about former state constitutional provisions that drew explicit racial lines, Oklahoma case law defining race, and the state's historical racial-segregation statutes, App.169-170. Once more, Schell acknowledged below that such matters are germane, conceding that "articles that contain information explaining the history and development of laws can help a lawyer maintain the requ[isite] skill and knowledge in their [practice] area." D.Ct. Dkt.181 at 7 (¶41).

Schell implies, however, that the article speaks to "the evils of … 'whiteness'" in the "present" because—in Schell's telling—it "stress[es]" that "'[t]he past is never dead.'" Br.50 (alteration in original) (quoting App.170). In

fact, the article makes exactly the opposite point: It *refutes* William Faulkner's adage that "[t]he past is never dead," App.170, stating that "Oklahoma's future does *not* need to be written by the past," App.172 (emphasis added). Just as Schell cannot prevail by telling this Court that *Schell I* held exacting scrutiny applicable when it actually held the opposite, he cannot show that this (or any) article is non-germane by telling the Court that the article's message is the opposite of what the article actually conveys.

The article also cites "racialized disparities" in "the Oklahoma bar," at "Oklahoma law schools," and "among major [law] firms in Oklahoma," disparities it seeks to redress by calling for greater "diversity in the office, on the bench and at the podium." App.170-171. As the district court recognized, such calls for diversity in the legal profession have been deemed germane by the very Fifth Circuit cases on which Schell heavily relies for his rewrite of *Keller*'s germaneness standard. *See* App.186 (citing *McDonald* and *Boudreaux*). Efforts to eliminate racial disparities in the bar also enhance public trust in the legal system. Schell's assertion that "enhanc[ing] the reputation of the legal industry" is not germane, Br.43 (quotation marks omitted), contradicts *Schell I*'s holding that an article's "promotion of the public's view of the judicial system" rendered the article "germane," 11 F.4th at 1193. Finally, the article's call to achieve greater diversity is expressly directed to "[m]embers of the legal profession," App.171, contrary to

Schell's bald assertion that "the article is plainly not directed at the legal profession," Br.50. The district court thus correctly concluded that "the article is germane to the OBA's purposes of regulating the legal profession and improving the quality of legal services." App.186.

5. "A Silent History" (App.173). This book review introduces readers to a historian's "well researched and documented manuscript" titled *And Still the Waters Run*. *Id.* That book's discussion of the historical legal status of Native Americans in Oklahoma bears heavily on one of the most significant legal developments in recent Oklahoma history, which occurred shortly before the book review was published: the Supreme Court's landmark decision in *McGirt v. Oklahoma*, 591 U.S. 894 (2020), which recognized that an Indian reservation covers a huge portion of the state, roughly a century after most Oklahomans believed it to have been extinguished. The reviewed book was even cited in *McGirt*. *Id*. at 922. It was also cited by the four-justice dissent in *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 664-665 (2022) (Gorsuch, J., dissenting), and by: this Court in *Indian Country, U.S.A., Inc. v. Oklahoma*, 829 F.2d 967, 980 n.6 (10th Cir. 1987); two dissenting members of this Court in *Woods Petroleum Corporation v. Department of Interior*, 47 F.3d 1032, 1046 (10th Cir. 1995) (en banc) (Henry, J., dissenting); the Chief Justice of the Oklahoma Supreme Court in *Matter of Stroble*, 2025 OK 48, 2025 WL 1805918, at *6 (Okla. July 1, 2025)

(Rowe, C.J., concurring); the District Court for the Eastern District of Oklahoma in *United States v. Adair*, 913 F.Supp. 1503, 1511 (E.D. Okla. 1995); and the District Court for the District of Columbia in *Harjo v. Kleppe*, 420 F.Supp. 1110, 1119 n.6 (D.D.C. 1976).

As these myriad citations demonstrate, the district court here was right to conclude that the book review may be "useful to an Oklahoma lawyer in understanding events shaping the law in Oklahoma," App.188—particularly, of course, lawyers handling Native American matters. Although the court nevertheless deemed the book review non-germane ("if only marginally so") because it "does not explicitly … suggest [the book's] use as a practice aid," *id.*, what matters is whether the article *is* germane, not whether the article explains *why* it is germane. In any event, putting aside courts' heavy reliance on the book, the *review* is germane because it discusses legal history, which, again, Schell conceded below is germane, *see* D.Ct. Dkt.181 at 7 (¶41). Schell attempts to deal with that concession by claiming (Br.51) that "[a]t no point" in the book review "is law discussed beyond noting that 'courts had little control over the lawless desperadoes of Indian Territory and even less over the white squatters and permitted residents'" (quoting App.173). That is false. The review also discusses how "[e]ach tribe had its own law and courts but no jurisdiction over white settlers," that "Congress passed laws requiring that Indian lands owned in common be divided up," the

"appointment of federal administrators for the land transfers," and the failure of a "guardianship system to protect Indian rights." App.173. All of these are quintessentially legal matters, further confirming the review's germaneness.

In sum, each of the five challenged articles satisfies *Keller*'s germaneness test. This Court need go no further (if it even addresses germaneness) to affirm.

## III. Even If Not Germane, The Challenged Articles Are Insufficient In Quantity And Nature To Support Schell's Free-Association Claim

Affirmance would be warranted even if any (or all) of the five challenged articles were not germane under *Keller*. Both precedent and common sense support the conclusion that the viability of a free-association challenge to mandatory membership in a state bar that engages in non-germane activity depends on the "quantity, substance, or prominence" of the non-germane activity, *Schell I*, 11 F.4th at 1195 n.11. As the Supreme Court and this Court have explained, compelled association violates free-association rights only if it "'affects in a significant way'" that party's expression. *St. Mary Catholic Parish in Littleton v. Roy*, 154 F.4th 752, 775 (10th Cir. 2025) (quoting *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000)). In the integrated-bar context, this means a bar's non-germane activity must be (1) significant in quantity (at least more than *de minimis*) and (2) reasonably attributable to the plaintiff, such that it affects her expression.

As elaborated below, the allegedly non-germane activity here is neither. Each deficiency provides an independent basis to affirm if the Court reaches this issue.

### A. Quantity

#### 1. A *de minimis* amount of non-germane activity does not violate freedom of association

As just noted, the effect of compelled association must be "'significant'" to support a free-association claim. *St. Mary*, 154 F.4th at 775 (quoting *Boy Scouts*, 530 U.S. at 648). Hence, in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006), the Supreme Court rejected a free-association challenge to a requirement that universities allow military recruiters on campus, on the ground that a "recruiter's mere presence on campus does not" force the school "to associate" with the military's message, *id*. at 70. Courts thus must evaluate whether an activity with which a plaintiff wishes not to associate is "enough" to support a constitutional claim. *St. Mary*, 154 F.4th at 776.

a. *Lathrop* illustrates this principle in the integrated-bar context. While there was no opinion for the Court there, a majority of the justices agreed that the requirement to be a dues-paying member of a bar association that engaged in only a limited quantity of non-germane activity did not support a First Amendment claim.

Specifically, the four-justice plurality in *Lathrop* rejected the free-association claim there (as this Court observed in *Schell I*) on the ground that "'the

bulk of State Bar activities serve[d]' the legitimate functions of the bar association." 11 F.4th at 1195 n.11 (quoting *Lathrop*, 367 U.S. at 843). "[E]ven though" the bar engaged in "some" non-germane activity, the plurality was "unable to find any impingement upon protected rights of association" because the non-germane activity was "not the major activity of the State Bar." *Lathrop*, 367 U.S. at 839, 843.

Two concurring justices—who together with the plurality constituted a majority of the Court—agreed on the relevance of quantity. Specifically, Justice Harlan's concurrence, which Justice Frankfurter joined, reasoned that a state bar's decision to spend "some part of the organization's funds" on non-germane activity does not "so identif[y]" a dues-paying member with the non-germane activity as to offend the First Amendment. *Lathrop*, 367 U.S. at 860 (Harlan, J., concurring).

Schell's claim is even weaker than the one in *Lathrop*, resting "[m]erely" on the fact "that Oklahoma law forces him to be a member of" OBA, Br.19 (emphasis omitted). The alleged violation, that is, supposedly occurs simply "[b]y dint of his forced membership." Br.20. The claim in *Lathrop*, by contrast, was based on the requirement to "be a member of *and* financially support" Wisconsin's bar association. *Lathrop*, 367 U.S. at 827 n.4 (plurality) (emphasis added). If a limited quantity of non-germane activity did not support that claim, then any *de*

*minimis* quantity of non-germane activity is insufficient, *a fortiori*, to support the weaker claim here.

Schell contends, however, that "this Court" was wrong to "suggest[]" in *Schell I* that *Lathrop* provides "potential support for a *de minimis* exception," because *Lathrop* was concerned with the "'question of compelled financial support of group activities, *not with involuntary membership in any other aspect*.'" Br.24-25 (quoting *Lathrop*, 367 U.S. at 828 (plurality) (emphasis added by Schell)). That distinction *hurts* Schell. Like Lathrop, Schell has never challenged any aspect of compelled membership with an expressive association beyond compelled financial support—but unlike in *Lathrop*, even that aspect (compelled financial support) is no longer at issue here: This Court affirmed the dismissal of Schell's dues-based claim, *see Schell I*, 11 F.4th at 1191, and Schell consented to the dismissal of his challenge to OBA's use-of-dues protections as moot in light of OBA's updated policy, *see id*. at 1186. Again, then, Schell's claim rests on a thinner reed—bare membership in an expressive organization—than did Lathrop's.

Schell next asserts that the Supreme Court offered an "authoritative construction of *Lathrop*" in a later case that said "'the only proposition about which a majority of the Court in *Lathrop* agreed was that the constitutional issues should be reached.'" Br.25 (quoting *Abood v. Detroit Board of Education*, 431 U.S. 209, 233 n.29 (1977)). But that footnoted dicta (from a since-overruled

decision, no less) does not help Schell. It concerned whether *Lathrop* "provide[d] a clear holding to guide [the Court] in adjudicating the constitutional questions *here presented*," i.e., presented in *Abood*. 431 U.S. at 233 n.29 (emphasis added). *Abood* did not involve the *de minimis* issue presented here, so the footnote understandably did not consider whether a majority of the justices in *Lathrop* agreed on that issue.

Similarly flawed is Schell's argument (Br.23) that *Keller* did not mention a *de minimis* exception. That is unsurprising, as *Keller* did not resolve the "broader freedom of association claim" at issue here, *Keller*, 496 U.S. at 17, instead addressing only the claim that the plaintiffs' "free *speech* rights were violated by the … use of [their] mandatory dues to support" non-germane activity, *id.* at 9 (emphasis added). Because the latter claim can be remedied by the relatively modest remedy of proportionate refunds, *see id*. at 16-17, the absence of a *de minimis* exception for such a claim (and hence of any discussion of it in *Keller*) makes sense. Schell's claim, by contrast, calls for the vastly more drastic remedy of overriding a state's policy choice by ordering the dismantling of an integrated bar and replacing it with "a hybrid system," Br.38. Such a federal intrusion on the sovereignty of well over half the states (*see* Br.4) is not warranted where only a *de minimis* amount of non-germane activity is shown.

Schell next contends (Br.22) that this Court ruled out a *de minimis* exception in *Wyoming Gun Owners*. But as explained, that case not only applied exacting scrutiny—a standard inapplicable here, *see supra* part I—but also explicitly cautioned that "different standards … govern different types of infringements," 83 F.4th at 1243. Equally inapposite are *Lorillard Tobacco Company v. Reilly*, 533 U.S. 525 (2001), and *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) (per curiam), which Schell also cites (Br.23). Neither case even involved a free-association challenge.

b. Turning to out-of-circuit precedent, Schell warns this Court (Br.25) against "split[ting] with another Circuit"—the Fifth—by recognizing a *de minimis* exception. But for starters, *not* recognizing such an exception would conflict with precedent from the Ninth Circuit, which "disagree[d] with the Fifth Circuit's holding that if a state bar engages in nongermane activities, compelled membership is necessarily unconstitutional." *Crowe v. Oregon State Bar*, 112 F.4th 1218, 1239 n.10 (9th Cir. 2024) (citing *McDonald*). Moreover, while the Fifth Circuit purported to reject a *de minimis* exception, it actually applied such an exception in precisely the manner Schell resists here: The court rejected a free-association challenge to the extent it was based on certain Texas Bar CLE and annual-convention offerings, on the ground that "any objectionable CLE and annual convention offerings are only one part of a large, varied catalogue," *McDonald*, 4

F.4th at 251. As to the later Fifth Circuit case Schell cites, *Boudreaux v. Louisiana State Bar Association*, its rejection of a *de minimis* exception rested largely on the assertion that *Keller* "categorically state[d] that bar associations cannot engage in non-germane speech." *Boudreaux*, 86 F.4th at 636-637. That is incorrect—which is likely why *Boudreaux* quoted nothing from *Keller* to support its assertion (and in fact cited *Keller* with only a "*cf.*" signal). As Schell agrees (Br.7), *Keller* "did not address when compelled membership in a bar association, as opposed to paying bar dues, would violate the First Amendment's Freedom of Association." And what *Keller* said on the page *Boudreaux* cited was that a "State Bar may … constitutionally *fund* activities germane to those goals out of the mandatory dues of all members. It may not, however, in such manner *fund* activities of an ideological nature which fall outside of those areas of activity." 496 U.S. at 14 (emphases added). *Boudreaux*'s leading rationale for rejecting a *de minimis* exception was therefore simply wrong; the Supreme Court has not held that "the Constitution prohibits non-germane speech by mandatory bar associations," *Boudreaux*, 86 F.4th at 637. That error further confirms that the weight of out-of-circuit authority—including *McDonald*—supports recognizing a *de minimis* exception.

c. Turning to policy arguments, Schell contends (Br.24) that inquiring into the quantity of non-germane activity would be impracticable. That is belied by several cases that have done so without trouble, including *Lathrop*, this case,

and *Pomeroy v. Utah State Bar*, 2024 WL 1810229 (D. Utah Apr. 25, 2024), *appeal submitted*, No. 24-4054 (10th Cir. Sept. 10, 2025), where the district court had no trouble following what it called "the Tenth Circuit's suggestion [in *Schell I*] to analyze … the amount of non-germane conduct," *id.* at *7. It is Schell's approach that would prove unworkable. As *Pomeroy* explained, "the lack of a *de minimis* exception could convert th[e] court into a perpetual monitor of every bar journal … and social media post," to see if even an iota of non-germane activity occurred. 2024 WL 1810229, at *5. That court was rightly "concerned about the burden that such a rigid standard would impose" on both "the court" and "the bar association." *Id*. Schell's insistence (Br.46) that courts parse articles paragraph-by-paragraph or sentence-by-sentence—rather than looking to their "thrust"—only amplifies the problem.

Schell's view that *any* non-germane activity automatically violates the First Amendment would also render ineffectual so-called *Keller* policies, i.e., policies "to prevent the impermissible use of mandatory bar dues," *Schell I*, 11 F.4th at 1186. Such policies "presuppose[] … that a state bar might engage in at least some non-germane activities: the refund mechanism is what allows a state bar to cure" any constitutional violation. *Pomeroy*, 2024 WL 1810229, at *6. *Keller* "procedures (and several decades of jurisprudence evaluating the constitutionality

of these procedures) would be superfluous if every instance of non-germane speech amounted to a violation of the freedom of association right." *Id*.

Schell also asserts (Br.24) that a *de minimis* exception would "allow bar associations to run up the score on 'germane' expressive activity to inoculate any non-germane advocacy they wish." But he points to no evidence that any bar association has ever taken that approach, including any association in the Ninth Circuit, where it has now been settled for well over a year that a *de minimis* exception exists. *See supra* p.39 (discussing *Crowe*). In any event, a court that found such intentionally manipulative conduct by a bar association could appropriately take account of it in conducting the analysis, by discounting (for purposes of applying a *de minimis* exception) any germane activity deemed to have been undertaken in order to "run up the score."

d. Finally, Schell derides a *de minimis* exception on the ground that it would "require courts to … draw an arbitrary, subjective point at which there is enough non-germane speech" to violate the First Amendment. Br.24 (quotation marks omitted). But deploying empty labels like "arbitrary" and "subjective" cannot obscure the fact that there is nothing unusual about courts holding limited infringements of constitutional rights (including the freedom to associate) insufficient to violate those rights. Indeed, courts do so day in and day out. To take just one example, in *Burdick v. Takushi*, 504 U.S. 428 (1992), the Supreme

Court—despite reaffirming that "voting is of the most fundamental significance under our constitutional structure," *id.* at 433—upheld a state "ban on write-in voting" on the ground that the ban "imposes only a limited burden on voters' rights to make free choices and to associate politically," *id.* at 439. Likewise in this context, the "limited burden on [the] right[] … to associate," *id.*, imposed by a *de minimis* amount of non-germane speech does not violate that right.

### 2. Any non-germane activity here was *de minimis*

Assuming there was any non-germane activity here, the district court correctly observed that "the quantity of non-germane activit[y] was very limited" and thus insufficient to support Schell's claim. App.191. Indeed, even if this Court somehow concluded that all five challenged articles were non-germane, that would still represent an infinitesimal fraction of *OBJ* articles, let alone OBA activity.

During the five-year statute-of-limitations period, OBA published 53 editions of *OBJ*, containing approximately 650 articles. D.Ct. Dkt.181 at 5 (¶27). Schell rests his appeal on just *five*, which is under 0.8% of *OBJ* articles, an average of one article per year, and under one article in every ten editions of *OBJ*. Furthermore, Schell does not even object to those five articles in their entirety, instead taking issue with specific snippets. *See supra* part II.B. Any non-germane activity thus assuredly is "not the major activity of" OBA, *Lathrop*, 367 U.S. at

839 (plurality). As in *Lathrop*, there is no "impingement upon protected rights of association" here because "[t]he bulk of State Bar activities" are germane. *Id*. at 843.

To excuse his paltry showing, Schell misleadingly portrays (Br.52) the five challenged articles as reflecting "a pattern of platforming politically charged and skewed articles." The record does not support that claim. To suggest otherwise, Schell repeatedly misreports that "[t]he parties have distilled the dispute into five articles." Br.44; *see also* Br.16. In reality, Schell alone (not "the parties") decided to rest his appeal on just the five articles. Having done so, he cannot dispute that those five are the correct basis for comparison when applying the *de minimis* exception.

In any event, the few specifics Schell gives about other allegedly non-germane activity does not help him. For example, he discusses (Br.8) OBA having weighed in on different methods of selecting state-court judges. But that is manifestly germane activity even under one of the cases Schell himself cites most frequently, *Schneider v. Colegio de Abogados de Puerto Rico*, 917 F.2d 620 (1st Cir. 1990). That case held that activity "directly linked to … the judicial system" is germane. *Id.* at 633, *quoted in* Br.26. Moreover, OBA's advocacy regarding the selection of state-court judges is not at issue on appeal. Schell chose not to

challenge the district court's holding that that activity was germane, App.179-180, electing to limit his appeal to "five [*OBJ*] articles," Br.44.

### B. Nature

#### 1. A state bar's non-germane activity supports a bar member's expressive-association claim only if the activity affects that member's expression

The First Amendment does not protect all interactions with others that "might be described as 'associational' in common parlance." *City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989). In particular, the free-association right is not implicated by relations that "do not involve the sort of expressive association that the First Amendment has been held to protect." *Id*. Schell thus rightly concedes (Br.18) that "[t]he government burdens First Amendment associational rights when it forces an association *that interferes with expression*" (emphasis added). (The First Amendment also protects "intimate association," *City of Dallas*, 490 U.S. at 25, but Schell claims only a violation of his "right to free expressive association," Br.12.)

The Supreme Court has repeatedly made clear that compelled association burdens expressive association only if the compelled association affects the plaintiff's own expression. For example, in *Boy Scouts of America v. Dale*, the Court held that requiring the Boy Scouts to accept a "gay rights activist" as a scoutmaster would "infringe[] the group's freedom of expressive association"

because "the presence of that person [would] affect[] in a significant way the group's" expression, "forc[ing] the organization to send a message" with which it disagreed. 530 U.S. at 648, 653. Similarly, in *New York State Club Association v. City of New York*, 487 U.S. 1 (1988), the Court rejected a claim that a law prohibiting discrimination by private clubs "infringes upon every club member's right of expressive association" because the law "does not affect in any significant way the ability of [those] individuals" to express themselves, *id*. at 13 (quotation marks omitted). And likewise in *Board of Directors of Rotary International, Inc. v. Rotary Club of Duarte*, 481 U.S. 537 (1987), the Court held that a law did "not interfere unduly with [club] members' freedom of private association" because the law would not "affect in any significant way the [club] members' ability to" express themselves, *id*. at 547-548. This Court engaged in the same analysis in *St. Mary Catholic Parish in Littleton v. Roy*, rejecting the "Parish Preschools' … claim" that a law "violates their freedom of expressive association" because the law did not "affect the Parish Preschools' ability to" express themselves. 154 F.4th at 775-776.

In *Crowe v. Oregon State Bar*, the Ninth Circuit straightforwardly applied the Supreme Court cases just cited to a claim like Schell's. As the court of appeals explained, a plaintiff who "challenges a requirement that he join an organization … can establish an infringement on his freedom of association by showing that his

membership in the organization impairs his own expression." 112 F.4th at 1233-1234. And "[t]he plaintiff can make that showing if a reasonable observer would attribute some meaning to his membership—because, for instance, a reasonable observer would assume that the plaintiff agrees with the organization's articulated positions—and he objects to that meaning." *Id*. at 1234.

Schell's attacks on this straightforward application of compelled-association precedent fail. First, Schell grasps (Br.29-30) for a distinction between cases like *Boy Scouts*, which "consider[] whether an association must admit new members," and cases like his, "where individuals are forced to become members." But neither Schell nor the First Circuit case he cites offers any reason for such a distinction. Schell merely avers (Br.29, 30) that the burden on expressive activity is "self-evident" in the latter situation and "not self-evident" in the former. Bald declarations do not make it so. Nor does *Janus* support Schell's assertion (Br.30) that it is "self-evident … that forcing someone to affiliate with an organization that engages in expressive activity forces that person to affiliate with the expression." *Janus* had nothing to do with compelled membership; the issue was whether *non-members* could be forced to *subsidize* a union. *Janus*, 585 U.S. at 884.

Supreme Court precedent in fact rejects Schell's distinction between the associational rights of a group and those of its members, making clear that a group's associational rights flow from its members'. For instance, in *NAACP v.*

*State of Alabama*, 357 U.S. 449 (1958), the Court explained that the NAACP's free-association claim "appropriately" asserted "the rights of its members," *id*. at 458. Schell himself also discredits the distinction he posits: He cites *Boy Scouts* (e.g., Br.31) in equating himself with the association in that case on the ground that each is "the affected party," *id.*

Schell next contends (Br.30-31) that it is improper to "look[] to whether a 'reasonable observer would impute some meaning to membership in the organization,'" insisting that courts must defer to "the affected party's understanding of its own expression" (quoting *Crowe*, 112 F.4th at 1234). But while *Boy Scouts* endorsed some deference to a speaker's view of what impairs its expression, 530 U.S. at 653, it clarified in the very next sentence (and the Court reiterated in a subsequent case) that "a speaker cannot 'erect a shield … simply by asserting' that mere association 'would impair its message.'" *Rumsfeld*, 547 U.S. at 69 (quoting *Boy Scouts*, 530 U.S. at 653). That is what Schell attempts here: He rests his claim "[m]erely" on the fact "that Oklahoma law forces him to be a member of" OBA. Br.19 (emphasis omitted).

Moreover, in *Boy Scouts*—Schell's primary support for resisting a third-party-observer standard—the Supreme Court reasoned that the Boy Scouts' right to free expressive association was burdened because accepting a gay scoutmaster would "force the organization to send a message" to "the world." 530 U.S. at 653.

"[T]he world" is precisely the "abstract third party" (Br.31) that Schell contends is irrelevant. This Court similarly applied the reasonable-observer standard in a recent expressive-association case, rejecting the free-association claim on the ground that "[n]o one would reasonably mistake" one set of views for those of the plaintiffs. *St. Mary*, 154 F.4th at 776.

Schell relatedly complains (Br.31) that "[m]isattribution is the wrong focus" altogether. Again, Supreme Court precedent proves him wrong. In *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), the Court rejected a free-association claim on the ground that "views expressed by" people "passing out pamphlets" in a shopping mall would "not likely be identified with those of the [mall] owner," *id*. at 87. Similarly, in *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008), the Court held that "the fatal flaw" at "the heart" of political parties' free-association claim was their faulty assumption that voters would "assume that the parties … approve of" the candidates listed on a ballot, *id*. at 454. This Court has likewise focused on the risk of misattribution in the expressive-association context; as just noted, it recently reasoned that "[n]o one would reasonably mistake" certain views for those of the plaintiffs. *St. Mary*, 154 F.4th at 776.

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), did not, as Schell claims, categorically "disavow[] conditioning First Amendment protection on the risk of

misattribution." Br.31-32 (quotation marks omitted). In *Moody*—brought by "major social-media platforms"—the Supreme Court stated that it "has never hinged a *compiler's* First Amendment protection on the risk of misattribution." *Moody*, 603 U.S. at 739 (emphasis added). The Court, that is, was considering "whether ordering a party to *provide a forum for someone else's views* implicates the First Amendment." *Id.* at 728 (emphasis added). Schell is not required by OBA to provide a forum for anyone else's views, nor is he a compiler. His purported "forced … associat[ion] with the editorial choices" of *OBJ* (Br.20) does not make him a compiler any more than every user of a major social-media platform is a compiler of all the content on that platform (a suggestion *Moody* did not even entertain). Indeed, Schell is even further removed from *OBJ*'s editorial decisions than a user of a social-media platform is from the platform's editorial decisions, given that membership in a social-media platform is voluntary. And as three concurring justices noted in *Moody*, "[i]n cases not involving core examples of expressive compilations," i.e., cases like this, "First Amendment protection has very much turned on the risk of misattribution." 603 U.S. at 785 n.18 (Alito, J., concurring).[1]

[1] In making this argument, Schell at times confusingly suggests that *Crowe* and the decision below analyzed what a third party would think about the *association's* views, rather than the plaintiff's. For example, after quoting *Crowe*'s reasoning, Schell says (Br.31) that "[t]he fulcrum is not the meaning that an abstract third party would ascribe to an *association*" (emphasis added). He similarly says in the

### 2. The challenged articles do not affect Schell's expression

The challenged *OBJ* articles do not affect Schell's expression—and hence do not violate the First Amendment—because the "circumstances would have prevented a reasonable person from attributing [to Schell any] viewpoint expressed in the article[s]," let alone any expression inherent in the *OBJ* Board of Editors' selection of the articles. App.192. Each article featured a by-line attributing the article to the author who submitted it. App.151, 156, 162, 167, 173. Each *OBJ* issue also included a masthead disclaimer explaining both that "[s]tatements or opinions expressed in [*OBJ*] are those of the authors and do not necessarily reflect those of [OBA]," and that "articles carried in [*OBJ*] are selected by the Board of Editors." D.Ct. Dkt.181 at 5 (¶29). Unlike in *Crowe*, moreover, where "the formatting and content" of a statement in the state bar's magazine "made it appear as though" the bar "adopted the … statement," 112 F.4th at 1236-1237, there is no contention here that anything about any article's "formatting [or] content," *id.* at

---

next sentence (*id.*) that "courts must give deference to an association's assertions regarding the nature of *its* expression and what would impair *its* expression" (emphases added) (quotation marks omitted). In reality, both *Crowe* and the district court here—consistent with the Supreme Court cases discussed in the text—examined not what a reasonable observer would conclude about the bar association's views, but what she would conclude about the plaintiff's, i.e., would the observer conclude that "the bar's activities reflect the *attorney's* personal views," *Crowe*, 112 F.4th at 1236 (emphasis added); *accord* App.192.

1236, suggested that anyone other than the author endorsed the content or that anyone other than the Board of Editors selected the article.

Schell himself has disclaimed the risk of misattribution under the circumstances here. In 2010, *OBJ* published an article Schell authored, "describing an oil and gas law he had lobbied for." D.Ct. Dkt.181 at 8 (¶48). And Schell conceded below that "no one would conclude that his speech as expressed in his OBJ article" was "the speech of anyone" but him. *Id*. at 8 (¶49). The same is true of each of the five challenged articles.

Despite his concession, Schell suggests (Br.33-34) that a reasonable observer *would* attribute to him the viewpoints contained in, or the selection of, others' *OBJ* articles. But the only case he cites for that proposition, *McDonald*, supports the opposite conclusion. The Fifth Circuit there *rejected* a free-association challenge to the extent it was based on publications of the bar journal, on the ground that the journal "feature[s] articles advancing various viewpoints, and, in any event, includes a disclaimer clarifying that the Bar does not endorse any views expressed therein." 4 F.4th at 252. The same is true of *OBJ*. Indeed, *OBJ*'s disclaimer additionally states that "articles carried in [*OBJ*] are selected by *the Board of Editors*"—i.e., not by OBA writ large. D.Ct. Dkt.181 at (¶29) (emphasis added). (Schell is an OBA member but not a member of the Board of Editors.)

Schell claims, however, that it "cannot be" that a "'general disclaimer … erase[s] the First Amendment infringement' of freedom of expressive association." Br.32 (quoting *Circle Schools v. Pappert*, 381 F.3d 172, 182 (3d Cir. 2004)). But the district court did not conclude, nor have defendants argued, that a general disclaimer automatically erases any First Amendment violation. The effect of compelled association on a party's expression is "highly contextual." *St. Mary*, 154 F.4th at 775. And the *OBJ* disclaimer—which was printed in the magazine and thus presented in the same medium as the speech it disclaimed, unlike the hypothetical disclaimer that Schell suggests the Boy Scouts "could have … announced" (Br.32)—is just one of the totality of circumstances that renders misattribution unreasonable here. As noted, it is a factor that the Fifth and Ninth Circuits have each deemed relevant. *See McDonald*, 4 F.4th at 252; *Crowe*, 112 F.4th at 1237, 1240 & n.12. Schell is simply wrong, moreover, to say that "even assuming that a disclaimer would clear the prospect of misattribution, it does not change that Schell is forced to engage[] in expression by becoming a full-fledged member of a bar association that engages in … speech … even when he would prefer to remain silent." Br.32-33 (alteration in original) (quotation marks omitted). By definition, Schell is *not* "engag[ing] in expression" undertaken by OBA if OBA's speech is not attributed to him, i.e., if a disclaimer "clear[s] the prospect of misattribution," Br.32. He is free to "remain silent," Br.33.

Schell's misattribution logic is also unpersuasive for other reasons. For example, Schell suggests that "an average person, who is presumably not a lawyer," could reasonably misattribute *OBJ* articles or their selection to him because the person would not "know whether [Schell] willingly joined [OBA] or was forced to join." Br.34 (emphasis omitted). But to start, as Schell recognizes (Br.52), *OBJ* is not a "general interest magazine." It is aimed at "practitioners," D.Ct. Dkt.181 at 4 (¶18), and "distributed mostly to lawyers in Oklahoma," App.188, all of whom are OBA members. Those individuals surely know not only that OBA membership is mandatory (although such knowledge is not necessary), because they themselves are subject to the membership requirement, but also that they themselves do not necessarily (or actually) agree with every view expressed in every *OBJ* article or with the Board of Editors' decision to run each article.

Furthermore, Schell's argument—that misattribution to him is reasonable because people may not know whether OBA membership is mandatory—assumes that an article in a *voluntary* bar association's journal (or the journal's decision to run the article) is necessarily attributable to all members. That assumption is patently unreasonable. Neither the record nor common sense suggests that when a lawyer chooses to join a bar association, a reasonable person would presume the lawyer agrees in perpetuity with every article, or with the selection of every article, published in that association's journal. This is particularly true where, as here, the

journal contains disclaimers clarifying that the views expressed are the authors' alone. In any event, a "mere possibility of … confusion" is not enough to support an expressive-association claim. *Washington*, 552 U.S. at 455.

Unsurprisingly, Schell's logic failed to persuade not only the Fifth Circuit, *see McDonald*, 4 F.4th at 252, but also the Ninth Circuit, which held that "a reasonable observer ordinarily would not interpret the fact that [an] attorney is a member of the bar to mean that the bar's activities reflect the attorney's personal views," *Crowe*, 112 F.4th at 1236. As Justices Harlan and Frankfurter concluded in *Lathrop*, "everyone understands or should understand that the views expressed [by a bar] are those of the State Bar as an entity separate and distinct from each individual," 367 U.S. at 859 (Harlan, J., concurring) (quotation marks omitted). This Court should not become the first to embrace Schell's highly counterintuitive contrary claim.

Finally, having failed to introduce any evidence below that a reasonable observer *would* attribute to him either the views expressed in *OBJ* articles submitted by others or the Board of Editors' decision to run such articles, Schell improperly attempts (Br.34) to supplement the record on appeal with two social-psychology articles not introduced below. "As [this Court] ha[s] stated" several times, it "will not reverse the grant of summary judgment … based on evidence not before the district judge." *Allen v. Minnstar, Inc.*, 8 F.3d 1470, 1475 (10th Cir.

1993). In any event, the articles are irrelevant, as they pertain to group psychology at a high level and do not mention or have anything to do with bar associations.[2]

* * *

In light of the small quantity of allegedly non-germane activity and its non-attributable nature, Schell cannot demonstrate that his own expression has been affected, let alone in "a significant way," *Boy Scouts*, 530 U.S. at 648. Thus, even if all five challenged articles were not germane, they would not support Schell's claim.

[2] Schell states (Br.20) that OBA engages in expression not only when it "publishes a magazine" but also when it "lobbies elected officials." But as noted, OBA's lobbying activity is not at issue because Schell chose not to challenge the district court's holding that that activity is germane, App.179-180.

## CONCLUSION

The district court's judgment should be affirmed.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary given the availability of multiple straightforward grounds for affirmance, including the district court's reasoning. Defendants stand ready, however, to present oral argument if the Court would find it helpful.

April 13, 2026

Respectfully submitted,

*/s/ Daniel S. Volchok*
DANIEL S. VOLCHOK
*Counsel of Record*
JOSEPH M. MEYER
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
daniel.volchok@wilmerhale.com
*Counsel for all defendants-appellees*

MICHAEL BURRAGE
WHITTEN BURRAGE
512 N Broadway Avenue, Suite 300
Oklahoma City, OK 73102

THOMAS G. WOLFE
HEATHER L. HINTZ
PHILLIPS MURRAH P.C.
424 N.W. 10th Street, Suite 300
Oklahoma City, Oklahoma 73103
*Counsel for the Members of the Oklahoma Bar Association Board of Governors and Janet Johnson*

KIERAN D. MAYE, JR.
LESLIE M. MAYE
MAYE LAW FIRM
3501 French Park Drive, Suite A
Edmond, Oklahoma 73034
*Counsel for the Chief Justice and Justices of the Oklahoma Supreme Court*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because—according to the word-count feature of the program used to prepare the motion (Microsoft Word)—the brief contains 12,999 words, excluding the portions exempted by Rule 32(f).

*/s/ Daniel S. Volchok*
Daniel S. Volchok

## CERTIFICATE OF SERVICE

On April 13, 2026, I filed the foregoing using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served by that system.

*/s/ Daniel S. Volchok*
Daniel S. Volchok