**[ORAL ARGUMENT REQUESTED]**

**No. 25-6189**

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

MARK E. SCHELL,

*Plaintiff-Appellant,*

*v.*

THE CHIEF JUSTICE AND JUSTICES OF THE OKLAHOMA SUPREME COURT; THE MEMBERS OF THE OKLAHOMA BAR ASSOCIATION'S BOARD OF GOVERNORS; JANET JOHNSON, Executive Director, Oklahoma Bar Association, all in their official capacities,

*Defendants-Appellees.*

On Appeal From The United States District Court
For The Western District Of Oklahoma

No. 5:19-CV-00281-HE (MDL No. 2695)
(The Honorable Joe Heaton)

# REPLY BRIEF OF PLAINTIFF-APPELLANT

Timothy Sandefur
Scott Day Freeman
Adam C. Shelton
Scharf-Norton Center for Constitutional Litigation at the
GOLDWATER INSTITUTE
500 E. Coronado Rd.
Phoenix, AZ 85004
(602) 462-5000
litigation@goldwaterinstitute.org

Anthony J. Dick
John C. Brinkerhoff Jr.
*Counsel of Record*
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001-2113
(202) 879-3939
jbrinkerhoff@jonesday.com

*Counsel for Plaintiff-Appellant Mark E. Schell*

## TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. The District Court Erred in Applying the Germaneness Standard. .......... 3

   A. Germaneness Requires an Inherent Connection to Practice of Law .......... 3

   B. The OBA's Editorial Decisions Are Not Germane .......... 8

II. Germaneness Alone Is the Relevant Inquiry .......... 14

   A. There Is No *De Minimis* Exception to the First Amendment .......... 14

   B. There Is No Misattribution Requirement .......... 21

CONCLUSION .......... 28

CERTIFICATE OF COMPLIANCE .......... 30

CERTIFICATE OF SERVICE .......... 31

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abood v. Detroit*,
431 U.S. 209 (1977) ... 16

*AFP v. Bonta*,
594 U.S. 595 (2021) ... 23

*Auraria v. Campus*,
843 F.3d 1225 (10th Cir. 2016) ... 5, 16

*Boudreaux v. LSBA*,
3 F.4th 748 (5th Cir. 2021) ... 6

*Boudreaux v. LSBA*,
86 F.4th 620 (5th Cir. 2023) ... 7, 8, 10, 13, 14, 17

*BSA v. Dale*,
530 U.S. 640 (2000) ... 19, 22, 24, 25

*Carroll v. Blinken*,
957 F.2d 991 (2d Cir. 1992) ... 22, 24

*CLS v. Walker*,
453 F.3d 853 (7th Cir. 2006) ... 22

*Crowe v. OSB* (*Crowe I*),
989 F.3d 714 (9th Cir. 2021) ... 16

*Crowe v. OSB* (*Crowe II*),
112 F.4th 1218 (9th Cir. 2024) ... 4, 5, 13, 15, 17, 19, 27

*Fla. Bar v. Schwarz*,
526 So.2d 56 (Fla. 1988) ... 24

*Good v. ASUW*,
542 P.2d 762 (Wash. 1975) ....................24

*Harris v. Quinn*,
573 U.S. 616 (2014)....................4–7, 18

*In re Chapman*,
509 A.2d 753 (N.H. 1986) ....................23, 24

*Janus v. AFSCME*,
585 U.S. 878 (2018)....................5, 18, 23

*Keller v. State Bar of Cal.*,
496 U.S. 1 (1990).................... 2–9, 10–11, 13–16, 18, 21, 23

*Knox v. SEIU*,
567 U.S. 298 (2012)....................6

*Lathrop v. Donohue*,
367 U.S. 820 (1961)....................16, 17

*Mahmoud v. Taylor*,
606 U.S. 522 (2025)....................9, 15

*McDonald v. Longley*,
4 F.4th 229 (5th Cir. 2021) ....................4, 17, 22, 24

*Moody v. NetChoice*,
603 U.S. 707 (2024)....................9, 20, 26, 27

*Pomeroy v. USB*,
2024 WL 1810229 (D. Utah 2024)....................21

*PruneYard v. Robins*,
447 U.S. 74 (1980)....................26

*Pryor v. Sch. Dist. No. 1*,
99 F.4th 1243 (10th Cir. 2024) ....................15

*Rodriguez v. Shearson/Am. Exp., Inc.*,
490 U.S. 477 (1989) .......... 6

*Romero v. Colegio*,
204 F.3d 291 (1st Cir. 2000) .......... 4–5, 8, 24

*Rumsfeld v. FAIR*,
547 U.S. 47 (2006) .......... 20

*Schell v. Chief Justice*,
11 F.4th 1178 (10th Cir. 2021) .......... 3, 5, 9, 10, 14

*Schneider v. Colegio*,
917 F.2d 620 (1st Cir. 1990) .......... 8

*St. Mary v. Roy*,
154 F.4th 752 (10th Cir. 2025) .......... 19, 20

*United States v. United Foods*,
533 U.S. 405 (2001) .......... 14

*Wash. State Grange v. Wash. Repub. Party*,
552 U.S. 442 (2008) .......... 26

*Wyo. Gun Owners v. Gray*,
83 F.4th 1224 (10th Cir. 2023) .......... 18–19

## INTRODUCTION

Integrated bar associations are a rare and increasingly isolated exception to the First Amendment's ban on compelled association. As numerous circuits have recognized, the First Amendment interests at stake require meaningful limits on the scope of this forced membership. To implement the Supreme Court's directive that attorneys cannot be forced to join bar associations that engage in speech not germane to regulating the legal profession and improving the quality of legal services, courts require an association's speech to be inherently linked to the practice of law. Under this or indeed any other plausible standard, the ideologically charged political advocacy that the Oklahoma Bar Association forces its members to associate with is indefensible.

In response, the Association resists clarifying the limits of its authority to speak for its unwilling members, insisting that "no further gloss is needed." Yet it tips its hand with its sweeping approach to the speech in this case. Its arguments would allow bar associations to engage in virtually unlimited ideological advocacy on issues that have only the most attenuated and artificial connection to the practice of law. For the Association, it is enough if it publishes an article with factual subject matter that may be considered in lawsuits, if it discusses a book that has been cited by a court, or if it passingly says something about lawyers in a politically slanted polemic.

The First Amendment requires more. It is difficult to conceive of any political advocacy that would not qualify as "germane" under the Association's justifications for its conduct. Almost every hot-button issue has been litigated and thus bears some indirect connection to the legal profession. And for the few articles that would not otherwise satisfy that standard, adding a few legal citations would be enough to transform them into legal "education."

This sweeping understanding of germaneness cannot be right under any standard. Even as the Supreme Court declined to pronounce the exact contours of the germaneness standard, it made clear, for example, that germane speech would not encompass advocacy for "a gun control or nuclear weapons freeze initiative." *Keller v. State Bar of Cal.*, 496 U.S. 1, 15-16 (1990). Yet that advocacy would pass muster under the Association's view. And if this Court agreed, it would split with numerous circuits that have adopted stronger protections.

Perhaps recognizing the issue, the Association proposes exceptions to germaneness found nowhere in *Keller*. First, it asks this Court to split with numerous circuits and adopt a *de minimis* exception, which would allow non-germane speech that falls below some unspecified share of the Association's total speech. But this standard is inconsistent with *Keller*, has no support in precedent, and creates a defense based on an association's total speech, which is irrelevant to the person forced to associate with hostile ideas.

Second, the Association argues Schell must prove that a reasonable observer would attribute to him the views it publishes. Among other problems, the argument ignores that membership in an expressive association is inherently expressive for the individual who joins. The constitutional harm of forced membership in an expressive association does not depend on what others perceive about the forced member.

At bottom, Schell's First Amendment rights have been violated. He is forced to join a group that publishes biased and tendentious partisan advocacy, and he is forbidden to quit that group while practicing law. This Court should reverse.

## ARGUMENT

### I. The District Court Erred in Applying the Germaneness Standard.

#### A. Germaneness Requires an Inherent Connection to Practice of Law.

**1.** This Court has held that *Keller*'s germaneness test applies to free-association claims against integrated bar associations. *Schell v. Chief Justice* (*Schell I*), 11 F.4th 1178, 1194-95 (10th Cir. 2021); *see* Op.Br.1, 11, 21, 35-36, 41-44. But *Keller* declined to elaborate on the contours of that test beyond its "extreme ends." 496 U.S. at 15. And *Schell I* limited its discussion to a few examples, explaining, for instance, that an article "encouraging attorneys to represent prisoners" would be germane, while "advocat[ing] for policies eliminating bars on a prisoner's ability to advance suits against prisons" would not. 11 F.4th at 1194.

Many open questions thus remain. But "several interlocking reasons compel," in one circuit's words, "'a germaneness test with teeth.'" Op.Br.35-44 (quoting *Romero v. Colegio*, 204 F.3d 291, 300 (1st Cir. 2000)). That test requires, in the words of another, at least "an 'inherent connection to the practice of law.'" *Id.* at 54 (quoting *Boudreaux v. LSBA* (*Boudreaux II*), 86 F.4th 620, 633 (5th Cir. 2023)).

**2.** The Association furiously resists this premise, selectively attacking some of the "several" reasons Schell provided for clarifying a narrow standard. *Id.* at 36. It first disputes Schell's observation that *Keller*'s germaneness test is a particularized application of exacting scrutiny. *Id.* at 20-21, 36-38. But the Association takes issue with the Supreme Court, not Schell. The Court has made clear that *Keller* "fits comfortably within the framework [it] applied"—*i.e.*, exacting scrutiny. *Harris v. Quinn*, 573 U.S. 616, 655-56 (2014). Both circuits to address the issue after *Harris* agree. *See Crowe v. OSB* (*Crowe II*), 112 F.4th 1218, 1238 (9th Cir. 2024) ("The Supreme Court has observed that *Keller*'s germaneness requirement fits comfortably within the exacting scrutiny framework."); *McDonald v. Longley*, 4 F.4th 229, 246 (5th Cir. 2021) ("Compelled membership in a bar association that engages in non-germane activities … fails exacting scrutiny."). As the First Circuit has also reasoned, *Keller* identified the "strong public interests" that justify a burden on First Amendment associational rights and imposed "the germaneness test [to] guarantee[] that these public interests are being served by any

challenged activity." *Romero*, 204 F.3d at 301. This makes sense: germaneness is *Keller*'s standard to ensure tailoring to the few interests that justify forced association.

The Association claims that *Schell I* rejected that position. Obviously not. That decision held that "*Keller* established a germaneness test" and that *Janus v. AFSCME*, 585 U.S. 878 (2018), "did not *replace* that longstanding test with exacting scrutiny." 11 F.4th at 1191. The court thus rejected Schell's argument that *Janus eliminated germaneness*. *See id.* at 1189-91. But it did not reject the idea—embraced by other circuits—of *defining germaneness* "within the exacting scrutiny framework." *Crowe II*, 112 F.4th at 1238. While germaneness is the governing standard, it remains an application of exacting scrutiny. *See Harris*, 573 U.S. at 655-56. And that context informs its (many) undefined contours. Op.Br.36-38.[1]

Second, the Association attacks the idea that this Court should "'harmonize[]'" *Keller* "'with prior and subsequent Supreme Court precedents.'" Op.Br.41-43 (quoting *Auraria v. Campus*, 843 F.3d 1225, 1237 (10th Cir. 2016)). But this Court cannot ignore the Supreme Court's later, narrowing constructions of

[1] The Association repeatedly misconstrues Schell's footnote stating, as one of a half-dozen issues preserved for further review, that "exacting scrutiny is the applicable standard of review" under *Schell I*. Op.Br.18 n.2. It sees this statement as somehow forming the "premise" for "his entire argument." Resp.Br.10. It does not. It just preserves for higher review the argument that strict scrutiny, rather than exacting scrutiny, applies—a question *Janus* left open. *See* 585 U.S. at 894.

both *Keller* and germaneness. *See, e.g.*, *Knox v. SEIU*, 567 U.S. 298, 310 (2012) (construing germaneness as authorizing associational burdens "only insofar as they are a necessary incident of the" government interests at stake); *Harris*, 573 U.S. at 655-56 (grounding *Keller* in the ethical regulation of attorneys).

The Association attacks a strawman in response, insisting these decisions could not "silently rewr[ite]" *Keller*. Resp.Br.22. But harmonization does not require rewriting; it requires that *"[w]here Keller* does not have 'direct application,'" this Court should understand that decision in light of other Supreme Court decisions that narrowly construed both germaneness and *Keller*. Op.Br.41-43 (quoting *Rodriguez v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989)). This is vertical *stare decisis*. It is not novel. *See Boudreaux v. LSBA* (*Boudreaux I*), 3 F.4th 748, 755 (5th Cir. 2021) (*Keller*'s "weakened foundations … counsel[] against expanding [its] application as [courts] consider various questions … left open").

**3.** It is worth stepping back to appreciate the Association's position. It asks this Court to view *Keller* as an island. Post-*Keller* decisions are apparently not pertinent, even if they addressed germaneness or interpreted the same First Amendment right in ways perfectly compatible with *Keller*. Yet this Court also cannot look to decisions predating *Keller*—even the very decision *Keller* cited as the source of its test—because those decisions have been "since-overruled." Resp.Br.37.

And this Court certainly cannot contextualize *Keller* within broader doctrine. It can ask only whether something is "reasonably related" to "law."

Refusing to read *Keller* in the context of other Supreme Court precedent makes no sense. *Keller* itself stressed that "defin[ing]" germaneness is a "difficult question" that "will not always be easy to discern," and it addressed only the "extreme ends of the spectrum" before leaving further clarification to future decisions. 496 U.S. at 14-16. As the Court would later reiterate, answering "[w]hat is 'germane'" requires "a substantial judgment call." *Harris*, 573 U.S. at 637. And in making that judgment call, this Court should obviously look to the broader context of how First Amendment doctrine has developed, how the issue of compelled association has been treated in other cases, how other circuits have addressed the issue, and the broader implications of standards for germaneness. *See* Op.Br.18-20, 35-44.

By maligning any attempt to further define germaneness as "layering additional adjectives," Resp.Br.21, the Association demands perpetual ambiguity. Freezing the standard at the highest possible level of generality maximizes its discretion to burden First Amendment rights. Other circuits have rightly rejected this gambit, recognizing that if germaneness is untethered from ensuring that a compulsory association's speech is "inherently tied to the practice of law or the legal profession," it becomes impossible "to discern any principled line," *Boudreaux II*,

86 F.4th at 633, and renders any "limitation on compulsory support … meaningless," *Schneider v. Colegio*, 917 F.2d 620, 631-33 (1st Cir. 1990) (expression must be "narrowly limited" and "directly linked to the legal profession or the judicial system").

In short, *Keller* invited courts to develop the germaneness standard. And for the numerous reasons Schell discussed, *see* Op.Br.19-20, 35-43, this Court should join other circuits in recognizing that the First Amendment requires "a germaneness test with teeth," *Romero*, 204 F.3d at 300. Because the very existence of these compulsory associations can be justified only by the government's interest in regulating the legal profession or improving the quality of legal services, the speech they engage in must have a direct and inherent connection to the *practice* of law—it must "revolve around the role of the lawyer as lawyer." *Schneider*, 917 F.2d at 640; *see Boudreaux II*, 86 F.4th at 633.

### B. The OBA's Editorial Decisions Are Not Germane.

The district court erred in its germaneness analysis under any standard.[2] The Association is wrong that its articles can be defended by looking to their overall

[2] The Association's claim that Schell "waived" any argument outside of exacting scrutiny, Resp.Br.17, is unserious. Again, exacting scrutiny was one of "several" reasons Schell gave for a narrower standard than the district court applied. Moreover, Schell's arguments about germaneness obviously preserve the broader issue whether the Association's speech is germane or not. *See* Op.Br.43-53.

"thrust" while ignoring any non-germane portions.[3] But even judged by overall "thrust," the articles are not germane. While it avoids articulating any meaningful standard for germaneness, the Association's arguments reflect a virtually unlimited view of its ability to force expression on its members.

Advocating for Prison Reform: The Association platformed an advocacy piece targeted at what this Court previously said would be nongermane: "advocat[ing] for policies eliminating bars on a prisoner's ability to advance suits against prisons and jails." *Schell I*, 11 F.4th at 1194. The article's thesis—not just a few "sentences," Resp.Br.27—is that prisoners cannot meaningfully sue prisons due to "the statutory blockade of the courthouse," so the law should be amended to avoid making "a nullity" of their substantive rights, App.151-55; *see* Op.Br.44-47.

The Association responds that the article is "dense with citations" to statutes and cases, so it "educat[es] lawyers as to the legal hurdles in pursuing claims for prisoners." Resp.Br.26-27. But the article is not about educating lawyers on how to

---

[3] The Association admits that "thrust" is ultimately part of its proposed *de minimis* exception, Resp.Br.41, which is meritless, *see infra* at 14-21. And contrary to its claim otherwise, *Schell I* plainly did not hold that compulsory association with non-germane advocacy is justified if smuggled into articles with a germane "thrust." It left the *de minimis* question open. The Association also decries a paragraph-by-paragraph review. But any "concerns about 'administrability' are a product of its own design." *Mahmoud v. Taylor*, 606 U.S. 522, 567 (2025). Publishing a magazine involves a flood of expressive choices. *Moody v. NetChoice*, 603 U.S. 707, 731 (2024) ("The editorial function itself is an aspect of speech."). Having chosen to make these expressive choices, the Association must justify them. It cannot hide behind burdens of its own making to avoid scrutiny. *Mahmoud*, 606 U.S. at 567.

litigate; it argues for normative change in the law that currently governs. Op.Br.46. It thus fails under *Schell I*'s clear holding that advocacy to change the law on prisoner suits is *not* germane. 11 F.4th at 1194. Besides, the Association's explanation proves far too much. *Any* advocacy piece can cite law. It would allow a bar association to create germaneness merely by citing statutes and caselaw in a piece advocating for "a gun control … initiative," which *Keller* recognized as falling at the "extreme" end of non-germaneness. 496 U.S. at 15-16.

Attacking Election Reform: The Association platformed an article on the "debate about election security and integrity," the central focus of which is crafting an incendiary link between historical discrimination and "new laws" that seek to prevent election fraud today. App.162-66; *see* Op.Br.47-49. The Association vaguely says this polemic is germane because understanding historical discrimination will "surely" help lawyers "provide better representation." Resp.Br.28. But to reiterate, the article did not purport to educate *lawyers* about *litigating modern lawsuits*. It advocated against *legislators enacting policies*. That is not germane. *Boudreaux II*, 86 F.4th at 635 ("[S]peech engaging with, promoting, or encouraging participation in wider public policy and social controversies is rarely, if ever, germane.").

Indeed, if the germaneness test included speech about a subject litigated "[d]ay in and day out" like "voting-rights lawsuits," Resp.Br.29, then it would

extend to any salient political issue including abortion, the death penalty, gun control, or immigration. It would, again, justify the very "extreme ends" *Keller* repudiated. 496 U.S. at 15.

<u>"Oklahoma's Embrace of the White Racial Identity":</u> The Association platformed an ideologically charged article about "[r]acial whiteness" and "[a]nti-Blackness and discrimination," linking a "history" of "cautionary tales of racial terror" to modern "racial inequality and disparate impacts in almost every facet of life." App.167-72; *see* Op.Br.49-50. Other than a single, generalized, and uncited paragraph about racial representation in law firms and courts, the article focused on connecting its extended critique of past "whiteness" to non-legal advocacy for "reengineer[ing]" society to reverse disparate racial impacts. App.171.

The Association really struggles to explain this one. Other than hyping that isolated paragraph, the best it can muster are two other (isolated) paragraphs: one mentioning how the Oklahoma Constitution defined race and another stating that "[f]ew" cases tried to define race. App.169, 170. That is it. Three paragraphs surrounded by pages of what the district court admitted was an "ideologically charged" account of "whiteness." App.167. Even if law-firm diversity is germane, stray references in an otherwise unrelated attack on "whiteness" cannot defeat the First Amendment. Deleting these three irrelevant paragraphs, without changing a single other word, would not change the article's meaning.

Criticizing the Failure to Teach History: Even the district court agreed that the Association's platforming of a nominal book review accusing Oklahoma of being "invested in keeping the bloody stains of its history hidden" was not germane. Add.13; *see* Op.Br.50-51. The article barely mentions the non-legal book under review and instead focuses on criticizing Oklahoma for failing to teach the author's partisan view of history.

The Association cherry-picks individual sentences to argue that passing references to historical laws somehow make the article germane. Resp.Br.32. But the mere fact that an article mentions historical laws does not regulate the legal profession or improve the quality of legal services. The Association also claims that the article is germane because, every decade or so, a court has cited the book nominally reviewed in the article. Resp.Br.32. But of course, courts routinely cite non-legal sources. The fact that some book might be occasionally relevant to a lawsuit does not make the book's entire subject germane. On the Association's logic, it could dedicate an issue to Dr. Seuss's *One Fish Two Fish Red Fish Blue Fish*, a book courts cite far more than the book nominally reviewed here.

"A Resilient Mindset": The Association also published an article dispensing psychological wellness advice. App.156-61; *see* Op.Br.51-52. But the Association is not "an all-encompassing wellness service," and if it can "opine … on anything

that [it] deem[s] is generally conducive to attorney health and wellness, there is no limiting principle." *Boudreaux II*, 86 F.4th at 632. It is not germane.

The Association recasts the article as "address[ing] lawyer-specific challenges." Resp.Br.25-26. But in just over a page, it quotes every passing reference to lawyers in the extended article, falsely intimating that they are topic sentences for further discussion. The article would read identically if those references were replaced by references to a medical practice or dental school. It is not actually geared towards lawyers. But even if it were, the fact that an "article is specific to lawyers" does not make it germane to regulating the legal profession or improving the quality of legal services. *Boudreaux II*, 86 F.4th at 634. Again, bar associations are not "wellness service[s]." *Id.* at 632.

At bottom, the Association's defense of its articles shows why it avoids articulating a standard for germaneness. Its conception is limitless. By allowing compulsory bar associations to make controversial statements about anything obscurely related to law, it easily encompasses articles "advanc[ing] a gun control or nuclear weapons freeze initiative," *Keller*, 496 U.S. at 16, criticizing the President's statements on immigration, *Crowe II*, 112 F.4th at 1239, "discouraging … abortion insurance coverage for attorneys," *Boudreaux II*, 86 F.4th at 633, or "advocat[ing] for policies eliminating bars on a prisoner's ability to

advance suits against prisons," *Schell I*, 11 F.4th at 1194. The First Amendment requires more.

## II. Germaneness Alone Is the Relevant Inquiry

After stressing for half its brief that *Keller* alone should govern, the Association pivots to invoke two exceptions found nowhere in *Keller*. Neither exists.

### A. There Is No *De Minimis* Exception to the First Amendment.

The Association first tries to graft a *de minimis* standard onto *Keller*. But that proposal contradicts precedent and is entirely arbitrary. Op.Br.22-25.

**1.** The Association's standard is not compatible with *Keller*, which held that the "guiding standard must be whether the challenged expenditures are" germane. 496 U.S. at 14. And when discussing what would plainly fail that standard, *Keller* explained that "dues may not be expended to endorse or advance a gun control or nuclear weapons freeze initiative." *Id.* at 16. Yet a *de minimis* exception would allow associations to endorse gun control or a nuclear-weapons freeze so long as that partisan advocacy was outweighed by enough germane content elsewhere.

*Keller*'s "central holding … was that the objecting members were not required to give speech subsidies for matters not germane to the larger regulatory purpose which justified the required association." *United States v. United Foods*, 533 U.S. 405, 414 (2001). For that reason, at least two circuits have "decline[d] to recognize a *de minimis* exception to the rule from *Keller*." *Boudreaux II*, 86 F.4th at 636; *see*

*Crowe II*, 112 F.4th at 1239 (finding violation from a single non-germane journal article). Accepting the Association's argument here would split with these decisions.

In response, the Association offers three meritless arguments. *First*, it tries to explain away *Keller* by distinguishing mandatory-dues "free speech" claims from forced-membership "free association" claims. Resp.Br.38. It reasons that dues violations "can be remedied by the relatively modest remedy of proportionate refunds," while free-association violations purportedly require a "vastly more drastic remedy" of "dismantling" the bar. *Id.* But the germaneness test obviously contemplates other remedies. Most notably, the Association can simply stop engaging in non-germane speech. Or it can give objecting members the option to resign their membership without barring them from practicing law, as many other states have done. That is hardly "drastic."

Even setting available remedies aside, the Association admits that non-germane activity violates the First Amendment under *Keller*; it just argues that the Constitution tolerates this violation because the violation would purportedly be hard to fix. It cites no authority for this staggering assertion. Under the First Amendment, a "governmental interest in upholding a mandate that is likely unconstitutional does not outweigh a movant's interest in protecting his constitutional rights." *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1254 (10th Cir. 2024); *see, e.g.*, *Mahmoud*, 606 U.S. at 567 ("There is no *de maximis* exception.").

*Second*, the Association turns to *Lathrop v. Donohue*, 367 U.S. 820 (1961), arguing that "a majority" there recognized a *de minimis* exception. But *Lathrop* never considered germaneness. The Supreme Court has construed *Lathrop* to hold only that a compelled-dues "requirement was not on its face unconstitutional." *Abood v. Detroit*, 431 U.S. 209, 232 n.29 (1977). Beyond that, "the only proposition about which a majority of the Court … agreed was that the constitutional issues should be reached." *Id.* Indeed, *Keller* not only stressed *Lathrop*'s "limited scope," but held that whether an individual can "be compelled to associate with an organization that engages in political or ideological activities beyond those for which mandatory financial support is justified" was not "at issue in *Lathrop*." 496 U.S. at 14, 17. Contrary to the Association's claims otherwise, this Court is bound by the Supreme Court's subsequent "guidance for reading" its prior decisions, including *Lathrop*. *Auraria*, 843 F.3d at 1230, 1236.

On its own terms too, *Lathrop* did not pioneer an exception to germaneness, a word it never mentioned. The plurality noted that the "bulk" of the bar's activities were not "legislative activity" without considering whether those activities were germane or not. 367 U.S. at 843. To the contrary, due to the facial nature of the challenge, the *Lathrop* "plurality presumed, on the bare record before it, that all the bar's activities, including lobbying, related to the regulatory program of improving the profession." *Crowe v. OSB* (*Crowe I*), 989 F.3d 714, 727-28 (9th Cir. 2021);

*accord McDonald*, 4 F.4th at 244 (recognizing that *Lathrop*'s holding addressed only mandatory membership in associations that "*solely* regulate[] the legal profession and improve[] the quality of legal services").[4]

*Third*, the Association tries to defuse its split with the Fifth and Ninth Circuits. *See supra* at 14-15. It oddly claims the Fifth Circuit only "purported to reject a *de minimis* exception," Resp.Br.39-40, citing *McDonald*'s conclusion that bars could maintain journals that "publish[] information related to regulating the profession and improving legal services," 4 F.4th at 252. But *McDonald* accepted the practice of "articles advancing various viewpoints," not publishing on non-germane subjects. *Id.*; *see also Boudreaux II*, 86 F.4th at 634-35 (finding various articles shared online non-germane). What matters is that court's unambiguous holding "declin[ing] to recognize a *de minimis* exception." *Id.* at 636. Similarly, the Ninth Circuit never held that "a *de minimis* exception exists." Resp.Br.39, 42. The Association misquotes *Crowe II*'s discussion about its (flawed but distinct) misattribution requirement. *See* 112 F.4th at 1239 n.10; *infra* at 21-28.

---

[4] The Association also misreads the concurring opinion, quoting language that involved neither germaneness nor free association. *See Lathrop*, 367 U.S. at 860 (Harlan, J., concurring) (concluding that a bar "devot[ing] some part of [its] funds" to "a *legislative proposal*" does not create a *compelled speech* problem).

In sum, the Association agrees *Keller* supplies the standard for germaneness and that *Keller* does not allow for a *de minimis* exception for compulsory dues. Its failure to distinguish compulsory dues from forced membership is thus dispositive.

**2.** Because a *de minimis* exception is incompatible with *Keller*, there is no reason to proceed further. But the caselaw that would control absent *Keller* also rejects the exception. As noted, exacting scrutiny is the correct comparator, both because the Supreme Court said so in *Harris*, 573 U.S. at 655-56, and because it is the minimum standard for forced-membership cases everywhere else, *see Janus*, 585 U.S. at 894; *supra* at 4-6. And when applying exacting scrutiny to free-association rights, this Court has flatly held "[t]here is no *de minimis* exception for a speech restriction that lacks sufficient tailoring or justification." *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1248 (10th Cir. 2023).

The Association tries to distinguish *Wyoming* by protesting whether "exacting scrutiny" should apply, and by noting that the decision recognized "different standards … govern different types of infringements." Resp.Br.39. But the Association's own position is that *Keller* "did not mention a *de minimis* exception," Resp.Br.38, so it agrees parties must look beyond *Keller*. And it neglects to mention that *Wyoming* went on to explain that the "different standards" it referenced are strict and exacting scrutiny. 83 F.4th at 1243. There is no *de minimis* exception even under the "lighter" standard of exacting scrutiny. *Id.* at 1243, 1248.

Instead of *Wyoming*, the Association offers caselaw holding that an association's rights are not violated "by the mandated inclusion of a person unless the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *St. Mary v. Roy*, 154 F.4th 752, 775 (10th Cir. 2025), *cert. granted* 2026 WL 1052111 (2026); *see* Resp.Br.35. But this comparison inappropriately conflates the standard for forced-inclusion cases (where an organization tries to exclude people by resisting antidiscrimination laws) with forced-membership cases (where an individual resists being forced to join an expressive association). They are materially different contexts with materially different standards. *See infra* at 22-24. The Association cites no case—nor is Schell aware of any other than *Crowe II*—applying this standard to forced membership.

In any event, the forced-inclusion standard does not remotely support the Association. That standard does not consider the "quantity" of speech at issue. Resp.Br.35. Rather, it considers whether forced inclusion of a member "would significantly burden" the organization's ability to express its message, "giv[ing] deference to an association's view of what would impair its expression." *BSA v. Dale*, 530 U.S. 640, 653 (2000). That is why a massive, nationwide organization can state a claim by showing that it "merely engag[ed] in expressive activity that could be impaired" by admitting even a single person. *Id.* at 655.

The two decisions the Association cites, Resp.Br.35, were both forced-inclusion cases. *See Rumsfeld v. FAIR*, 547 U.S. 47 (2006); *St. Mary*, 154 F.4th at 775. And neither looked to the "quantity" of speech at issue when rejecting association claims. *Rumsfeld*, which held that law schools could be forced to host military recruiters, reasoned that there was no forced "association" at all because nothing "force[d] a law school to accept *members* it does not desire." 547 U.S. at 69 ("Recruiters are, by definition, outsiders…."). And *St. Mary* held that the forced-inclusion at issue—admitting preschoolers to a school—involved *no* interference with the organization's rights of associational expression. 154 F.4th at 776 ("[T]his case does not involve the presence of persons who *might affect* the [school's] ability to advocate for their viewpoint.").

**3.** Even on a blank slate, a *de minimis* exception would still be unwarranted. Op.Br.24. When someone is forced to associate with a certain message by joining an organization, the quantity of that organization's unrelated speech is irrelevant. If, for example, only a few articles each year "support[ed] Nazi ideology" or "encourage[d] teenage suicide," *id.* (quoting *Moody*, 603 U.S. at 737), would there be any doubt that many members would want to disassociate themselves from the Association? Because total quantity of speech is an entirely arbitrary denominator, there would be no principled way to identify injury, requiring courts to draw arbitrary lines.

The Association nevertheless insists that a *de minimis* standard can be applied "without trouble." Resp.Br.40. But because no circuit has *ever* adopted that standard, the entirety of its proof is a single district-court decision. *See Pomeroy v. USB*, 2024 WL 1810229 (D. Utah 2024). And neither that court nor the Association explains how the exception works. Should "total speech" reference an association's entire expressive activity, particular publications, particular volumes, or something else? What is an acceptable ratio? Is there some absolute amount of "speech" above which percentages do not matter? The Association has no answers because this exception has never existed.[5]

In sum, *Keller* controls. Even if *Keller* did not, then *Wyoming* controls. And even if neither controlled, there is no justification for a "de minimis" exception based on an arbitrary factor like an association's unrelated speech.

**B. There Is No Misattribution Requirement.**

As a last resort, the Association invokes the Ninth Circuit's misattribution requirement. But Schell has already discussed the problems with that approach, Op.Br.28-35, and the Association has no sound response.

---

[5] The Association also claims that a *de minimis* exception is required to avoid abrogating so-called *Keller* policies, which refund dues money spent on non-germane expression to objecting members. But *Keller* policies would remain necessary for bars that do not compel membership but still compel dues and engage in non-germane speech.

**1.** The Association first argues that a misattribution test grafts the standard for "'forced inclusion' expressive association cases," *CLS v. Walker*, 453 F.3d 853, 862 (7th Cir. 2006), onto forced-membership association cases. When an organization is forced to include others under antidiscrimination law, it must establish a burden on its expressive activity. *BSA*, 530 U.S. at 647. But the Association never explains why this requirement extends to cases where individuals are forced to join groups engaged in speech they oppose.

The two contexts are different, as Schell explained. *See* Op.Br.29-30. Whether a particular individual's membership among a sea of others is an expressive act *for the organization* is a different question from whether it is an expressive act *for that individual*. An individual member does not necessarily connote an expressive message to an organization because individuals do not necessarily carry expressive meaning. So further inquiry is required. *See id.*

Conversely, membership in an expressive association is an expressive act for the individual member. Such an association trades on its members—that is, "part of its expressive message is that its members stand behind its expression." *McDonald*, 4 F.4th at 245-46. Thus, mandatory membership "puts the lie to [an association's] argument that [members] are not linked in the popular mind with [its] aims," as the organization "expressly forges such a link when it proclaims that its 'membership' includes" the group compelled to be members. *Carroll v. Blinken*, 957 F.2d 991,

1003 (2d Cir. 1992). And by dint of "forced" membership, an attorney has no right to "resign from the association" in protest like "a dissenting member of a voluntary bar association." *In re Chapman*, 509 A.2d 753, 756 (N.H. 1986). This distinction is why *Keller* made no mention of any requirement to show a risk of misattribution when ruling that compulsory bar associations cannot engage in non-germane speech. 496 U.S. at 14.

Forcing someone to join an expressive association compels him to associate with that group's expression. Op.Br.18-20. That is the mirror of prohibiting someone from joining one. And in that context, even laws indirectly chilling expressive association—such as disclosure requirements—trigger heightened scrutiny. *See, e.g.*, *AFP v. Bonta*, 594 U.S. 595, 616 (2021). A misattribution requirement defies all of this by demanding more to acknowledge a burden on First Amendment rights.

This understanding tracks *Janus*, which observed that requiring "a union [to] serve as exclusive bargaining agent" was "*itself* a significant impingement on associational freedoms." 585 U.S. at 916.[6] Requiring an individual to accept that an organization speaks on his behalf precludes him from disassociating.

Beyond ignoring *Janus*, the Association asks this Court to join an extreme minority. It acknowledges a split with the First Circuit, which held that the "act of

---

[6] Contrary to the Association's suggestion, this statement addressed compelled association, not dues. *See Janus*, 585 U.S. at 916.

compulsion in forcing attorneys" to join associations "distinguishes" forced-inclusion and forced-membership cases. *Romero*, 204 F.3d at 301 & n.9. But it ignores that the Fifth Circuit and New Hampshire Supreme Court also held that "compelling a lawyer to join a bar association engaged in non-germane activities burdens his or her First Amendment right to freedom of association" because "membership is part of the message." *McDonald*, 4 F.4th at 245-46; *see Chapman*, 509 A.2d at 758; *see also Fla. Bar v. Schwarz*, 526 So.2d 56, 57 (Fla. 1988) ("[C]ompelled membership should limit the activities of The Florida Bar to [narrowly] stated purposes."). So did the Second Circuit and Washington Supreme Court when rejecting compelled membership in student groups. *See Carroll*, 957 F.2d at 1003; *Good v. ASUW*, 542 P.2d 762, 768 (Wash. 1975). The Ninth Circuit did not appear to appreciate the split it was creating. This Court should not join it on that limb.

**2.** The Association's second independently dispositive problem is looking to whether a "reasonable observer" would misattribute speech. Resp.Br.51. Even under the standards that apply to forced inclusion, the test is not what a "reasonable observer" would attribute to an organization; rather, courts must "give deference to an association's view of what would impair its expression." *BSA*, 530 U.S. at 653; Op.Br.30-31.

Misquoting *BSA*'s qualification that "an expressive association can[not] erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message," 530 U.S. at 653, the Association argues that Schell must do something more than disagree with its partisan advocacy. While it is unclear why antidiscrimination law matters to an individual's association, the Association never explains what else Schell must do.

More importantly, the Association never acknowledges, much less disputes, Schell's argument: Its "reasonable observer" standard is irreconcilable with *BSA*'s requirement to both look to and defer to the perspective of the affected party. To accept a misattribution standard—a decision that itself would require splitting with the First, Second, and Fifth Circuits—this Court would need to either defy *BSA*'s deference requirement by looking to the "reasonable observer" or split with the Ninth Circuit too and chart yet another novel course by retrofitting *BSA*'s organizational deference standard to individual members. Because the Association uncritically parrots "reasonable observer" everywhere else without addressing the clear conflict, it never clarifies which of these bad options it prefers.

**3.** The Association's next independently dispositive problem is that misattribution is not the core harm of forced membership. *See* Op.Br.31-33. For example, the average person would understandably object if he were forced to join

a hate group, even if people knew he was forced to join. The association itself and the inability to repudiate the expressive association are the harms.

How does the Association defend misattribution? It leads by citing *PruneYard v. Robins*, which mentioned the absence of misattribution. 447 U.S. 74, 87 (1980). But the Supreme Court has squarely held that it has "never hinged a compiler's First Amendment protection on the risk of misattribution." *Moody*, 603 U.S. at 739-40 (construing *PruneYard*). The Association can only protest that *Moody* involved compelled hosting of speech and that Schell's risk of misattribution is purportedly lower. Resp.Br.50. Those are meaningless distinctions. The Court held that risk of misattribution *is not required at all*.

For authority, the Association tellingly relies on a separate opinion in *Moody* that *disagreed* with the majority about misattribution and proposed an *alternative* test based on "core" expression. 603 U.S. at 784-85 & n.18 (Alito, J., concurring in judgment). Under the controlling opinion, Schell does not lose his "First Amendment protection [even if] no one will wrongly attribute to [him] the views" of the Association. *Id.* at 739 (majority op.).[7]

[7] The Association's only other authority, *Washington State Grange v. Washington Republican Party*, 552 U.S. 442 (2008), is further off base. Rejecting an argument that "voters will be confused" about party endorsements under a certain ballot system, the Court disagreed with the factual premise without endorsing the legal premise: it was possible that voters would not be confused, so there was no need to go further because the plaintiffs had brought a facial challenge. *Id.* at 454.

**4.** The Association's final independently dispositive problem is that reasonable observers would attribute meaning to Schell's membership. Op.Br.33-35. The Association plays a shell game, focusing on whether observers would attribute *the views expressed* in *individual articles* to Schell, but the relevant question is whether observers would attribute *some meaning* to him from the *editorial choices* to platform those articles. Again, editorial discretion is distinct expressive activity. *Moody*, 603 U.S. at 731. When considering a newspaper's opinion page, for example, people know that "statements or opinions expressed in [a publication] are those of the authors and do not necessarily reflect those of [the publication]." Resp.Br.51. Yet publishers still convey distinct messages by selecting content: the *New York Times*'s publication decisions send a different message than those of the *Wall Street Journal*. That meaning likewise transfers to subscribers. An observer would attribute some meaning to a person's choice to regularly read the *New York Times* versus the *Wall Street Journal*.

Properly framed, *Crowe II* was wrong that "a reasonable observer understands state bar membership to mean only that the attorney is licensed by the bar." 112 F.4th at 1236. After all, people join voluntary bar associations even though they have

---

Despite extensively citing this decision for its analysis of facial challenges, no opinion in *Moody* misconstrued it as the Association does.

nothing to do with licensing. Op.Br.33-34. And a reasonable observer would not know whether a given state's association is mandatory or voluntary.

In response, the Association selectively jettisons the "reasonable observer" standard yet again, asking this Court to focus not on an objective observer but on the subjective beliefs of those who receive the journal. And even then, the best the Association can say is that the journal is distributed "mostly to lawyers in Oklahoma," who presumably know Oklahoma's bar is mandatory. Resp.Br.54. But even on its own terms, focusing on distribution "mostly" to members makes little sense. Nonmembers also receive the journal, and many others read articles without subscribing.

Finally, the Association balks at the idea that people might attribute an organization's speech to its members. Op.Br.34-35. It does not dispute Schell's citations to scholarship showing that people commonly do so; it says only that this scholarship is factual evidence not presented below. Resp.Br.55-56. But misattribution is a legal standard, and this Court is free to take account of reality in recognizing that the risk of misattribution exists as a matter of law.

## CONCLUSION

This Court should reverse the judgment of the district court.

Dated: May 18, 2026

Respectfully submitted,

/s/ *John C. Brinkerhoff Jr.*
Anthony J. Dick
John C. Brinkerhoff Jr.
*Counsel of Record*
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001-2113
(202) 879-3939
jbrinkerhoff@jonesday.com

Timothy Sandefur
Scott Day Freeman
Adam C. Shelton
Scharf-Norton Center for
Constitutional Litigation at the
GOLDWATER INSTITUTE
500 E. Coronado Rd.
Phoenix, AZ 85004
(602) 462-5000
litigation@goldwaterinstitute.org

*Counsel for Plaintiff-Appellant Mark E. Schell.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,498 words. It complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: May 18, 2026

*/s/ John C. Brinkerhoff Jr.*

John C. Brinkerhoff Jr.
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Tenth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

Dated: May 18, 2026

*/s/ John C. Brinkerhoff Jr.*

John C. Brinkerhoff Jr.
*Counsel for Plaintiff-Appellant*